## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Zikar Holdings LLC, Jameel Ahmed, and Faraaz Mohammed,<br><br>   Plaintiffs,<br><br>v.<br><br>Michael Ruhland, in his individual capacity, Christopher Lyden, in his individual capacity, and City of Lino Lakes, Minnesota,<br><br>   Defendants. | Case No. 24-cv-03721-JMB-SGE<br><br><br>**VERIFIED**<br>**AMENDED COMPLAINT** |

Plaintiffs Zikar Holdings LLC, Jameel Ahmed, and Faraaz Mohammed for their Verified Amended Complaint against Defendants Michael Ruhland, Christopher Lyden, and the City of Lino Lakes, Minnesota, state and allege as follows:

### INTRODUCTION

1.      Councilmembers Michael Ruhland, Christopher Lyden, and other members of Lino Lakes' City Council do not want Muslims in their City. The Council, and its members, have made a series of obviously discriminatory statements and official decisions in furtherance of that unlawful and unconstitutional purpose.

2.      Plaintiffs applied to build a mixed-use residential and commercial development in Lino Lakes on land that is now a sod farm. Their project is in perfect alignment with the City's Comprehensive Plan, which calls for mixed residential and commercial development of this property, in this decade (2020-2030).

3.      When a previous developer proposed a non-conforming, residential-only development on the same property two years ago, the City Council promptly gave it a

greenlight. After that project fell through, Plaintiffs approached the City and applied to develop the same property.

4.    Plaintiffs proposed development is an even better match for the City's objective criteria. Lino Lakes' ordinances expressly mandate that new neighborhoods be built around a central "physical feature unique to that particular neighborhood" such as a "church." *But* Plaintiffs hope to build a masjid (mosque) as part of their development. And many in Lino Lakes, including a majority of the City Council, do not want a neighborhood that would attract Muslims or their place of worship.

5.    Immediately after word of Plaintiffs' plans spread through Lino Lakes, an organized opposition bombarded the City Council with comments. The opposition's leader, Luke Walters, summarized their position at a March 25 City Council meeting:

> If you are choosing to live near your religious building, it goes to say that you're probably on the more fervent side of religious. You're probably a bit more conservative. So when [Plaintiffs] talk about welcoming, I'm sure that would be [Plaintiffs'] intent, but human nature is such that [non-Muslim] people would not want to necessarily buy a home and insert themselves into a community where they feel they're going to have conservative religious [Muslim] neighbors. You start to think about would they be comfortable with certain modes of dress, alcohol, all kinds of lifestyle choices that you take for granted in mixed communities, you would wonder how people would necessarily feel welcome.

6.    Instead of fairly considering the merits of Plaintiffs' application, the City Council adopted a pretextual moratorium ordinance prohibiting essential components of Plaintiffs' development, only in the corner of the City where Plaintiffs planned to build. Plaintiffs' was the only pending land-use application impacted by the moratorium.

7.    During deliberations, a majority of Councilmembers expressly tied their votes to Plaintiffs and their Muslim faith.

8.    Mayor Rob Rafferty echoed Walter's comments, explaining he would be voting for the moratorium because "Lino Lakes is about establishing neighborhoods, not communities. Communities separate themselves. We are about neighborhoods." Of course, Plaintiffs had never suggested they intended or hoped to create a separate community, rather than a Lino Lakes neighborhood.

9.    Defendant Ruhland initially proposed the moratorium for an obviously pretextual reason. After abandoning that false justification for another, Ruhland's speech in favor of the moratorium repeatedly insulted Plaintiffs and the Council on American-Islamic Relations ("**CAIR**"), while weaving an obviously false narrative. Ruhland accused Plaintiffs and CAIR of raising "inaccurate," "unfounded and shameful," "shameful," "lying," and "slander[ous]" concerns about his moratorium. Of course, he ignored his earlier admission that he thought of the moratorium when negative opinions regarding a video about Plaintiffs' development were "going viral" among Lino Lakes' residents.

10.    Before voting, Defendant Lyden suggested his vote for the moratorium was because he disliked the accents of people who supported Plaintiffs, because Plaintiffs or CAIR lacked "character," and because CAIR's website talks "about creating mutual understandings … but they make no mention of the October 7th attack on Israel."

11.    A few weeks later, when Defendant Lyden was copied on an email replete with anti-Muslim slurs—including "Islam's our enemy!" "DON'T BELIEVE THE LYING MUSLIMS" and "Good luck halting the Muslim conquest of Minnesota!"—Lyden

replied from his official Lino Lakes email account, stating that the message was "Maybe the best email I have ever received!"

12.    Plaintiffs thus are unable to move forward with their proposed development because of an obviously discriminatory, unlawful, and unconstitutional moratorium. They have no choice but to come to this Court for redress.

## THE PARTIES

13.    Plaintiff Jameel Ahmed ("**Ahmed**") is an individual resident of Blaine, Minnesota. He is also a Muslim.

14.     Plaintiff Faraaz Mohammed ("**Mohammed**") is an individual resident of Blaine, Minnesota. He is also a Muslim.

15.    Zikar Holdings LLC ("**Zikar**") is a Minnesota Limited Liability Company formed in December 2023 by Ahmed and Mohammed.

16.    Zikar's offices are in Blaine, Minnesota. Ahmed and Mohammed are the member-owners of Zikar.

17.    Defendant City of Lino Lakes ("**Lino Lakes**" or the "**City**") is a Minnesota home rule charter city located in Anoka County, Minnesota.

18.    Defendant Michael Ruhland ("**Ruhland**") is an individual resident of Lino Lakes. While he is a member of Lino Lakes City Council, he is sued as an individual.

19.    Defendant Christoper Lyden ("**Lyden**") is an individual resident of Lino Lakes. While he is a member of Lino Lakes City Council, he is sued as an individual.

## JURISDICTION AND VENUE

20.    This Court has personal jurisdiction over Lino Lakes as a city within the

state of Minnesota.

21.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, as this action arises under (1) the First and Fourteenth Amendments to the United States Constitution; (2) 28 U.S.C. § 1343(a)(3), as it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; (3) 28 U.S.C. § 1343(a)(4), as it seeks to recover damages and secure equitable relief under Acts of Congress, specifically Title VIII of the Civil Rights Act of 1968, a.k.a. the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, (the "**FHA**"), the Religious Land Use and Institutionalized Persons Act ("**RLUIPA**"), 42 U.S.C. § 2000cc, *et seq.*; and (4) 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; under 42 U.S.C. § 1988(b), as it seeks an award of attorneys' fees; under 28 U.S.C. § 2201(a), as it seeks to secure declaratory relief; and under 28 U.S.C. § 2202, as it seeks to secure permanent injunctive relief and damages.

22.     Venue is proper in the United States District Court for the District of Minnesota under 28 U.S.C. § 1391(b), as all or a substantial part of the events giving rise to the claims occurred within the District.

### The Robinson Property, Relevant City Regulations, and Potential Development of the Robinson Property in 2022

23.     The Robinson sod farm property (the "**Robinson Property**") abuts the Western boundary of Lino Lakes in its Northwest quarter and consists of four parcels with Anoka County Property Identification numbers ("**PIDs**") 07-31-22-22-0001, 07-31-22-21-0001, 07-31-22-12-0001, and 07-31-22-13-0001. The location of the Robinson

Property is shown on the map of Lino Lakes attached hereto as Exhibit A.

24.    In November 2020, the City adopted its 2040 Comprehensive Plan (the **"Comprehensive Plan"**). This plan constitutes the primary land use control for the City.

25.    Through the Comprehensive Plan's "Utility Staging Plan," the City planned where future development should occur that would "not negatively impact natural features of the community." The City anticipated and planned for future water supply and wastewater infrastructure needs from this expected development.

26.    The Comprehensive Plan states that "All development must be located within the current 10-year staging area …." The Robinson Property's parcels are within the 2020-2030, 10-year staging area.

27.    The Comprehensive Plan refers to the Robinson Property is part of its "Planning District 2." The Plan provides that one of the Robinson Property's parcels should be developed with an "80/20 percent mix of residential and commercial." The plan guides three of the property's parcels as Low, Medium, and High Density Residential. One parcel is guided "Planned Residential/Commercial," a district that includes both "high density development" and "neighborhood scale retail, service and office uses."

28.    The Comprehensive Plan's notes regarding Planning District 2 state that a "Master Plan for the Main Street Corridor between Sunset Avenue and 4th Avenue should be completed," but does not require a master plan for development to occur, nor does it prescribe the scope or contents of any "master plan."

29.    The Comprehensive Plan identifies "implementation strategies" which are "major initiatives … that represent a new direction or require significant efforts" by the

City. The plan provides a schedule showing whether a strategy would be implemented in the "short" term—meaning scheduled for the plan's first five years (2021-2025)—or in the "medium" term—meaning scheduled for the next five years (2026-2030). The plan states that "timing and priority of these strategies should be regularly reevaluated as part of the City's annual goal setting and work planning process."

30.     The plan explains that medium-term actions are "needed to serve the 2040 MUSA." This "Metropolitan Urban Service Area" includes areas of the City where public utilities are available and where they are planned. Attached as <u>Exhibit B</u> is a Metropolitan Council map showing the 2020, 2030, and 2040 MUSA in Lino Lakes.

31.     Three of the Robinson Property's four parcels are within the 2020 MUSA area and one of its parcels is within the 2030 MUSA area.

32.     The Comprehensive Plan provides that completion of "master plans as noted in the individual planning districts" is one of its "medium"-term actions scheduled for the 2026-2030 and which are "needed to serve the 2040 MUSA."

33.     Under Minnesota's Metropolitan Land Planning Act ("**MLPA**"), Lino Lakes Comprehensive Plan constitutes the primary land use control for the City and supersedes all other municipal regulations that conflict with the plan.

34.     The City's zoning ordinance is set forth at Lino Lakes, Minn. Code §§ 1007.00-1007.151 (hereinafter, the "**Zoning Ordinance**").

35.     The Robinson Property's parcels are zoned Rural. The MLPA requires the property's zoning to be consistent with the Comprehensive Plan's guidance.

36.    The Comprehensive Plan's goals and policies include to "Increase commercial/residential development in appropriate and designated areas" and to "promote the use of Planned Unit Developments (PUD) as the city's preferred development process."

37.    The Zoning Ordinance requires PUDs with residential units to meet "Neighborhood performance standards." These standards seek to "provide an identity and create a cohesive development pattern" by mandating that housing be oriented "toward an identifiable feature which they have in common." The ordinance states that one way to meet this standard is to arrange structures to "take visual advantage of a … church … or other physical feature unique to that particular neighborhood."

38.    In December 2021, Integrate Properties, LLC ("**IPL**") submitted a PUD Concept Plan application to the City, proposed development of the Robinson Property.

39.    IPL's Concept Plan proposed construction of 707 housing units on the Robinson Property, including: 263 single family homes (of various lot sizes), 164 townhomes; and 280 apartments in 14, 20-unit buildings.

40.    IPL's PUD Concept Plan did not include any neighborhood scale retail, service, office, or commercial uses, nor did the plan include construction of a masjid.

41.    When the City's Planning & Zoning Board (the "**Planning Board**"), City Council, and other City officials reviewed IPL's PUD Concept Plan application, they did not consider religion or the religious beliefs of the development's future residents.

42.    The City Council and Planning Board reviewed IPL's PUD Concept Plan promptly, consistent with the requirements of Minnesota Statutes and City ordinances.

43.     The Planning Board reviewed IPL's PUD Concept Plan on January 12, 2022. The meeting's staff memo specifically asked the Board, "Should a Master Plan for the Main Street Corridor between Sunset Avenue and 4th Avenue be required?"

44.     Minutes of the January 12, Board meeting note member comments, including that "the concept plan does not include any amenities for the City to use," "would like to see more trails" and "would like the applicant to incorporate a park component," among others. A member of the Board suggested that the City should pursue master planning of the City's "gateway" areas. The Board voted to discuss master planning at its next meeting on February 9.

45.     The City Council reviewed IPL's PUD Concept Plan application on February 7, just 56 days after it was submitted to the City on December 13. As with the Planning Board, staff asked for "feedback from the City Council" regarding IPL's PUD Concept Plan, and whether "a Master Plan for the Main Street Corridor between Sunset Avenue and 4th Avenue be required?"

46.     Councilmembers' comments included, "if the commercial element isn't included in a south of Main Street project, it would have to be included when the area north of Main is developed," "prefer to see the commercial included because there's no guarantee the north will develop," and "wonders if creativity is necessary," among others.

47.     Councilmembers did not discuss a Master Plan at the meeting, nor did they suggest a Master Plan must be completed before IPL developed the Robinson Property.

48.     The Planning Board discussed gateway design standards and master plans on February 9. The Board discussed which areas of the City to prioritize for master plan-

ning studies and made comments that master plans should not be "excessively detailed." Ultimately, the Board voted unanimously to recommend master planning studies for three "gateway" areas of the City: Main Street from 21st Avenue to 24th Avenue, Main Street and Lake Drive, and Main Street and Sunset Avenue.

49.    On May 2, 2022, the City Council considered the Planning Board's February 9 recommendation. A staff memo noted that each of six areas of the City where "gateway" planning was contemplated was "under some level of development planning or interest," including IPL's proposed development of Robinson Farms. Staff noted gateway studies could be funded by "Approximately $34,000" budgeted for "code updates, small area plans, and other consultant services." The Council directed "staff to keep looking so that a plan can be identified for the future."

50.    On September 12, 2022, the City Council accepted staff's recommendation and approved a contract with WSB and Associates to develop design guidelines for the six gateway areas identified by staff. A staff memo again noted that IPL's planned development of Robinson Farms and three other proposed or planned development projects.

51.    On October 10, 2022, the City Council considered and adopted Resolution No. 22-125 finding that an Environmental Assessment Worksheet ("**EAW**") prepared by the City as the Responsible Government Unit ("**RGU**") related to IPL's proposed development of the Robinson Property. The resolution found that the EAW demonstrated that IPL's proposed "project does not have the potential for significant environmental effects" and concluded that an Environmental Impact Statement ("**EIS**") was not needed or required for IPL's proposed development to move forward.

52.     During the City meetings in 2022 that considered IPL's proposed development of the Robinson Property or potential master planning, neither the City Council, nor the Planning Board, nor any City official suggested the City should adopt an interim ordinance or moratorium. Nor did any City Official suggest that the City must complete the master plan noted in the Comprehensive Plan regarding Planning District 2 before development could occur.

53.     IPL did not move forward with its proposed development of the Robinson Property and the property became available to other prospective purchasers.

54.     Consistent with the Comprehensive Plan's schedule, the City did not plan to complete the master plan noted in Planning District 2 before April 2024, nor was funding for such master plan included in the City's 2021, 2022, 2023, or 2024 budgets.

## ZIKAR'S RELIGIOUS MISSION AND THE MADINAH LAKES DEVELOPMENT

55.     Ahmed and Mohammed worship at the Blaine Masjid, 12175 Aberdeen Stret NE, Blaine, MN 55449.

56.     The Blaine Masjid has insufficient capacity for worshippers and its services are regularly crowded.

57.     Other masjids in Minnesota have two or three services on Fridays. The Blaine Masjid has four Friday services.

58.     The Blaine Masjid has insufficient space for parking. The City of Blaine has raised concerns regarding parking for the Masjid.

59.     Ahmed and Mohammed believe that Muslims should be able to walk to

worship at their masjid. Islamic Hadiths teach that Muslims should walk to their masjid and that they receive spiritual blessings for doing so.

60.    Ahmed and Mohammed were aware of a new housing development that was constructed adjacent to a masjid. The housing development allowed worshipers to live near and walk to the masjid. Living nearby also helped to build a sense of community among worshippers.

61.    Ahmed and Mohammed recognized the benefits of this development concept and the potential for their own religious community. They realized they could practice their faith and serve their religious community by pursuing a similar project.

62.    In 2023, Ahmed and Mohammed began looking for a property to purchase for a development that would include both a masjid and housing where worshipers and others could live.

63.    Because one of their goals was to help eliminate the overcrowding and provide a better facility for worshipers at the Blaine masjid, Ahmed and Mohammed began looking for property that they could purchase in and around the City of Blaine.

64.    Ahmed and Mohammed became aware that the Robinson Property might be available because IPL's proposed development had not been built.

65.    In December 2023, Ahmed and Mohammed formed Zikar Holdings LLC, as a Minnesota limited liability company.

66.    "Zikar" is an anglicized form of the Urdu word "zikr," which means "remembering," "commemoration," or "to mention." Muslims use the word to describe a

form of Islamic worship, Ahmed and Mohammed chose the name because their company is both a business and a means to exercise their faith.

67.    Ahmed and Mohammed began to plan the development that came to be known as "Madinah Lakes." They chose this name because "Madinah" is a reference to the city in Saudi Arabia, which is one of the most sacred cities to Muslims. This part of the name is a reference to the masjid, the Muslim component of the proposed development. "Lakes" is a reference to Minnesota and Lino Lakes, and the fact that Zikar's planned development is open to all Minnesotans.

68.    While Ahmed, Mohammed, and Zikar hoped to build a masjid as part of the Madinah Lakes development to benefit Muslims and practice their faith, they are not qualified and do not intend to operate the masjid.

69.    Plaintiffs plan and have always planned that Madinah Lakes would be open to anyone, regardless of religion or any other characteristic protected by law.

70.    The Blaine Masjid and others in Minnesota are operated by the Muslim American Society of Minnesota ("**MAS-MN**").

71.    Ahmed and Mohammed discussed Zikar's proposed Madinah Lakes development with MAS-MN. MAS-MN was excited about the potential for a new masjid.

72.    Zikar and MAS-MN agreed that if the Madinah Lakes development was completed, Zikar would construct the masjid at Plaintiffs' expense and that Zikar would lease the masjid and property to MAS-MN for $1. MAS-MN agreed to help promote the Madinah Lakes project to potential residents.

73.     If Madinah Lakes is built, Ahmed and Mohammed intend to live in the development and they intend to worship at the masjid built there.

74.     In March 2024, Zikar agreed to buy the Robinson Property from its owners, contingent on obtaining any necessary City or other government approvals for Zikar's proposed development among other potential contingencies. The parties executed a written purchase agreement in April 2024 memorializing their agreed terms.

75.     As it planned for the potential Madinah Lakes development, Zikar engaged architectural, engineering, and other necessary and helpful consultants.

76.     On March 7, 2024, Ahmed, Mohammed, and Zikar's consultants met with Lino Lakes City Planner Katie Larsen and Community Development Director, Michael Grochala at Lino Lakes City offices. They discussed Zikar's planned PUD Concept Plan application for the Madinah Lakes development.

77.     In this meeting, Planner Larsen and Director Grochala provided suggestions regarding Zikar's planned PUD Concept Plan application. Neither Larsen nor Grochala raised any significant concerns and, instead, provided helpful comments.

78.     On March 17, Zikar posted a video on its website via YouTube regarding the potential Madinah Lakes development. The video was intended to generate interest in the project among prospective residents.

## DISCRIMINATORY OPPOSITION TO MADINAH LAKES AND COUNCILMEMBERS DISCRIMINATORY RESPONSE

79.     Zikar did not believe the Madinah Lakes video would be controversial. However, as the video and the news about a masjid potentially being built in Lino Lakes

quickly spread among Lino Lakes residents, many expressed negative views about a potential masjid being built in Lino Lakes and about Muslims, generally.

80.    Lino Lakes resident Luke Walter quickly became a vocal opponent of Madinah Lakes and the planned masjid. Walter organized opposition, including creating a group and private Facebook page titled "LoveLinoLakes," to oppose Madinah Lakes.

81.    By March 18, City staff and City Council members were inundated with phone calls and emails from opponents of Madinah Lakes.

82.    Local officials joined in this negativity, including Anoka County Commissioner Jeff Reinert who sent a series of text messages to a Lino Lakes resident on March 18 and 19 attempting to gather information about Madinah Lakes. These texts ended with the following sent by Reinert in which he commented on the likelihood the City would approve Madinah Lakes and suggested the resident should purchase guns:



83.    Commissioner Reinert is the most recent former Mayor of Lino Lakes and a political ally of current Mayor Rafferty and Defendants Ruhland and Lyden. Exhibit C is a compilation of campaign information and pictures posted by or about these officials.

84.    In 2010, when Commissioner Reinert was Mayor of Lino Lakes, Reinert and then-Councilmember Rafferty voted to adopt Ordinance 10-68. This ordinance declared English to be the City's official language and prohibited translation of "any documents or publications" using City funding.

85.    In March 2024, when information about Zikar's proposed Madinah Lakes development spread in the Lino Lakes community, many of those who contacted the City and City Councilmembers communicated negative and hateful messages regarding Muslims, generally, and about the potential that Muslims might move to Madinah Lakes.

86.    On March 19, members of Lino Lakes City Council met with Pulte Homes and toured a development in another city in response to Pulte's invitation. During this tour, Councilmembers discussed Zikar's video and negative comments about Madinah Lakes by non-Muslim Lino Lakes residents.

87.    Pulte had expressed general interest in developing a 55+ senior community just north of the Robinson Property in Lino Lakes. However, Pulte had not, and has not, submitted any application nor has Pulte acquired land for its potential project.

88.    On March 20, Mohammed received a cryptic email from City Planner Larsen asking him to call. When they spoke, Larsen explained that there was an uproar in the Community about Zikar's video. Larsen suggests that Mohammed should attend the March 25 City Council Meeting to address the uproar during the public comment period.

89. On this call, Larsen also confirmed that Zikar, its consultant, and City Staff would be meeting on March 22 about Zikar's planned application.

90. On March 22, Ahmed, Mohammed, and Zikar's consultant met again with Planner Larsen and Director Grochala to discuss Madinah Lakes PUD Concept Plan application. At this meeting, City staff reiterated Larsen's earlier suggestion that Zikar discuss the Madinah Lakes development at the Council meeting on March 25 due to negativity spreading in the community.

91. On March 25 at or about 12:25 PM, Defendant Ruhland completed an online form to schedule a new agenda item for the City Council's April 1 Work Session regarding "a moratorium on residential development …." He marked the item's "Urgency Level" as "High" and explained that he was proposing a moratorium because he was concerned about Lino Lake's water infrastructure and a lawsuit involving White Bear Lake, Minnesota. A copy of Defendant Ruhland's submission is attached as Exhibit D.

92. Defendant Ruhland submitted the proposed moratorium agenda item shortly after hearing about the potential Madinah Lakes development.

93. Before Defendant Ruhland scheduled the agenda item, the City had not considered a moratorium on residential development.

94. Defendant Ruhland's explanation for why he proposed a moratorium did not reference a master plan or creating a master plan.

95. Defendant Ruhland's explanation for why he proposed a moratorium was false and pretextual. His moratorium proposal was designed to target Madinah Lakes.

96.    Defendant Ruhland proposed that the moratorium on residential development because he did not want Muslims to move to the Madinah Lakes development if approved and/or because he believed members of the Lino Lakes community did not want a Muslims to move to the Madinah Lakes development if approved.

97.    Defendant Ruhland proposed that the moratorium on residential development in response to negative, anti-Muslim opinions they heard from Lino Lakes residents regarding Madinah Lakes and particularly the masjid it proposed.

98.    Upon information and belief, when he first proposed a moratorium on residential development, Defendant Ruhland was already working with Luke Walter or other opponents of the Madinah Lakes development.

99.    Defendant Ruhland proposed a moratorium intending to stop the Madinah Lakes development because of his own discriminatory animus, and because of the discriminatory animus of members of the public, toward Muslims generally and toward Ahmed and Mohammed's Muslim faith, in particular.

100.   Contrary to Ruhland's message adding the moratorium proposal to the Council's April 1 work session's agenda, the City's Comprehensive Plan expected that the City had less than expected development between 2010-2020. The City estimated and had planned for infrastructure (including water) capable of serving at least 1,400 acres of new development and 3,800 new residents between 2020 and 2030.

101.   In March 2024 and afterward, the City was and is aware that it would have enough drinking water capacity to accommodate the City's present water usage plus any additional water usage from future residents of Madinah Lakes.

102.   In May and June 2024, the City approved construction of a new water treatment facility and installation of a new drinking water well to augment and increase existing drinking water capacity. (City Resolutions 24-48, 24-84.) Councilmembers were aware of these planned improvements on or before April 1, 2024.

103.   Defendant Ruhland knew his concerns regarding water and water infrastructure concern, used as the basis for advocating for a moratorium ordinance, was pretextual and based on his or the public's discriminatory animus.

104.   Dozens of Madinah Lakes opponents attended the City Council meeting the evening of March 25 to which Mohammed had been invited. Mohammed spoke, attempting to dispel false information that was circulating. He explained that if the Madinah Lakes development were approved, it would be inclusive and open to everyone.

105.   Leaders of the organized opposition to Madinah Lakes spoke next, including Randy Reneker and Luke Walter. Walter informed Councilmembers that he believed Madinah Lakes would result in segregation if a masjid were built in a residential neighborhood, stating:

> If you are choosing to live near your religious building, it goes to say that you're probably on the more fervent side of religious. You're probably a bit more conservative. So when [Plaintiffs] talk about welcoming, I'm sure that would be [Plaintiffs'] intent, but human nature is such that [non-Muslim] people would not want to necessarily buy a home and insert themselves into a community where they feel they're going to have conservative religious [Muslim] neighbors. You start to think about would they be comfortable with certain modes of dress, alcohol, all kinds of lifestyle choices that you take for granted in mixed communities, you would wonder how people would necessarily feel welcome. And I

think what's naturally going to happen is people would choose not to live there.

So that would concern me that it's almost this segregation, not by intent, but through choice. And when you think about a development of 158 acres, 450 homes, possibly four family units per home, that's 1,800 people living a certain way of life, a community within a community. And history has taught us over and over again, that sort of division is harmful to a society.

***

I'm not here to rally against any race, religion or otherwise, but it's a deep concern. The optics of that outside the movement is, well, a divided city, that sort of thing. And we don't want those sorts of headlines, and we do believe that ultimately it will be that sort of a situation where a single group of people will be in a block together. And I just think it's bad for everyone.

When Walter finished, the large group of Madinah Lakes opponents erupted in applause.

106.    Later in the evening on March 25, Mayor Rafferty called Mohammed. Mohammed and Rafferty spoke by telephone on March 26. Rafferty stated that he and other Councilmembers had been bombarded with phone calls from residents opposing Madinah Lakes. Rafferty asked Zikar to take down the Madinah Lakes video from its website.

107.    Zikar complied with Mayor Rafferty's request and took down its video.

108.    On March 27, Defendant Ruhland scheduled a second agenda item for the City Council's April 1 Work Session. Ruhland again attempted to target Zikar by proposing that the City expand the neighboring property owners who are notified about development applications.

109.    At the City Council's April 1 work session, Defendant Ruhland introduced his development moratorium. In his oral comments, he did not mention a master plan or

master planning. Rather, Ruhland's comments and purported reason for proposing a moratorium solely focused on issues related to water and water infrastructure.

110.    The minutes of the City Council's April 1 work session state: "Councilmember Ruhland …. highlighted that he believes instituting a moratorium on residential development specific to the northwest quadrant of the City to be in the best interest of the City due to water capacity issues."

111.    The idea of connecting a moratorium to a "master plan" was first mentioned by Director Grochala, not any Councilmember.

112.    At the April 1 work session, Grochala mentioned that "the comprehensive plan does notify, recommend, out in that area that potentially a corridor study, a master plan be done for that Main Street corridor between Sunset and 4th Avenue," but he added "[w]e've typically relied on those developers to kind of bring that in."

113.    Director Grochala also stated, "All of this kind of needs to, I think, run through the city attorney and I want him to be able to respond to some of the implications of this. Doing a moratorium is not a small undertaking and it has an impact on a lot of people, a lot of businesses."

114.    On April 17, Zikar submitted its PUD Concept Plan application related to the Madinah Lakes development that it had discussed with City staff in March.

115.    On April 25, City staff notified Zikar that its application was complete and scheduled for review by the Planning Board on June 24 and the City Council on July 1.

116.    The City's "Completeness" determination triggered the requirements of Minn. Stat. § 15.99 that the City to approve or deny Zikar's application within 60 days, or

within 120 days if the City extended the deadline.

117.    Unlike its review of IPL's PUD Concept Plan application, the City chose to extend its deadline for reviewing Zikar's PUD Concept Plan application. After this extension, the City Council was required to approve or deny Zikar's application within 120 days, by August 23, 2024, or the application would be deemed automatically approved.

118.    The City Council considered Defendant Ruhland's proposed moratorium at its April 29 work session. Councilmembers' comments again focused on water infrastructure and water capacity. Director Grochala again brought up the reference to a "Master Plan for the Main Street Corridor between Sunset Avenue and 4th Avenue" that was suggested in the Comprehensive Plan.

119.    On May 29, the City's Environmental Board reviewed Zikar's PUD Concept Plan. A Board member suggested that Zikar should be required to participate in an Alternative Urban Area Wide Review ("**AUAR**"). An AUAR is a more complex environmental review than an EAW-EIS, which the City had already determined was not required for IPL's proposed development of the Robinson Property in 2022.

120.    On June 5, the City's Park Board reviewed Zikar's PUD Concept Plan. Walter attended the meeting to continue his attacks on Zikar and Mohammed and to demand that a Park Board member recuse himself because the member made a public comment supportive of Madinah Lakes. Other attendees continued making bigoted, anti-Muslim comments in this meeting.

121.    At the June 10 City Council meeting, there were no agenda items related to Madinah Lakes or the proposed moratorium ordinance. Nonetheless, Madinah Lakes op-

ponents appeared and spoke against the project and continued to disparage Mohammed.

Among other comments, Walter alleged:

> It doesn't sound like the plan is to be part of our existing
> community or even include anyone who doesn't look like,
> talk like, and share beliefs. This reinforces our stated con-
> cerns that the Madinah Lakes City USA intends to be separate
> and segregated from people who look like me and people in
> the community that don't look and talk like the target demo-
> graphic.

122.    On June 12, the Planning Board considered Madinah Lakes PUD Concept

Plan application. The Board Chair's comments appeared to hint to the gathered opposi-

tion that Madinah Lakes would not be approved by the City. He stated, in part:

> This is a concept plan review. So what we're doing is review-
> ing a concept and providing input to the developer and to staff
> that if this was to move forward, these were some of the
> things we would like to see or not like to see in this project,
> and that nothing that's said prior to any final decision, noth-
> ing that's said here is binding, and both either on the develop-
> er or on the city, and that does not imply or suggest that any
> decision has been made on anything. These are just providing
> feedback. Okay. I just want to be, you know, once again,
> very, very clear about that. All right. All right.

123.    On June 17, the Planning Board held a hearing on Defendant Ruhland's

proposed moratorium ordinance. The Board voted to recommend that the Council adopt

the moratorium ordinance and require an AUAR.

124.    The draft moratorium ordinance approved by the Planning Board on June

17 did not cite concerns regarding water and water infrastructure that had been Defendant

Ruhland's original pretextual reason for the moratorium. Instead, the City had replaced

those reasons for to new proposed "findings" citing the master plan that was referenced in

the City's Comprehensive Plan—an issue raised by City staff—as the reasons why a moratorium was in the public interest.

125.    The June 17 draft ordinance did not state that a master plan was the reason why a moratorium was proposed or why it was approved by the Planning Board.

126.    On June 24, the City Council considered the first reading of Defendant Ruhland's proposed moratorium ordinance, Ordinance 11-24 (the "**Moratorium**").

127.    City Council materials for the June 24 meeting included a written statement by Defendant Ruhland falsely disparaging Zikar and the Minnesota chapter of the Council on American-Islamic Relations ("**CAIR-MN**").

128.    CAIR-MN had raised concerns regarding the City's actions seeking to stop Madinah Lakes and anti-Muslim rhetoric by members of the community with apparent support from members of the City Council.

129.    At the June 24 Council meeting, Zikar provided copies of 82 pages of hateful, anti-Muslim online comments posted by members of LoveLinoLakes and other opponents of Madinah Lakes. These materials demonstrated anti-Muslim bigotry among opponents of the development in the community. These pages were made part of the record for the City Council's meeting.

130.    During the Council's June 24 discussion regarding the proposed Moratorium, a Councilmember asked City Attorney Jay Squires: "Question for Mr. Squires, is a moratorium required for master planning?" Squires responded:

> No, it's not required. That's the council's determination as to whether it makes sense to impose a moratorium or a pause while you get the master plan in place before pieces might

24

come in that may ultimately be not consistent with what your
master plan might lead you to. So it's not required.

131.    When Defendant Ruhland spoke, he seemed to attempt to grandstand for
the crowd gathered to oppose Madinah Lakes as he read his prepared statement. Ruhland
echoed claims made by members of the LoveLinoLakes group and claimed that the Mor-
atorium was "not and never has been an attempt to block any development in our city.
Instead, it's a strategic pause to ensure that we plan responsibly and thoughtfully for the
future growth of our community." Ruhland went on to insult Zikar, Mohammed, and
CAIR-MN. He also candidly admitted that he first thought of the Moratorium when Zik-
ar's Madinah Lakes "video was going viral" online among Lino Lakes residents.

132.    Defendant Ruhland's comments at the meeting came shortly after hearing
Zikar explain about hateful anti-Muslim comments by members of the community. None-
theless, Defendant Ruhland ended his comments with:

> I want to give a special thank you to all the citizens of Lino
> Lakes that have been taking time out of their day to organize
> and have your voices heard. Countless emails, phone calls,
> stopping me to talk in the community, etcetera. I feel a lot of
> you are just like me in why I decided to get involved in City
> Council. I care what my city has to offer and how it is shaped
> for years to come.
>
> It has become incredibly clear that many of you share my lev-
> el of passion for that, which has been overwhelmingly great
> to see. I want to thank you for your continued commitment to
> our community. Let us move forward with a spirit of collabo-
> ration and mutual respect. Thank you.

133.    On July 1, the City Council was scheduled to consider Zikar's PUD Con-
cept Plan. The Moratorium had not yet been adopted and was still scheduled for a second

reading at the City's next Council meeting, so the City's consideration of the Moratorium should have had no effect on Council's consideration of Zikar's PUD Concept Plan.

134.   Even if the Moratorium had been adopted, Minn. Stat. § 462.355, subd. 4(d) provides that an interim moratorium ordinance may not "extend the time deadline for [a city's] action set forth in section 15.99 with respect to any application filed prior to the effective date of the interim ordinance."

135.   On July 1, the City Council debated whether to consider the Zikar's PUD Concept Plan application or to table the application. Defendant Ruhland informed the Council that he has attended other City meetings regarding Zikar's Concept Plan application and even if the Council considered the plan at the July 1 work session, he refused to comment on the plan. The Council voted to table consideration of Zikar's Concept Plan until August 19, 2024, after the Council's final vote on the Moratorium and if the Moratorium was approved, then the Council would not consider the Zikar's Concept Plan.

136.   During the Council's discussion on July 1, Defendant Lyden indicated that he believes that the City Council should not consider Zikar's application because the Council would likely amend the City's Comprehensive Plan and Zoning Ordinance as a result of the Moratorium. He implied that the Council would change these regulations in ways that would make it more difficult for Madinah Lakes to be approved.

137.   On July 8, the City Council adopted the Moratorium. Despite asserting that the Moratorium was not related to Zikar or Muslims, when Councilmembers discussed the Moratorium, their comments focused on, attacked, and insulted Zikar, Mohammed, CAIR-MN, Muslims, and immigrants, including:

A. Mayor Rafferty, who suggested that Madinah Lakes or Muslims intended to be a separate community and not a genuine Lino Lakes neighborhood. He explained, "Lino Lakes is about establishing neighborhoods, not communities. Communities separate themselves. We are about neighborhoods...." Plaintiffs had never suggested they intended or hoped that Madinah Lakes would be a separate community, rather than a Lino Lakes neighborhood.

B. Defendant Lyden repeatedly attacked Muslims, CAIR-MN, non-native English speakers, among others. His comments included:

> First, our city name is not pronounced Lean-o Lakes. It's Line-o Lakes and it's been that way for a long time. Second thing, everyone, and I mean everyone, needs to know, including CAIR Minnesota and their attorneys, that no amount of tactics, intimidation, bullying will taunt or taint the legitimacy of our work. Okay.

> Third thing, my personal social lens. Everyone has a personal social lens that they look through, that they interpret the world, that they make judgments. Your personal social lens.

> Quite simply, and I'll be transparent here, Martin Luther King best sums up my social lens in one quote. This quote, "I have a dream that my four little children will one day live in a nation where they will not be judged by the color of their skin, but by the content of their character."

> Character, character, character is what matters in life. I don't care about your race or the color of your skin. I don't care about your religion, your sexual preference, or your political party.... I appreciate those who have high standards, high morals, high ethics. Those who express the virtues of honesty, compassion, who know how to put other people first.

> Fourth thing, I don't know why or how CAIR got involved right away, but they sent us that cute little form letter, you know, threatening us. So I go to their website, I look at what they're about. They're about talking about improving their

image, about creating mutual understandings, that they want to promote justice, they talk about religious discrimination, they talk about hate crimes, talk about religious freedom, but they make no mention of the October 7th attack on Israel. It's important that you take responsibility and accountability in life. If you're worried about your image, CAIR maybe needs to take a hard look in the mirror. Let me be very clear, I don't have an Islamic-phobic problem. You, chair does. No one comes into this council chambers, defecates, and then has the audacity to blame the smell on others. That is not character. That is gas lightning.

Because I don't agree with you does not make me Islamic-phobic. I don't need an apology. The people of Lino Lakes do or deserve it.

As I previously stated, I support the moratorium, but also support the wide parameters it may entail, including comp plan amendments and rezoning. Nothing is off the table.

C. Finally, Defendant Ruhland read comments from a computer for more than 13 minutes in a mocking and sarcastic manner. While Ruhland denied that the moratorium related to Zikar or Islam, his speech consulted of a series of attacks, mischaracterizations and insults against CAIR-MN, Mohammed, and Zikar. Ruhland weaved an obviously false narrative and accused Plaintiffs and CAIR-MN of raising "inaccurate," "unfounded and shameful," "shameful," "lying," and "slander[ous]" concerns about the moratorium.

138.    Many of these anti-Muslim and anti-immigrant comments are memorialized in the minutes of the Council's July 8 meeting, a copy of which is attached as Exhibit E.

139.    Defendant Ruhland moved to approve the Moratorium, Defendant Lyden seconded the motion, and the ordinance was adopted by a vote of 4-1. In addition to Ruhland and Lyden, Mayor Rafferty, and Councilmember Dale Stoesz voted in favor. A copy

of the Moratorium (Ordinance 11-24) is attached hereto as <u>Exhibit F</u>.

140.    Defendant Ruhland's explanation for why he proposed the Moratorium was false. In fact, he intended to target Plaintiffs and Madinah Lakes.

141.    Defendant Ruhland proposed the Moratorium because he believed Muslims would move to the Madinah Lakes development if it was approved and/or because he believed members of the Lino Lakes community did not want Muslims to move to the Madinah Lakes development.

142.    Defendants Ruhland and Lyden, and other Councilmembers voted for the Moratorium because they believed the ordinance would delay and could prevent Madinah Lakes and, therefore, potentially prevent Muslims from moving to Lino Lakes.

143.    Defendants Ruhland and Lyden, and other Councilmembers voted for the Moratorium because they did not want Muslims to live in Madinah Lakes or because they believed their constituents did not want Muslims to live in Madinah Lakes.

144.    On July 11, Defendant Ruhland and Zikar opposition leaders Walter and Renneker went out to a local restaurant to celebrate passage of the moratorium. Pictures of Defendant Ruhland, Luke Walter, and Randy Renneker dining together on July 11 are attached hereto as <u>Exhibit G</u>.

145.    When Zikar submitted its PUD Concept Plan application, Plaintiffs asked Mayor Rafferty and members of the City Council, including Ruhland and Lyden, to meet with them and learn about the proposed development. Only one Councilmember was willing to do so. Mayor Rafferty, Defendants Ruhland and Lyden, and Councilmember Stoesz—the members who voted for the Moratorium—refused to meet with Plaintiffs.

146.    The Moratorium was unnecessary, even if the City genuinely wanted to prepare a Master Plan for the Main Street Corridor or to have such a plan prepared.

147.    A Master Plan could have been prepared in conjunction or simultaneously with the City's consideration of Zikar's PUD Concept Plan application and subsequent applications related to approval of a PUD for Madinah Lakes.

148.    While the City Council claimed it was intended to slow or stop development in the City, the Moratorium only restricted development on approximately 980 acres out of the City's total of 4,897 undeveloped acres.

149.    The only land use application submitted to the City that the City has refused to consider because of the Moratorium, is Zikar's Madinah Lakes application.

150.    While it is clear Defendants Ruhland and Lyden and other Councilmembers intended to interfere with and prevent Plaintiffs' Madinah Lakes development, even if that had not been their intention, they knew that the Moratorium and the City Council's refusal to consider Plaintiffs PUD Concept Plan application would interfere with and could prevent the Madinah Lakes development from being approved and being built.

151.    When they voted in favor of the Moratorium, Defendants Ruhland and Lyden and other Councilmembers knew that the Madinah Lakes development, as proposed by Plaintiffs, would attract Muslim residents and that a substantial number of the residents who would live in Madinah Lakes would be Muslims.

152.    The portion of the City in which the Moratorium limits residential development, and the location of the Robinson Property, is shown on Exhibit A.

153.    On August 4, the New York Times published a story, authored by reporter

Dan Barry, regarding Madinah Lakes, community opposition, and the City's actions, titled "A Battle Over a Farm, a Mosque and the Moral High Ground."

154.    The same day, an individual calling himself "Sean," sent an email to New York Times reporter Dan Barry, copying Defendant Lyden and CAIR-MN Executive Director Jaylani Hussein, among others. This message consisted of pages of hateful vitriol regarding Islam and Muslims, including "Islam's our enemy!" "DON'T BELIEVE THE LYING MUSLIMS" and "Good luck halting the Muslim conquest of Minnesota!"

155.    On August 6, Defendant Lyden responded to this email from his official, Lino Lakes email address, clyden@linolakes.us. Lyden's message stated, "Might be the best email I have ever received! Thank you Sir!" A copy of the original August 4 email message and Defendant Lyden's reply is attached hereto as Exhibit H.

156.    The City Council did not approve, deny, or comment on Plaintiffs' PUD Concept Plan application by August 23, the deadline under Minn. Stat. § 15.99.

157.    On September 23, Lino Lakes' City Council considered a proposed resolution (No. 24-114) to censure Defendant Lyden for his August 6 email, Exhibit H. The proposed resolution was drafted by City Attorney Squires. The draft stated that Lyden's August 6 email "could be interpreted *by some* as endorsing the views and opinions expressed" (emphasis added) in the August 4 email to which he had replied.

158.    The City Attorney's draft included a false, pretextual reason for the City Council's adoption of the Moratorium on July 8. The resolution alleged that the Moratorium's adoption "was driven by the City's Comprehensive Plan and the potential for two

large-scale developments in the NW Quadrant of the City being undertaken in the absence of a master plan." A copy of Resolution No. 24-114 is attached hereto as <u>Exhibit I</u>.

159.     Responding to the resolution, Defendant Lyden argued that "exposing the hate does not make me the hater." Lyden held up a book labeled "Quran In English" and asked if other Councilmembers had read the Quran. Lyden suggested that if other Councilmembers had read the Quran and researched the information in the August 4 email, they would have also find that the August 4 email was great.

160.     Defendant Ruhland spoke and reacted to Defendant Lyden's comments by discussing the August 4 email message to which Lyden had replied. (Exhibit H.) Ruhland explained that he could not form an opinion about the email because he had not "read the Quran" and he believed "people are entitled to their opinions." Ruhland explained that his *only* concern regarding Defendant Lyden's August 6 email was that Lyden "was handling [*sic*] personal opinions or personal business matters with City resources."

161.     Resolution No. 24-114 was approved by a 3-1 vote. Defendant Ruhland was the only voting member of the Council to vote against the censure of Lyden.

162.     At the same September 23 meeting, the City Council approved $479,075 to pay contractor Kimley-Horn for the Master Plan and AUAR called for by the Moratorium. The City also engaged a Rapp Strategies, a communications firm that advertises specialties in shaping public understanding, managing risk, and reputation management.

163.     The City had not considered the Moratorium's Master Plan as part of the City's annual goal setting and work planning process for 2024 (or ever). Nor had the City budgeted for a Master Plan to be prepared in 2024.

164.    When the Council approved funding for the Moratorium's Master Plan, Staff indicated that the funding for the Master Plan would be taken from City funds designated for the City's Area and Unit Trunk fund, Surface Water Management Fund, MSA Construction fund, Cable TV & Communications fund and Closed Bond fund.

165.    As a result of Defendant Ruhland's, Defendant Lyden's, and the City's actions Plaintiffs cannot apply for City approval of a PUD or other City approvals necessary for the Madinah Lakes Development.

166.    While blocking Madinah Lakes, the City Council has allowed other residential and commercial development projects to move forward.

167.    On October 7, the City Council considered and allowed two PUD Concept Plan to move forward. The developments would add 448 new housing units to the City, including in Planning District 2 where Zikar hoped to develop Madinah Lakes.

168.    The City may act to extend the Moratorium's 12-month period.

169.    During or after the Moratorium's period, the City may adopt changes to the City's Comprehensive Plan or Zoning Ordinance intended to make it more difficult for Plaintiffs to obtain any City approvals necessary for the Madinah Lakes development.

170.    Members of the City Council including Defendants Ruhland and Lyden have considered the possibility of an extension of the Moratorium's period and the possibility of adopting changes to the City's Comprehensive Plan and Zoning Ordinance related to the Moratorium.

171.    Defendant Ruhland's and Defendant Lyden's actions and discrimination violated well-established principles of law under the Free Exercise Clause of the First

Amendment to the U.S. Constitution and under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

172.    All acts set forth herein of Defendants and the City of Lino Lakes' officers, agents, servants, employees, or persons acting at its behest or direction, were done and are continuing to be done under the color and pretense of state law and pursuant to the City's policies, practices and/or customs. Said acts include, without limitation, the enactment, implementation and enforcement of the Moratorium and the Defendants and the City of Lino Lakes' refusal to consider and approve applications necessary for the Madinah Lakes development.

173.    Defendants' and the City of Lino Lakes' actions have caused, and will continue to cause, Plaintiffs to suffer undue and actual hardship and irreparable injury.

174.    Plaintiffs have no adequate remedy at law to correct the continuing deprivations of their rights.

175.    The City's failure to properly train, direct, control and supervise the actions and conduct of Defendants and of other City Officials, agents, servants, employees, or persons acting at its behest or direction, which failure amounted to deliberate indifference, resulted in the violation of Plaintiffs' constitutional and other rights.

176.    The City's deliberate indifference to act to stop or remedy the unlawful actions amounted to endorsement, adoption and ratification of unlawful actions by any individual member of the City Council, City employee, or City agent.

177.    The City failed to repudiate or discipline, and failed to immediately act to remedy, the unlawful and discriminatory actions and unlawful conduct set out herein.

178.    As a direct and proximate result of the City's violations, including its continuing violations, of Plaintiffs' rights, Plaintiffs have in the past and will continue to suffer in the future direct and consequential damages, including but not limited to, the loss of the ability to exercise their constitutional and other rights.

## **CLAIMS FOR RELIEF**

### **COUNT I**
**(By All Plaintiffs Against All Defendants)**
**DISPARATE TREATMENT IN VIOLATION OF THE FAIR HOUSING ACT,**
**TITLE VIII OF THE CIVIL RIGHTS ACT OF 1968, 42 U.S.C. § 3601, *et seq*.**

179.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

180.    The FHA, at 42 U.S.C. § 3604(a), provides that it shall be unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

181.    The FHA, at 42 U.S.C. § 3604(a), provides that it shall be unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

182.    The FHA, at 42 U.S.C. § 3617, provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

183.   Defendants' actions set forth above, including proposing and adopting the Moratorium, refusing to act on or provide comments regarding Plaintiffs' PUD Concept Plan application, and refusing to accept or consider any additional applications for land use approvals regarding the Madinah Lakes development, violated the FHA.

184.   Defendants Ruhland, Lyden, and other members of Lino Lakes City were personally motivated by discriminatory animus against Muslims.

185.   Defendants Ruhland, Lyden, and other members of Lino Lakes City were also motivated to please their constituents or other members of the public who they knew harbored discriminatory animus toward Muslims.

186.   Defendants' unlawful actions have, at a minimum, delayed and increased the cost of the Madinah Lakes development.

187.   Defendants' unlawful actions have jeopardized whether the Madinah Lakes development can be built at all.

188.   Upon information and belief, Defendants intend to take further actions to delay or prevent Plaintiffs from obtaining approval for the Madinah Lakes development.

189.   Defendants' unlawful actions have increased Plaintiffs' costs and may prevent them from building the Madinah Lakes development.

190.   Defendants' unlawful actions have prevented Ahmed and Mohammed from living and worshiping in Madinah Lakes.

191.   Plaintiffs are "aggrieved person" for purposes of the FHA.

192.   Plaintiffs have been injured by Defendants' discrimination.

193.    As a direct result of Defendants' violation of the FHA, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief.

194.    As a direct result of Defendants' violation of the FHA, Plaintiffs have suffered harm and are entitled to recover compensatory, punitive, and nominal damages, as well as attorneys' fees, prejudgment interest, and any other available relief.

**<u>COUNT II</u>**
**(By All Plaintiffs Against All Defendants)**
**DISPARATE IMPACT IN VIOLATION OF THE FAIR HOUSING ACT, TITLE VIII OF THE CIVIL RIGHTS ACT OF 1968, 42 U.S.C. § 3601, *et seq*.**

195.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

196.    The FHA, at 42 U.S.C. § 3604(a), provides that it shall be unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."

197.    The FHA, at 42 U.S.C. § 3617, provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

198.    It is a violation of the FHA, §§ 3604(a) and 3617, to exclude members of a protected class from certain areas because of their religion by acting to prevent the construction of housing that will likely be used by members of that protected class in a place

that presently lacks residents who are members of that protected class or in a way that has a greater adverse impact on the protected group than on others.

199.   In 2022, City Officials evaluated IPL's PUD Concept Plan application. At that time, City Officials and Defendants did not believe that IPL's development would result in a substantial number of new Muslim residents moving to the City. Defendants did not take steps to impede, interfere with, or otherwise make the proposed construction of housing unavailable to IPL.

200.   Defendants proposed and adopted the Moratorium intending to, or at least knowing that, the Moratorium would delay, impede, interfere with, and potentially prevent construction of the Madinah Lakes development that included a masjid and housing that would be used by a substantial number of Muslims.

201.   Defendants refused to act on or provide comments regarding Plaintiffs' PUD Concept Plan application and refused to accept or consider additional applications for land use approvals regarding the Madinah Lakes development. This has delayed, impeded, interfered with, and potentially will prevent construction of the Madinah Lakes development that included a masjid and housing that would be used by a substantial number of Muslims.

202.   Defendants' actions set forth above, including proposing and adopting the Moratorium, refusing to act on or provide comments regarding Plaintiffs' PUD Concept Plan application, and refusing to accept or consider any additional applications for land use approvals regarding the Madinah Lakes development, constitute an unlawful practice which has caused and predictably will cause a disparate impact on Plaintiffs and potential

Muslim residents of the Madinah Lakes development because of their Muslim faith, in violation of the FHA.

203.    Defendants had no justification for their actions and practices.

204.    Defendants engaged in their actions and practices in direct response to Plaintiffs' Madinah Lakes development and because of Plaintiffs' and Madinah Lakes future residents' Muslim faith.

205.    Plaintiffs' PUD Concept Plan application for the Madinah Lakes development was the only land-use application pending when Defendants' actions took place.

206.    As a direct result of Defendants' violation of the FHA, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief.

207.    As a direct result of Defendants' violation of the FHA, Plaintiffs have suffered harm and are entitled to recover compensatory, punitive, and nominal damages, as well as attorneys' fees, prejudgment interest, and any other available relief.

### COUNT III
**(By Plaintiffs Ahmed and Mohammed Against All Defendants)**
**VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

208.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

209.    Defendants' actions, enactments, policies, practices, on their face and as applied to Plaintiffs, violate and violated the Free Exercise Clause of the First Amendment to the Constitution of the United States.

210.    Knowing that Plaintiffs intended to develop the Robinson Property for religious purposes, Defendants engaged in a series of discriminatory actions intended to keep Plaintiffs and other Muslims from living and worshiping on the property without any legitimate or lawful purpose.

211.    Defendants' actions were motivated by their personal, and their constituents, religious animus toward Muslims and the Islamic faith.

212.    Through the Madinah Lakes development, Plaintiffs seek to build a masjid, a place of religious assembly and worship, at which Ahmed and Mohammed seek to worship in furtherance of Ahmed's and Mohammed's sincerely held religious beliefs.

213.    Through the Madinah Lakes development, Plaintiffs seek to build housing, in which Ahmed and Mohammed intend to live, that allows residents to walk to their masjid, an exercise of their sincerely held religious beliefs.

214.    The terms, operation, and effect of the Moratorium are not neutral and are not generally applicable.

215.    The terms and operation of the Moratorium substantially burden Ahmed's and Mohammed's exercise of religion.

216.    Defendants unlawfully adopted the Moratorium and took other official actions for the purpose of targeting and discriminating against Plaintiffs and other Muslims because of their religion.

217.    Defendants' statements regarding, and actions toward, Plaintiffs violated the required neutrality toward religion mandated by the First Amendment. Defendants'

statements and actions showed a clear and impermissible hostility to Muslims and the Islamic faith.

218.    Defendants' discriminatory, disparate, and less favorable treatment of Plaintiffs, Muslims, and the Madinah Lakes development because of it involved a masjid and was likely to attract Muslim residents.

219.    Defendants' enforcement of the City's land use regulations and adoption of its Moratorium is not neutral or of general applicability.

220.    Defendants imposed land use regulations in a manner that treats Plaintiffs' land use application less favorably than applications involving developments that did not involve a masjid and were not likely to attract Muslim residents.

221.    Defendants imposed land use regulations in a manner that treats Plaintiffs' land use application less favorably than applications involving developments that did not involve a masjid and were not likely to attract Muslim residents.

222.    Defendants' actions were not and are not narrowly tailored to any compelling government interest.

223.    Defendants' actions were not and are not rationally related to any legitimate government interest.

224.    As a direct result of Defendants' violations of the U.S. Constitution, as alleged above, Plaintiffs is suffering irreparable harm for which there is no adequate remedy at law.

225.    As a direct result of Defendants' violation of Plaintiffs' First Amendment right to the free exercise of religion, as alleged above, Plaintiffs are suffering irreparable

harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief.

226.    As a direct result of Defendants' violation of Plaintiffs' First Amendment right to the free exercise of religion, as alleged above, Plaintiffs have suffered harm and are entitled to recover compensatory, punitive, and nominal damages, as well as attorneys' fees, prejudgment interest, and any other available relief.

### COUNT IV
**(By Plaintiffs Ahmed and Mohammed Against All Defendants)**
**DENIAL OF PLAINTIFFS' RIGHT TO EQUAL PROTECTION IN**
**VIOLATION OF THE FOURTEENTH AMENDMENT TO**
**THE UNITED STATES CONSTITUTION**

227.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

228.    Defendant Ruhland, Defendant Lyden, and other Councilmembers discriminated against and treated Plaintiffs differently than other similarly situated developers and land use applicants because of their religion and because of their association with a development that would attract Muslim residents and included a masjid at which Muslims would worship.

229.    Defendant Ruhland's, Defendant Lyden's, and other Councilmembers' statements, and actions, and the City's ordinances and regulations, including proposing and adopting the Moratorium, refusing to consider, act on, or provide feedback regarding Plaintiffs PUD Concept Plan, and disrespectfully treatment of Plaintiffs and encouragement of disrespectful treatment of Plaintiffs by others, infringe and infringed upon Plaintiffs' fundamental rights to freedom of religion, freedom of speech, freedom of assembly, among other fundamental rights.

230.   Other non-religious developers and applicants, and applicants and developers of different faiths, who applied to the City were and are similarly situated to Plaintiffs, including without limitation IPL.

231.   Defendant Ruhland, Defendant Lyden, and other Councilmembers intentionally and unlawfully targeted Plaintiffs and treated and are treating them unequally as compared to other similarly situated developers that are not Muslim and that are not associated with a development that would attract Muslim residents and included a masjid at which Muslims would worship.

232.   Religion is an inherently suspect classification.

233.   Defendant Ruhland's, Defendant Lyden's, and other Councilmembers' statements, actions, and regulations, including proposing and adopting the Moratorium, refusing to consider, act on, or provide feedback regarding Plaintiffs PUD Concept Plan, and disrespectfully treatment of Plaintiffs and encouragement of disrespectful treatment of Plaintiffs by others, were and are irrational and unreasonable, impose irrational and unjustifiable restrictions on constitutionally protected speech, assembly, and worship.

234.   Defendant Ruhland's, Defendant Lyden's, and other Councilmembers' statements, actions, and regulations, including proposing and adopting the Moratorium, refusing to consider, act on, or provide feedback regarding Plaintiffs PUD Concept Plan, and disrespectfully treatment of Plaintiffs and encouragement of disrespectful treatment of Plaintiffs by others, serve and served no rational, let alone compelling, substantial, or important, government interest, and are not and were not narrowly tailored or the least restrictive means to serve such interest.

235.    Defendant Ruhland's, Defendant Lyden's, and other Councilmembers' statements, actions, and regulations, including proposing and adopting the Moratorium, refusing to consider, act on, or provide feedback regarding Plaintiffs PUD Concept Plan, and disrespectfully treatment of Plaintiffs and encouragement of disrespectful treatment of Plaintiffs by others, violate the Plaintiffs' Fourteenth Amendment rights to equal protection of the law.

236.    As a direct result of Defendants' violations of Plaintiffs' Fourteenth Amendment rights to equal protection of the law, as alleged above, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief.

237.    As a direct result of Defendants' violations of Plaintiffs' Fourteenth Amendment rights to equal protection of the law, as alleged above, Plaintiffs have suffered harm and are entitled to recover compensatory, punitive, and nominal damages, as well as attorneys' fees, prejudgment interest, and any other available relief.

### COUNT V
**(By Plaintiffs Ahmed and Mohammed Against Defendant City of Lino Lakes)**
**VIOLATION OF RLUIPA: UNLAWFUL SUBSTANTIAL BURDEN**
**42 U.S.C. § 2000cc(a)(1)**

238.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

239.    Congress defined "religious exercise" to broadly include, "[a]ny exercise of religion, whether or not compelled by, or central to, a system of religious belief," and specifies that the "use, building, or conversion of real property for the purpose of reli-

gious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7).

240.    Congress further directed that RLUIPA should be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

241.    Ahmed and Mohammed efforts to obtain approval for, build, live in, worship at, and to provide a place where others live and worship operated by MAS-MN, on the Robinson Property through the Madinah Lakes development is an exercise their Muslim faith and constitutes "religious exercise" as that phrase is defined in 42 U.S.C. §2000cc-5(7).

242.    Section 2(a)(1) of RLUIPA protects Ahmed's and Mohammed's "religious exercise" and provides that "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person … unless the government demonstrates that imposition of the burden on that person, assembly, or institution…is in furtherance of a compelling government interest [and] is the least restrictive means of furthering that compelling government interest." U.S.C. 2000cc(a)(1).

243.    The City's actions, statements, and regulations, through its City Council, allowed the City Council to make "individualized assessments" targeting Plaintiffs and their religious exercise within the meaning of 42 U.S.C. § 2000cc(a)(2)(C).

244.    By refusing to consider and comment on Plaintiffs' PUD Concept Plan related to the Madinah Lakes development, and by adopting the Moratorium targeting and

intending to block the Madinah Lakes development and Ahmed's and Mohammed's religious exercise, the City, through its City Council, has placed a substantial burden on Ahmed's and Mohammed's religious exercise as well as the religious exercise of MAS-MN and of future residents of Madinah Lakes who intend to worship at the masjid.

245.    The burden placed on Ahmed's and Mohammed's religious exercise by the enactment of the moratorium is significant and is far more onerous than a simple inconvenience.

246.    The City's and City Council's actions have, at a minimum, indefinitely delayed have jeopardized the entire Madinah Lakes development.

247.    The City actions and regulations have, in the totality of the circumstances, imposed a substantial burden on Ahmed's and Mohammed's religious exercise.

248.    The City has no compelling interest that could justify the substantial burden it has imposed on Ahmed's and Mohammed's religious exercise.

249.    The Moratorium and the City Council's refusal to consider Plaintiffs PUD Concept Plan application are not the least restrictive means of achieving any compelling government interest that could be asserted by the City.

250.    The City has violated Ahmed's and Mohammed's rights set forth in 42 U.S.C. § 2000cc(a) of RLUIPA.

251.    As a direct result of the City's violation of the Ahmed's and Mohammed's rights under 42 U.S.C. § 2000cc(a) of RLUIPA, as alleged above, Ahmed and Mohammed are suffering irreparable harm for which there is no adequate remedy at law. They are therefore entitled to injunctive relief.

252.   As a direct result of the City's violation of Ahmed's and Mohammed's rights under 42 U.S.C. § 2000cc(a) of RLUIPA, as alleged above, Ahmed and Mohammed have suffered harm and are entitled to recover compensatory, punitive, and nominal damages, as well as attorneys' fees, prejudgment interest, and any other available relief.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and that this Court:

A.   Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declarations shall have the force and effect of final judgment and that the Court retain jurisdiction of this matter for the purpose of enforcing the Court's Orders;

B.   Pursuant to 28 U.S.C. § 2201, declare that City Ordinance 11-24 (the "Moratorium"), on its face and as applied to Plaintiffs and Plaintiffs' proposed Madinah Lakes development, to be in violation of the FHA, the First and Fourteenth Amendments to the United States Constitution, and RLUIPA;

C.   Pursuant to 28 U.S.C. § 2201, declare that Defendants' refusal to consider or comment on Plaintiffs' PUD Concept Plan Application, and other aforementioned unlawful actions of the City, and the City's unlawful policies and practices described above

to be in violation of the FHA, the First and Fourteenth Amendments to the United States Constitution, and RLUIPA;

D.     Pursuant to 28 U.S.C. § 2202, FED. R. CIV. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc-2(a), granting preliminary and permanent injunctive relief enjoining the City and all members of the Lino Lakes City Council from: (i) enforcing the Moratorium, including, without limitation, to impede or further delay Plaintiffs' proposed Madinah Lakes development; (ii) requiring as a condition of any further or additional approval needed for Plaintiffs' proposed Madinah Lakes development any condition or requirement that is not neutral and generally applicable; and (iii) requiring as a condition of any further or additional approval needed for Plaintiffs' proposed Madinah Lakes development any condition or requirement that is discretionary or that was not clearly described in the City's Comprehensive Plan, Zoning Ordinance, or other City ordinance on March 1, 2024.

E.     Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. §2000cc-2(a), award Plaintiffs nominal and compensatory damages, and pre-judgment and post-judgment interest on these awards;

F.     Pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000cc-2(a), FED. R. CIV. P. 54(d), and other applicable law, award Plaintiffs their reasonable attorneys' fees and costs;

G.     Grant such other and further relief as the Court deems equitable, just, and proper.

Dated: October 16, 2024

**CROSSCASTLE PLLC**

 /s/Samuel W. Diehl
Samuel W. Diehl (#0388371)
Christopher R. Johnson (#402005)
14525 Highway 7, Ste. 345
Minnetonka, MN 55345
P (612) 429-8100
F (612) 234-4766
sam.diehl@crosscastle.com
christopher.johnson@crosscastle.com

**MONROE MOXNESS BERG PA**

 /s/Matthew S. Duffy
Matthew S. Duffy (#0391072)
**MONROE MOXNESS BERG PA**
7760 France Avenue South, Suite 700
Minneapolis, MN 55435
Telephone: (952) 885-5999
Facsimile: (952) 885-5969
Email: mduffy@mmblawfirm.com

***Attorneys for Plaintiffs Zikar Holdings LLC,
Jameel Ahmed, and Faraaz Mohammed***

4867-1055-5373, v. 5

## <u>VERIFICATION OF AMENDED COMPLAINT</u>

I, Faraaz Mohammed, verify and declare under penalty of perjury as follows:

I am a member of Plaintiff Zikar Holdings LLC. I am also a Plaintiff in my individual capacity.

The factual allegations in the foregoing Amended Complaint are based on my personal knowledge or on records, statements, and communications of Defendants which I have reviewed and with which I am familiar.

I have reviewed the factual allegations in the foregoing Amended Complaint and such factual allegations are true and correct to the best of my knowledge, information, and belief.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: October 16, 2024                          /s/Faraaz Mohammed
                                                          Faraaz Mohammed

4867-1055-5373, v. 5