## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Zikar Holdings LLC, Jameel Ahmed, and Faraaz Mohammed, | Case No. 24-cv-03721-JMB-SGE |
| Plaintiffs, | |
| v. | **MEMORANDUM OF LAW IN SUPPORTOF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Michael Ruhland, in his individual capacity, Christopher Lyden, in his individual capacity, and City of Lino Lakes, Minnesota, | |
| Defendants. | |

## <u>INTRODUCTION</u>

Defendants Michael Ruhland, Christopher Lyden, and the other members of Lino Lakes' City Council do not want Muslims in their City. The City Council, and its members, have made a series of obviously discriminatory statements and official decisions in furtherance of that unlawful and unconstitutional purpose. Plaintiffs seek injunctive relief to avoid irreparable harm that will result from Defendants' unlawful acts.

Plaintiffs applied to build a mixed-use residential and commercial development in Lino Lakes on land that is now a farm. Their project is in perfect alignment with the City's Comprehensive Plan, which calls for mixed residential and commercial development of this property, in this decade (2020-2030). When a previous developer proposed a non-conforming, residential-only development on the same property two years ago, the City Council promptly gave it a greenlight. After that project fell through, Plaintiffs approached the City and applied

to develop the same property. Plaintiffs proposed development is an even better match for the City's objective criteria. Lino Lakes' ordinances expressly mandate that new neighborhoods be built around a central "physical feature unique to that particular neighborhood" such as a "church." *But* Plaintiffs hope to build a masjid (mosque) as this central feature. And many in Lino Lakes, including a majority of the City Council, do not want a masjid or neighborhood that could attract Muslims to their City.

Instead of fairly considering the merits of Plaintiffs' application, the City Council adopted a pretextual "moratorium" that prohibits essential components of Plaintiffs' development but that affects only the corner of the City where Plaintiffs planned to build. Lino Lakes' City Attorney publicly acknowledged this moratorium was unnecessary. Nonetheless, the moratorium currently prevents Plaintiffs from moving forward with their planned development.

While this moratorium purports to be neutral, Plaintiffs' was the only pending land-use application it affected. And a majority of the City Council expressly tied their votes to negative statements and opinions about Plaintiffs and their Muslim faith. Plaintiffs are likely to succeed on their Free Exercise and Fair Housing Act claims, and all of the other relevant factors demonstrate the need for preliminary injunctive relief. Without it, Plaintiffs will likely lose the ability to pursue their planned development in Lino Lakes. To prevent this irreparable injury, Plaintiffs ask the Court to issue the proposed preliminary injunction field herewith.

## FACTUAL BACKGROUND

### A. Plaintiffs' Motivation and Plan to Develop Property.

Ahmed[1] and Mohammed are Muslims who live and worship in Blaine. (Dkt. 9, Verified Amended Complaint ("Compl.") ¶¶13-14,55.) The Blaine masjid, where they worship, is overcrowded. It has insufficient parking space and is required to have extra services. (*Id.* ¶¶56-58.)

Ahmed and Mohammed believe that Muslims should be able to walk to worship at their masjid, consistent with Islamic teachings. (*Id.* ¶59.) They learned of a development constructed adjacent to a masjid. This allowed worshipers to practice their faith and helped build a sense of community. (*Id.* ¶60.) They recognized the benefits of this development concept and the potential for their own religious community. They realized they could practice their faith and serve their religious community by pursuing a similar project. (*Id.* ¶61.)

In 2023, Ahmed and Mohammed began looking for a property to develop in or around Blaine, to include both a masjid and housing where worshipers and others could live. (*Id.* ¶¶62-63.) They formed Zikar Holdings LLC to pursue this project (*Id.* ¶¶15,65.) "Zikar" is a phrase that refers to a form of Muslim worship. Ahmed and Mohammed chose the name because the company is both a business and a means to exercise their faith. (*Id.* ¶66.)

Plaintiffs named their planned development "Madinah Lakes," combining "Madinah" the name of the holy city in Saudi Arabia—and a reference to its masjid—and "Lakes" referring to Minnesota/Lino Lakes, and the fact the development's residential housing that would be available to all Minnesotans. (*Id.* ¶67.)

---

[1] Unless otherwise noted, individuals are referenced by last name.

3

Plaintiffs eventually focused on the Robinson sod farm (the "Robinson Property"), four parcels in northwest Lino Lakes that had recently been approved for development. (*Id.* ¶23, Ex. A.)

### B. The City Council's Regulation of the Robinson Property and t Response to Non-Muslim Development.

In December 2021, Integrate Properties, LLC ("IPL") submitted a Planned Unit Development ("PUD") Concept Plan application seeking approval to develop the Robinson Property. (*Id.* ¶¶38-39; Ex. J pp. 2-3.[2]) The City Council worked cooperatively with IPL through this process.

The City considered the application, applying the requirements of its Comprehensive Plan and Zoning Ordinance.[3] (Comp.-Plan 1.) IPL's planned development was generally consistent with City requirements. The Comprehensive Plan designates certain areas of the City planned for future development consistent with the City's analysis of its sewer, water, and transportation systems. (Comp.-Plan 3-13; Compl. ¶25.) IPL's plan to develop the property was consistent with the Comprehensive Plan's development schedule. (Comp.-Plan 3-14, Fig. 3-4; Compl. ¶¶26,31, Ex. B.)

One Comprehensive Plan goals is to "[i]ncrease commercial/residential development" in designated areas. (Comp.-Plan 3-4.) These include one of the Robinson Property's four parcels guided "Planned Residential/Commercial." (*Id.* 3-6, Fig. 3-2.) Its remaining parcels are guided residential. (*Id.*) The property's

---

[2] Exhibits A-I were attached to Dkt. 9, Plaintiffs' Verified, Amended Complaint; Exhibits J-BB are attached to the Diehl Declaration, filed herewith.

[3] The Zoning Ordinance, City Code §§1007.000-1007.151, is available at https://codelibrary.amlegal.com/codes/linolakes/latest/overview. The City's current Comprehensive Plan is at https://linolakes.us/184/2040-Comprehensive-Plan.

parcel are currently zoned Rural.[4] Any development requires rezoning consistent with the Comprehensive Plan's guidance. (Compl. ¶¶33,35); Minn. Stat. §473.858, subd. 1.

IPL's PUD Concept Plan proposed 707 housing units, including: 263 single family homes, 164 townhomes, and 280 apartments in 14, 20-unit buildings. (*Id.* ¶¶38-39; Ex. J pp. 2-3.[5]) The plan was inconsistent with the Comprehensive Plan because it had no neighborhood commercial uses. (*Id.* ¶40; Ex. J p. 4.) T

The City's Planning & Zoning Board (the "Planning Board") and City Council promptly reviewed IPL's Concept Plan on January 12, and February 7, 2022, respectively. (Exs. K-L.) Both the Planning Board and the Council made comments regarding IPL's Plan. Neither the Planning Board or Council suggested IPL's development should be delayed or prevented from moving forward. (Exs. K-L.) Before both meetings, City staff's memo posed the same question, "Should a Master Plan for the Main Street Corridor between Sunset Avenue and 4th Avenue be required?"(Exs. J, M.)

This reference to this Master Plan comes from Comprehensive Plan District 2, stating that a "Master Plan for the Main Street Corridor between Sunset Avenue and 4th Avenue should be completed…." (Comp.-Plan 3-24, 3-25, Fig. 3-9.) Neither the Planning Board nor City Council suggested a Master Plan should be completed before IPL's development could move forward d. (Exs. K-L.) This is consistent with the Comprehensive Plan schedule, indicating the referenced mas-

---

[4] https://mn-linolakes.civicplus.com/DocumentCenter/View/168/Zoning-District-Map-August-2023-PDF.

[5] Copies of City meeting minutes and packets are available at: https://miweblink.metro-inet.us/llpublic/welcome.aspx?cr=1

ter plan was a "medium" term action item scheduled for 2026-2030 to serve future development. (Compl. ¶¶29-31; Comp.-Plan 12-2.)

As IPL continue to seek approvals for development, the Planning Board and City Council considered whether the City should complete master plans referenced by the Comprehensive Plan. (Exs. N,EE.) During this process, staff described various Master Plans that might be completed and noted that developers either planned or had expressed interest in developing several areas of the City in addition to the Robinson Property. (Ex. O.) In September 2022, the City Council concluded its consideration of master plans, approving $34,000 to develop design guidelines. The Council did not require any master planning effort related to the Main Street Corridor. (Ex. P.) Earlier om 2022, the Council had approved $39,500 for development of a Master Plan related to roughly 400 acres in the City north of Main street and east of 35E. The Council did not restrict development while the plan was completed. (Ex. Q.)

In October 2022, the City considered a second application from IPL regarding environment. (Ex. R.) The Council reviewed IPL's Environmental Assessment Worksheet ("EAW") and found development of the Robinson Property would "not have the potential for significant environmental effects," so an EIS was unnecessary. (Compl. ¶51.) During the Council and Planning Board's consideration of IPL's proposed development, as well as their review of potential master plans in 2022 no City official or staff suggested that IPL's or any other development should be delayed to complete a master plan. And the City never considered a moratorium to halt development. Ultimately, IPL's development did not come to fruition. (Compl. ¶53.)

## C. The Community's and Council's Discriminatory Opposition to' Madinah Lakes.

In March 2024, Zikar agreed to purchase the Robinson Property and planned Madinah Lakes. Plaintiffs met with City Planner Katie Larsen and Development Director Michael Grochala on March 7 and March 22 to discuss their planned PUD Concept Plan application regarding Madinah Lakes. (Compl. ¶¶74-76, 90.) Larsen and Grochala provided suggestions regarding their application, but neither raised any significant concerns regarding Madinah Lakes or Zikar's application. (*Id.* ¶77.)

On March 17, Zikar posted a video on its website regarding Madinah Lakes. (*Id.* ¶78.) Plaintiffs did not believe the video would be controversial. However, the video and news about Madinah Lakes quickly spread among residents. They began to express negative views about a masjid being built and Muslims moving to Lino Lakes. (*Id.* ¶79; Ex. DD.) By March 18, City staff and City Council members were inundated with phone calls and emails from opponents of Madinah Lakes. (*Id.* ¶81.) Opponents of the project began to express hateful, anti-Muslim messages online and in-person at Council meetings. These messages included:

- "Does anyone know why the women 'allegedly' from Blaine and Circle Pines don't even pronounce Lino Lakes correctly? … Limn O Lakes….. Not Leen O Lakes"

- "There are no benefits to a community when you try to insert a separate community into it!"

- "Everyone around that Muslim city should get pigs."

- "They treat their women like garbage."

- "We don't need a mosc [*sic*]" (Ex. U.)

Anti-Muslim comments did not just spread online. Former-City Mayor and current Anoka County Commissioner Jeff Reinert—a political ally of Mayor Rafferty, Ruhland, and Lyden—sent a series of text messages on March 18 and 19 seeking to prevent the sale of the Robinson Property to Zikar. Reinert's last messages predicted the Council would not approve Madinah Lakes and suggested resident should purchase guns:



(Compl. ¶¶82-83, Ex. C.)[6]

On March 21,[7] City Council and Planning Board members met with Pulte Homes and toured one of its developments in another city. (Compl. ¶86.) Ac-

---

[6] In 2010, when Reinert was Mayor of Lino Lakes, he and then-Councilmember Rafferty voted to adopt City Ordinance 10-68 that declared English to be the City's official language and prohibited translation of City documents. (*Id.* ¶84.)

[7] Ex T. Compl.¶86 erroneously states this tour was March 19. Ex. T is correct.

cording to Ruhland, he first learned of the potential Madinah Lakes during this tour when information regarding Madina Lakes was "going viral." (Ex. S at 1:38-1:39:21.) on March 20, Mohammed received a cryptic email from City Planner Larsen asking him to call. When they spoke, Larsen explained there was an uproar in the Community about Madinah Lakes. She suggested Mohammed should attend the March 25 City Council Meeting to address the community's uproar during public comments. (*Id.* ¶88.) Larsen reiterated this suggestion when Staff met with Plaintiff's again on March 22 to discuss Zikar's application. (*Id.* ¶90.)

As soon as news of Madinah Lakes masjid became known, its opponents began organizing. Walter either was or became an ally of Defendant Ruhland. (Compl. ¶¶98, 144, Ex. G.) Walter quickly became a vocal opponent of Madinah Lakes, organizing opposition and creating an opposition group called "LoveLinoLakes." (*Id.* ¶80.) Walter sought to hide LoveLinoLakes' anti-Muslim bias, explaining to members they should mask their discrimination by "focus[ing their criticism] on infrastructure impacts and the inclusion and the diversity without specifics." (Ex. U p. 76.) Ruhland and Walter apparently began to work together, seeking to stop Madinah Lakes. (Ex. D.)

Just four days after he first learning about Madinah Lakes, and aware of significant community opposition, on March 25 Ruhland submitted a new item for the Council's April 1 Work Session agenda, "a moratorium on residential development…." (Compl. ¶¶90-91, Ex. D.) Ruhland's submission stated that his moratorium proposal arose from "concern[s] about our city's water infrastructure" and "a ton of developers…currently looking to develop probably [*sic*] over 500 acres of land in Lino Lakes for residential development." Ruhland stated

new development might overwhelm the City's infrastructure. (Ex. D.)  HE did not suggest the proposed moratorium related to planning or any master plan. (*Id*.) Before Ruhland proposed it, the City had never considered a moratorium on residential development. (*Id.* ¶93.)

Ruhland's purported concerns regarding infrastructure had no basis in fact. As required by Minnesota law, the City estimated and planned for infrastructure expansion capable of serving at least 1,400 acres of new development, and 3,800 new residents over this decade. (*Id.* ¶100-102; City Resolutions 24-48, 24-84.) Of course, facts were beside the point. Ruhland's moratorium was merely a pretextual tool intended to stop Madinah Lakes.

At the Council meeting that evening dozens of Madinah Lakes opponents packed the City Council's Chambers. Following staff's suggestion, Mohammed spoke and attempted to dispel false information circulating about Madinah Lakes. (Compl. ¶104.) While Plaintiffs met with stiff about Zikar's application, it had not been submitted. Mohammed explained that if the development would be inclusive and open to everyone, regardless of religion. (Compl. ¶104; Ex. V 5:07-9:48.) Undeterred by these facts, opposition leaders, including Walter and Randy Reneker, also spoke at the meeting. Walter's sought to stoke fears regarding Muslims, explaining that if a Muslim wanted to live near a masjid, they would inevitably be "conservative," "fervent," and intolerant of dress, alcohol, all kinds of lifestyle choices   that Madinah Lakes would result in segregation if a masjid was built. He explained

> If you are choosing to live near your religious building, it goes to say that you're probably on the more fervent side of religious. You're probably a bit more conservative. So when [Plaintiffs] talk about

welcoming, I'm sure that would be [Plaintiffs'] intent, but human nature is such that [non-Muslim] people would not want to necessarily buy a home and insert themselves into a community where they feel they're going to have conservative religious [Muslim] neighbors. You start to think about would they be comfortable with certain modes of dress, alcohol, all kinds of lifestyle choices that you take for granted in mixed communities, you would wonder how people would necessarily feel welcome. And I think what's naturally going to happen is people would choose not to live there. So that would concern me that it's almost this segregation, not by intent, but through choice. And when you think about a development of 158 acres, 450 homes, possibly four family units per home, that's 1,800 people living a certain way of life, a community within a community. And history has taught us over and over again, that sort of division is harmful to a society.

(Ex. V 14:20-16:26.) When Walter finished speaking, the large group of Madinah Lakes opponents erupted in applause. (*Id.* ¶105; Ex. V 16:30.)

That evening, Rafferty called Mohammed. When they spoke, Rafferty stated that he and other Councilmembers had been bombarded with phone calls from residents opposing Madinah Lakes. Rafferty asked Zikar to take down its video and Zikar complied. (*Id.* ¶¶106-07.) At the Council's April 1 work session, Ruhland introduced his development moratorium. His comments did not mention a master plan or master planning and he, again, explained he was proposing a moratorium solely because of alleged concerns related to water and water infrastructure. (*Id.* ¶109.) As memorialized in the meeting's minutes: "Councilmember Ruhland …. highlighted that he believes instituting a moratorium on residential development specific to the northwest quadrant of the City to be in the best interest of the City due to water capacity issues." (*Id.* ¶110.)

Recognizing that purported water concerns could not justify a moratorium, Community Development Director Grochala suggested connecting a mora-

torium to a "master plan." He explained that the City's "comprehensive plan does notify, recommend, out in that area that potentially a corridor study, a master plan be done for that Main Street corridor between Sunset and 4th Avenue," but he added "[w]e've typically relied on those developers to kind of bring that in." (*Id.* ¶112.) Grochala also apparently realized that Ruhland's proposal might be illegal, suggesting "All of this kind of needs to, I think, run through the city attorney and I want him to be able to respond to some of the implications of this. Doing a moratorium is not a small undertaking and it has an impact on a lot of people, a lot of businesses." (*Id.* ¶113.)

**D. Zikar's Application and the Council's Discriminatory Moratorium.**

On April 17, Zikar formally submitted its PUD Concept Plan application related to Madinah Lakes that it had discussed with City staff in March. (*Id.* ¶114.) The Application proposed 434 housing units, including single family homes, townhomes, and two apartment buildings. Unlike IPL, Zickar's application proposed 4.8 acres of commercial development consistent with the Comprehensive Plan's "Planned Residential/Commercial" guidance. (7-1 Packet.; Comp.-Plan 3-12.) And the application's inclusion of a masjid as a central focal point is specifically commended by the Zoning Ordinance, provided that the City would interpret the term "church" in the ordinance to also refer to a Muslim place of worship. The Zoning Ordinance's "Neighborhood performance standards" for PUD's expressly endorse meeting the standard by arranging structures to "take visual advantage of a … church … or other physical feature unique to that particular neighborhood." City Code §§1007.024(6)(d)(1)(b).

On April 25, City staff notified Zikar that its application was complete and scheduled for review by the Planning Board on June 24 and the City Council on July 1. (Compl. ¶115.) Unlike its review of IPL's application, the City chose to extend its deadline for reviewing Zikar's application from 60 to 120 days. (*Id.* ¶¶116-117.)

The City Council considered Ruhland's proposed moratorium again at its April 29 work session. Councilmembers' comments again focused on water infrastructure and water capacity and Grochala, again, brought up a "Master Plan for the Main Street Corridor between Sunset Avenue and 4th Avenue" suggested in the Comprehensive Plan. (*Id.* ¶118.) As the City Council considered blocking Madinah Lakes through Ruhland's proposed moratorium, other City boards considered or went through the motions of considering Zikar's PUD Concept Plan. When they did, they added unnecessary requirements, including a recommendation that the City add an Alternative Urban Area Wide Review ("AUAR"). An AUAR is a more complex environmental review than an EAW-EIS, which the City had already determined was not required for IPL's proposed development. (*Id.* ¶119.)

Community opposition, led by Walter, relentlessly hounded Plaintiffs at City meetings, regardless of whether Zikar's application was being considered. On June 5, Walter attended the City Park Board's review of Zikar's application. He demanded that a Park Board member recuse himself because the member made a comment supportive of Madinah Lakes. Other attendees continued making bigoted, anti-Muslim comments in this meeting. (*Id.* ¶120.) And at the June 10 City Council meeting, Madinah Lakes was not on the agenda. Nonetheless, Wal-

ter and Madinah Lakes opponents appeared and spoke against the development. Among other comments, Walter alleged:

> It doesn't sound like the plan is to be part of our existing community or even include anyone who doesn't look like, talk like, and share beliefs. This reinforces our stated concerns that the Madinah Lakes City USA intends to be separate and segregated from people who look like me and people in the community that don't look and talk like the target demographic.

(*Id.* ¶121; Ex. W 5:58-6:18.) On June 12, the Planning Board considered Madinah Lakes PUD Concept Plan. It appeared from his comments that the Board's Chairperson knew the City would not allow the development. (*Id.* ¶122.)

On June 24, the City Council considered Ruhland's proposed moratorium ordinance, Ordinance 11-24 (the "Moratorium"). (*Id.* ¶126.) City Council materials for the meeting included a written statement from Ruhland falsely disparaging Zikar and the Minnesota chapter of the Council on American-Islamic Relations ("CAIR-MN"). (*Id.* ¶127.) CAIR-MN had raised concerns regarding the City's actions obviously seeking to stop Madinah Lakes, as well as the anti-Muslim rhetoric by members of the community with apparent support from the City Council. (*Id.* ¶128.) At the Council meeting, Zikar provided copies of 82 pages of hateful, anti-Muslim online comments posted by Walter and others that demonstrated anti-Muslim bigotry motivated opposition to Madinah Lakes. (*Id.* ¶129; Ex. X-Y.)

Councilmembers did not express concern or alarm at these posts. (Ex. X.) Instead, Ruhland applauded the opposition's participation, stating:

> I want to give a special thank you to all the citizens of Lino Lakes that have been taking time out of their day to organize and have

> your voices heard. Countless emails, phone calls, stopping me to
> talk in the community, etcetera. I feel a lot of you are just like me in
> why I decided to get involved in City Council.

(Compl. ¶132; Ex. X 1:43:10-1:43:25.) And while simultaneously alleging the
Moratorium was not targeting Plaintiffs or Muslims, Ruhland admitted that he
thought of the idea of the Moratorium when he saw Zikar's video about Madi-
nah Lakes and then continued to mock and insult Zikar, Mohammed, and CAIR-
MN. (Ex. X 1:38:14-1:39:21.)

Meanwhile, during the Council's June 24 discussion regarding the Morato-
rium, another Councilmember asked City Attorney Jay Squires: "Question for
Mr. Squires, is a moratorium required for master planning?" Squires responded:

> No, it's not required. That's the council's determination as to wheth-
> er it makes sense to impose a moratorium or a pause while you get
> the master plan in place before pieces might come in that may ulti-
> mately be not consistent with what your master plan might lead you
> to. So it's not required.

(*Id.* ¶130; Ex. X (1:00:36-1:01:0.) The City Council did not attempt to explain why
it had not considered a moratorium and had not required a master plan in re-
sponse to IPL's application.

On July 1, the City Council was scheduled to consider Zikar's PUD Con-
cept Plan. The Moratorium had not yet been adopted and, even if it had, a mora-
torium ordinance does not change the City's requirement to review pending ap-
plications. (Compl. ¶¶133-34.) Minn. Stat. §462.355, subd. 4(d). Despite this, Ruh-
land informed other Councilmembers that he would refuse to comment on Zik-
ar's Madinah Lakes Concept Plan. (*Id.* ¶135; Ex. Z.) Lyden indicated that he be-
lieved that during the period of the Moratorium, the City might change relevant

zoning or amend the comprehensive plan, so he too, would not consider Zikar's application. (*Id.* ¶136.) Director Grochala explained that the Council should not be "presumptuous" that the Moratorium would pass, he reminded the Council of the deadline for City Council action imposed by Minn. Stat. § 15.99, and he recommended that the Council proceed since all they were required to do is to provide "non-binding comments related to" Zikar's concept plan. (Ex. Z 21:12-21:46.) Lyden responded, flatly, "I'm not engaging in this conversation." (*Id.* 21:47-21:49.) Lyden made a motion to table the Council's consideration of the application, seconded by Ruhland, and the Council voted to avoid reviewing Zikar's application. (*Id.* ¶135.)

On July 8, the City Council adopted the Moratorium. Despite asserting that the Moratorium was not related to Zikar or Muslims, when Councilmembers discussed the Moratorium, their comments focused on, attacked, and insulted Zikar, Mohammed, CAIR-MN, Muslims, and immigrants, including:

1. Mayor Rafferty, who echoed Walter's false criticisms by suggesting that Madinah Lakes or Muslims who might live there planned to be a separate community, not a legitimate Lino Lakes neighborhood. Rafferty explained, "Lino Lakes is about establishing neighborhoods, not communities. Communities separate themselves. We are about neighborhoods…." However, Plaintiffs had never suggested they intended or hoped that Madinah Lakes would be a separate community, rather than another Lino Lakes neighborhood. (Ex. AA 1:20:45-1:21.)

2. Lyden, who repeatedly attacked Muslims, CAIR-MN, and non-native English speakers, among others. He explained:

First, our city name is not pronounced Lean-o Lakes. It's Line-o Lakes and it's been that way for a long time. Second thing, everyone, and I mean everyone, needs to know, including CAIR Minnesota and their attorneys, that no amount of tactics, intimidation, bullying will taunt or taint the legitimacy of our work. Okay…. Character, character, character is what matters in life. I don't care about your race or the color of your skin. I don't care about your religion, your sexual preference, or your political party….I appreciate those who have high standards, high morals, high ethics. Those who express the virtues of honesty, compassion, who know how to put other people first. ….I don't know why or how CAIR got involved right away, but they sent us that cute little form letter, you know, threatening us. So I go to their website, I look at what they're about. They're about talking about improving their image, about creating mutual understandings, that they want to promote justice, they talk about religious discrimination, they talk about hate crimes, talk about religious freedom, but they make no mention of the October 7th attack on Israel. It's important that you take responsibility and accountability in life. If you're worried about your image, CAIR maybe needs to take a hard look in the mirror. Let me be very clear, I don't have an Islamic-phobic problem. You, chair does. No one comes into this council chambers, defecates, and then has the audacity to blame the smell on others. That is not character. That is gas lightning. [*sic*] Because I don't agree with you does not make me Islamic-phobic. I don't need an apology. The people of Lino Lakes do or deserve it. As I previously stated, I support the moratorium, but also support the wide parameters it may entail, including comp plan amendments and rezoning. Nothing is off the table.

(Ex. AA 1:22:04-1:25:24.)

3. And finally, Ruhland who read comments from a computer for more than 13 minutes in a mocking and sarcastic tone. While Ruhland denied

17

that the moratorium related to Zikar or Islam, his speech consisted of a series of attacks, mischaracterizations and insults regarding CAIR-MN, Mohammed, and Zikar. Ruhland weaved an obviously false narrative and accused Plaintiffs and CAIR-MN of raising "inaccurate," "unfounded and shameful," "shameful," "lying," and "slander[ous]" concerns about the moratorium. (*Id.* ¶137; Ex. AA 1:26:11-1:39:51.)

Many of the Council's anti-Muslim and anti-immigrant comments are memorialized in the minutes of the Council's July 8 meeting. (*Id.* ¶138; Ex. E.) Ruhland moved to approve the Moratorium, Lyden seconded the motion, and the ordinance was adopted by a vote of 4-1. In addition to Ruhland and Lyden, Mayor Rafferty, and Councilmember Dale Stoesz voted in favor. (*Id.* ¶139, Ex. F.) Three days after the Council's vote to block Madinah Lakes through the Moratorium, Ruhland and Zikar opposition leaders Walter and Renneker went out to a local restaurant to celebrate its passage. (*Id.* ¶144; Ex. G.) When Zikar submitted its PUD Concept Plan application, Plaintiffs asked Mayor Rafferty and members of the City Council, including Ruhland and Lyden, to meet with them and learn about the proposed development. Only one Councilmember was willing to do so. Mayor Rafferty, Defendants Ruhland and Lyden, and Councilmember Stoesz—the members who voted for the Moratorium—refused to meet with Plaintiffs. (*Id.* ¶145.)

On August 4, the New York Times published a story about Madinah. (*Id.* ¶153.) The same day, an individual sent an email to the New York Times reporter, copying Lyden and CAIR-MN's Executive Director, among others. This message consisted of pages of hateful vitriol regarding Islam and Muslims, including

18

"There's no such thing as 'I-phobia' because Islam's our declared enemy." "DON'T BELIEVE THE LYING MUSLIMS" and "Good luck halting the Muslim conquest of Minnesota!" (*Id.* ¶154.) Two days later, Lyden responded to the message from his official, Lino Lakes email address, stating, "Might be the best email I have ever received! Thank you Sir!" (*Id.* ¶155; Ex. H.)

The City Council did not approve, deny, or comment on Plaintiffs' PUD Concept Plan application by August 23, the deadline under Minn. Stat. § 15.99. (*Id.* ¶156.) However, after claiming to want to slow growth in the City, the City Council reviewed and approved other development's applications, including 448 new housing units approved on October 8, including in Planning District 2 where Zikar hoped to develop Madinah Lakes. (*Id.* ¶167.)

On September 23, the Council considered a proposed resolution (No. 24-114) to censure Lyden. The proposed resolution stated Lyden's August 6 email "*could* be interpreted *by some* as endorsing the views and opinions expressed" (emphasis added) in the hateful August 4 email. (Compl. ¶157; Exs. I,BB.) The City Attorney's draft resolution falsely alleged the Moratorium "was driven by the City's Comprehensive Plan and the potential for two large-scale developments in the NW Quadrant of the City being undertaken in the absence of a master plan." (Compl. ¶158; Ex. I.)

Lyden responded by arguing that "exposing the hate does not make me the hater." Lyden held up a book labeled "Quran In English" and asked if other Councilmembers had read the Quran. Lyden suggested that if other Councilmembers had read the Quran and researched the information in the August 4 email, they would have also found the August 4 email was "great." (*Id.* ¶159; .)

Ruhland spoke and reacted to Lyden's comments by discussing the August 4 email message to which Lyden had replied. (Ex. H.) Ruhland explained that he could not form an opinion about the email because he had not "read the Quran" and he believed "people are entitled to their opinions." Ruhland explained that his only concern regarding Lyden's August 6 email was that Lyden "was handling [sic] personal opinions or personal business matters with City resources." (*Id.* ¶160, Ex. BB.) Resolution No. 24-114 was approved by a 3-1 vote. Ruhland was the only voting member of the Council to vote against the censure of Lyden. (*Id.* ¶161.) At the same September 23 meeting, the City Council approved $479,075 to pay contractor Kimley-Horn for the Master Plan and AUAR called for by the Moratorium. The City also engaged Rapp Strategies, a communications firm that advertises specialties in shaping public understanding, managing risk, and reputation management. (*Id.* ¶162.) The City had not considered the Moratorium's Master Plan as part of the City's annual goal setting and work planning process for 2024 (or ever). Nor had the City budgeted for a Master Plan to be prepared in 2024. (*Id.* ¶163.) When the Council approved funding for the Moratorium's Master Plan, Staff indicated that the funding for the Master Plan would be taken from City funds designated for the City's Area and Unit Trunk fund, Surface Water Management Fund, MSA Construction fund, Cable TV & Communications fund and Closed Bond fund. (*Id.* ¶164.) As a result of Ruhland's, Lyden's, and the City's actions Plaintiffs cannot apply for City approval of a PUD or other City approvals necessary for the Madinah Lakes Development. (*Id.* ¶165.) While blocking Madinah Lakes, the City Council has allowed other residential and commercial development projects to move forward. (*Id.* ¶166.)

In April 2024, Zikar executed a purchase agreement to buy the Robinson Property, subject to certain contingencies. (*Id.* ¶74.) The City's Moratorium prevents Zikar from applying for the approvals it needs in order to close on this purchase. In addition, Zikar's purchase agreement, and its right to purchase the Robinson Property, will expire long before the conclusion of the Moratorium. (Diehl Decl. ¶2.) If the Moratorium is not enjoined Zikar will likely lose its opportunity to purchase the Robinson Property.

## ARGUMENT

### I.    PRELIMINARY INJUNCTION STANDARD

The Court has broad power to order preliminary injunctive relief pursuant to Rule 65. As the Court is aware, to determine if a preliminary injunction should issue requires consideration of:

(1) the threat of irreparable harm to the movant;

(2)  the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

(3) the probability that movant will succeed on the merits; and

(4) the public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Applied to the evidence before the Court, each factor warrants issuance of an injunction. Because the "third factor, probable success on the merits, is frequently considered the most important," *Am. Dairy Queen v. New Line Prod., Inc.*, 35 F. Supp. 2d 727, 729 (D. Minn. 1998), Plaintiffs will address this factor first.

### II.    <u>Plaintiffs' Free Exercise and FHA Claims Are Likely to Succeed</u>

To succeed on their Free Exercise and Fair Housing Act claims, Plaintiff must show that unlawful religious discrimination was a motivating factor in the City Council's adoption of the Moratorium against Madinah Lakes. The same ev-

identiary showing is required as to both claims. *See, e.g.*, *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-68 (1977) (considering FHA and discussing potential evidence that may be relevant to decide if unlawful discrimination was a motivating factor in a city council's decision); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah* (hereinafter, "*Lukumi*"), 508 U.S. 520, 540 (1993) (deciding Free Exercise claim regarding adoption and citing *Arlington Heights* regarding proof of city council's motives)

Here, Plaintiffs easily meet this standard, because the evidence clearly shows that Defendants enacted the Moratorium based on anti-Muslim bias.

### A.    The City Council's adoption of the Moratorium was motivated by unlawful religious discrimination.

The City's adoption of the Moratorium was conceived and adopted for obviously unlawful, discriminatory reasons. The record is awash in evidence of anti-Muslim bias and pretextual and unnecessary hurdles that Defendants fabricated to prevent Plaintiffs from completing a development that would include a masjid and attract Muslims to Lino Lakes. Plaintiffs may demonstrate this unlawful motivating factor through direct or circumstantial evidence. *Lukumi*, 508 U.S. at 540 (citing *Arlington Heights*, 429 U.S. at 266). Evidence of an unlawful motivating factor may include:

> The historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.

*Id*. So it does here.

The City Council's repeated effort to discourage and ultimately stop Plaintiffs from developing Madinah Lakes stands in stark contrast to the Council's welcoming approach to IPL's objectively similar application. By any objective criteria, Zikar's 2024 PUD Concept Plan application was similar to, if not more consistent with, the City's Comprehensive Plan and Zoning Ordinance, than was IPL's 2022 application. Yet, the City Council's response to the applications could not have been more different when compared side-by-side:

| Issue | IPL's 2022 Application | Zikar's 2024 Application |
|---|---|---|
| **Masjid/Association with Islam** | No | Yes |
| **Community Opposition** | No | Yes |
| **Property to be Developed** | Robinson Property | Robinson Property |
| **Housing Units** | 707 units | 448 units |
| **Commercial Component** | No | Yes (consistent with Comprehensive Plan's mixed residential/commercial guidance) |
| **City Council Review** | City Council reviewed IPL's PUD Concept Plan application and provided comments. | City Council refused to review or comment on Zikar's PUD Concept Plan application. |
| **Timing of Review** | Council reviewed IPL's application 56 days after it was submitted. | Council was scheduled to review the application after 75 days, but declined |

| Issue | IPL's 2022 Application | Zikar's 2024 Application |
|---|---|---|
| **Simultaneous Developments** | Council was aware of, but was unconcerned with, several other developments and potential developments. | Council purported to be concerned with possible, but uncertain Pulte development, while allowing approving other developments to proceed. |
| **Master Planning** | Council considered whether a Master Plan was required and deemed it unnecessary | Council considered and required a Master Plan as a pretextual justification for Moratorium. |
| **Environmental Review** | Council found EIS was unnecessary. | Council required AUAR, a more complex and time-consuming environmental review even than EIS |
| **Further Applications** | Council considered EAW and found EIS unnecessary, clearing the way for additional applications. | Council never considered Zikar's PUD Concept Plan. Moratorium blocked all future applications. |
| **Moratorium** | Never considered. | Proposed by Ruhland based on pretextual concerns just 4 days after learning of Zikar's application. |

It is obvious that City Councilmembers were influenced by anti-Muslim animus among the organized community opposition to Madinah Lakes. In that light, it does not even matter whether Defendants personally harbor anti-Muslim prejudice that was an additional motivation for their actions.. Even Defendants they were simply responding to religious animus expressed by their constituents, it is "clearly unconstitutional state action" for a government official to "effectuat[e] the discriminatory designs of" the public. *United States v. Sch. Dist. of Omaha*, 521 F.2d 530, 538 n.14 (8th Cir. 1975) (quoting *United States v. City of Black Jack*,

*Missouri*, 508 F.2d 1179, 1185 n.3 (8th Cir. 1974)). A plaintiff need only provide evidence that the unlawful "animus was a significant factor in the position taken by [community members] to [whom] the official decision-maker is knowingly responsive." *U.S. v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1226 (2d Cir. 1987). Here, the evidence could not be more clear.

Members of the City Council exuded anti-Muslim bias and offered only the flimsiest pretextual veneer of neutrality. For example, Ruhland proposed the Moratorium just four days after learning of Plaintiffs' plan to submit a PUD Concept Plan application. He had not previously suggested a moratorium was necessary, and his action was simultaneous with Walter's organized opposition to Madinah Lakes. Yet, Ruhland would have this Court believe that this was coincidental, and that the real motivator was that he just happened to become concerned about water infrastructure. Assuming, *arguendo*, this concern could be genuine, how could Ruhland have plausibly believed that halting development, in one small quadrant constituting 20% of the City's undeveloped acres could address concerns about water use? Obviously, Ruhland was never genuinely concerned about water infrastructure. He promptly abandoned his concerns about water immediately after City staff suggested a more plausible reason. After all its effort, the City is left without an explanation for Ruhland's actions and why a master plan suddenly became essential, when it was of no consequence in 2022. The City Attorney admitted the Moratorium was unnecessary and the City had approved other master plans without the need for a moratorium.

Of course, even without other evidence, the City Council's statements regarding Plaintiffs and the Madinah Lakes development are alone sufficient to

demonstrate unlawful, anti-Muslim bias. When adopting the Moratorium, Councilmembers were, no doubt, aware that any façade of non-discrimination depended on avoiding connecting their votes to Plaintiffs, specifically, or Muslims, generally. Yet, a majority of the City Council expressly tied their vote to anti-Muslim sentiments and repeated discriminatory comments from members of the community. For example, opposition leader Walter repeatedly asserted that Madinah Lakes would create a separate, segregated "community within [Lino Lakes'] community" not by intention, but because Walter and others would not want to live among Muslims. (Compl. ¶105.) Mayor Rafferty parroted Walter when explaining why he was voting for the Moratorium, stating, "Lino Lakes is about establishing neighborhoods, not communities. Communities separate themselves. We are about neighborhoods…." (*Id.* ¶137.) Rafferty's explanation had no connection to any purportedly neutral purpose.

For his part, Ruhland's statements regarding the Moratorium he proposed falsely characterized his own actions, while insulting and lecturing Plaintiffs, CAIR-MN, and others. In his 13-minute speech, Ruhland intentionally mispronounced Zikar as "Zak-har" while he lectured Plaintiffs regarding accuracy. Ruhland asserted that the "timeline matters" and claimed that the City was "talking about a moratorium" when Zikar submitted its application. He apparently failed to recall that he had previously explanation that he thought of the Moratorium when the Madinah Lakes video was "going viral" on March 21. Ruhland then falsely asserted that Zikar's inclusion of commercial development in Madinah Lakes somehow complicated the City's review of its application, when he knew this component caused the application to conform to the require-

ments of the City's Comprehensive plan. (*Id.*) This list could continue--but it is sufficient to say that there was little in Ruhland's speech that was truthful, or had connection to the Moratorium that was supposedly at issue.

Defendant Lyden anti-Muslim animus is self-evident. Like Rafferty, Lyden's July 8, 2024, rant repeated discriminatory comments from LoveLino-Lakes, which insulted women with accents for supposedly mispronouncing "Line O Lakes" as "Leen O Lakes." Lyden then explained that his vote on the Moratorium was allegedly related to the purported fact that CAIR did not discuss the October 7 attacks on Israel on its website. Of course, all of this was merely prologue to Lyden's candid admission of anti-Muslim animus. Lyden declared that a hate-filled email—asserting that "There's no such thing as 'I-phobia' because Islam's our declared enemy," "DON'T BELIEVE THE LYING MUSLIMS," and "Good luck halting the Muslim conquest of Minnesota!," among many other statements—"[m]ight be the best email [he] have ever received!" (Ex. H.) Then, when the City Council attempted to distance itself from Lyden's statements, he doubled-down by holding up the "Quran In English" and claiming that if other Councilmembers had just read the Quran, they too would applaud the hateful August 4 email. (*Id.* ¶¶137, 154-59.)

Not to be outdone, Ruhland bizarrely defended Lyden. Ruhland explained that he could not form an opinion about whether "There's no such thing as 'I-phobia' because Islam's our declared enemy," "DON'T BELIEVE THE LYING MUSLIMS," and a "Muslim conquest of Minnesota!" because he had not "read the Quran." Ruhland explained that his only concern regarding Lyden's August

6 email was that he "was handling [sic] personal opinions or personal business matters with City resources." (*Id.* ¶160.)

In sum, Defendants' adoption of the Moratorium was clearly motivated by anti-Muslim bias.

### B. Defendants Violated the Free Exercise Clause.

The City's Moratorium and other efforts to prevent Plaintiffs from developing Madinah Lakes violate Ahmed's and Mohammed's rights under Free Exercise Clause of the First Amendment. The Free Exercise Clause "protect[s] religious observers against unequal treatment…." *Lukumi*, 508 U.S. at 542  (citing *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148 (1987)). To this end, the clause prohibits laws, like the Moratorium, that "discriminate[] against some or all religious beliefs or regulate[] or prohibit[] conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. Thus, the Free Exercise Clause prohibits government from "deciding that secular motivations are more important than religious motivations." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 165 (3d Cir. 2002), and "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021) (citation omitted); *Lukumi*, 508 U.S. at 533).

For land-use regulations, these principles boil down to a simple rule. Under the Free Exercise Clause, cities may not use zoning and land use regulations "to single out Plaintiffs from using their property based on the exercise of their religion." *Congregation Rabbinical College of Tartikov, Inc. v. Village of Pomona*, 915

F.Supp.2d 574, 620 (S.D.N.Y.2013) (citing C*ottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203, 1225 (C.D.Cal.2002)).

Here, it is obvious that Defendants did exactly that. The City Council allowed IPL's proposed development to proceed on the same property where Defendants have now prohibited Plaintiffs' from building. Even the Moratorium effectively operates only against Plaintiffs: developments outside the small corner of the City targeted by the Moratorium may proceed, while Plaintiffs' development is barred. The Moratorium's sham neutrality cannot save it. The Free Exercise Clause "protects against governmental hostility" to religion, regardless whether it masked or overt. *Id*. at 534.

In sum, the Moratorium is quite literally gerrymandered to affect only a development proposed by Muslims—and Defendants made it very clear, very recently, that developments on even that very same land by people without a public religious profile would be acceptable. Because the Moratorium therefore is neither neutral nor "of general application, it must undergo the most rigorous of scrutiny" that requires the law is justified by a legitimate governmental "interest[] of the highest order" and "narrowly tailored" to such an interest. *Lukumi*, 508 U.S. at 546; *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458, 461-62 (2017) (quoting *Lukumi*, 508 U.S. at 542).

The City cannot meet this burden. Ahmed and Mohammed seek to exercise their religion by building a development where Muslim residents can live and worship at a masjid in their neighborhood. Lino Lakes has codified its endorsement of such a development when a development is built around a centrally located  "church." The City may not discriminate against Plaintiffs and con-

tinue to block Madinah Lakes because it will be built with a Muslim place of worship, rather than a "church" as its focal point.

### C.    Defendant Violated Plaintiffs' Rights under the FHA.

Plaintiffs will also succeed in their claim that Defendants unlawfully discriminated on the basis of religion in violation of the Fair Housing Act (the "FHA"). Section 3604(a) of the FHA provides that it is unlawful to "make unavailable or deny, a dwelling to any person because of …religion…." 42 U.S.C. § 3604(a). Section 3604(b) prohibits discrimination against any person "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of …religion." *Id* § 3604(b). The FHA's implementing regulations further proscribe "any conduct relating to the provision of housing … that otherwise makes unavailable or denies dwellings to persons … because of … religion." 24 C.F.R. § 100.70(b). Prohibited activities under this provision include "[e]nacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings" on account of religion. *Id*. § 100.70(d)(5). Consistent with this regulation, the FHA has been interpreted to prohibit municipalities from using their zoning powers to discriminate on the basis of the FHA's protected characteristics relating to the provision of housing. *Arlington Heights*, 429 U.S. at 268; *Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1283 (11th Cir. 2006). The FHA also "prohibits governmental agencies from implementing or enforcing" housing and zoning regulations in a discriminatory manner. *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003).

Here, Defendants are violating the FHA by intentionally discriminating on the basis of religion. Courts applying the FHA have found that "sudden and dramatic change to an existing zoning ordinance in response to a particular land-use application…bespeaks pretext" and unlawful discrimination. *Assisted Living Assoc. of Moorestown v. Moorestown Townshi*p, 996 F.Supp. 409, 436 (D.N.J.1998); *cf. Kennedy Park Homes Assn. v. City of Lackawanna*, 436 F.2d 108 (2d Cir.1970), *cert. denied*, 401 U.S. 1010, (1971) (sudden moratorium on subdivisions imposed by town on learning of planned integrated housing evinces discrimination); *see also Sunrise Development, Inc. v. Town of Huntington, New York*, 62 F.Supp.2d 762, 776 (E.D.N.Y. 1999). That is exactly what happened here. The City Council discriminated against Plaintiffs because of Councilmembers' own anti-Muslim animus and to carry out the anti-Muslim animus espoused by local advocates, including Walter and others. Discriminatory "animus expressed by members of the community who seek to influence decisionmakers with respect to the pertinent action can be" used to demonstrate a "discriminatory purpose when local officials effectuate the discriminatory designs" of local advocates. *Jones v. City of Faribault*, No. 18-1643 (JRT/HB), 2021 WL 1192466, at *14 (D.Minn. 2021). For the reasons set forth above, Defendants violated the FHA.

### III. The Remaining *Dataphase* Factors Demonstrate a Preliminary Injunction Should Issue.

#### A. Without Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm.

Plaintiffs have demonstrated they are likely to succeed on their Free Exercise claims. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Therefore, "[i]n the context of First Amendment cases, courts normal-

31

ly assume irreparable injury." *Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1031 (D. Minn. 2010) (internal quotation omitted).

Plaintiffs can demonstrate irreparable harm even if it were not established as a matter of law. If the Moratorium is not enjoined, Zikar risks losing the opportunity to purchase the Robinson Property for good. Its purchase agreement expires long before the expiration of the Moratorium. "Real estate has long been thought unique," and so the loss of a particular piece of real property constitutes irreparable harm. *Minnesota Vikings Football Stadium, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 193 F. Supp. 3d 1002, 1016 (D. Minn. 2016); *O'Hagan v. United States*, 86 F.3d 776, 783 (8th Cir. 1996) ("monetary relief fails to provide adequate compensation for an interest in real property, which by its very nature is considered unique," so plaintiff would suffer irreparable harm if denied injunctive relief); *CEZ Prior, LLC v. 755 N Prior AVE, LLC*, No. 23-CV-3896 (NEB/DJF), 2024 WL 780456, at *3 (D.Minn. 2024).

### B.    The Balance of Harms Favors an Injunction.

When considering a First Amendment claim, the balance of equities favors the constitutionally-protected freedoms. *Phelps-Roper*, 545 F.3d at 690. Therefore, as with irreparable harm, the balance-of-equities factor in First Amendment cases is generally determined by examining the plaintiff's likelihood of success on the merits. *Id.*

This factor is satisfied here. As described above, virtually all of the "harms" that Defendants said the Moratorium was supposed to address were plainly pretextual and implausible. In all events, the ongoing harm to Plaintiffs' First Amendment freedoms is substantially greater than any minimal harm that

Defendants would suffer from an injunction. *Northshor Experience, Inc. v. Duluth*, 442 F.Supp.2d 713, 719 (D.Minn. 2006). "The rights of [Defendants] will only be curtailed to the extent required by law." *Wickersham v. City of Columbia, Mo.*, 371 F.Supp.2d 1061, 1075 (W.D.Mo. 2005). This factor weighs in favor of the injunction.

### C.    An Injunction Is In the Public Interest.

"[I]t is always in the public interest to protection constitutional rights." *Phelps-Roper*, 545 F.3d at 690; *see also Kirkeby*, 52 F.3d at 775. Because the public interest favors the core First Amendment freedoms that Plaintiffs have shown are at stake, this factor supports a preliminary injunction. *See, e.g., Iowa Right to Life Committee, Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999).

## CONCLUSION

For the reasons set forth above, Plaintiffs ask the Court to enter the proposed preliminary injunction filed herewith.

Dated: October 22, 2024                  **CROSSCASTLE PLLC**

                                               /s/Samuel W. Diehl
                                               Samuel W. Diehl (#0388371)
                                               Christopher R. Johnson (#402005)
                                               14525 Highway 7, Ste. 345
                                               Minnetonka, MN 55345
                                               P (612) 429-8100
                                               F (612) 234-4766
                                               sam.diehl@crosscastle.com
                                               christopher.johnson@crosscastle.com

**MONROE MOXNESS BERG PA**

Matthew S. Duffy (#0391072)
7760 France Avenue South, Suite 700
Minneapolis, MN 55435
Telephone: (952) 885-5999
Facsimile: (952) 885-5969
Email: mduffy@mmblawfirm.com

*Attorneys for Plaintiffs Zikar Holdings LLC, Jameel Ahmed, and Faraaz Mohammed*

4858-4655-5371, v. 5