IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Zikar Holdings LLC, Jameel Ahmed, and Faraaz Mohammed, | Case No. 24-cv-03721 (JMB/SGE) |
| Plaintiffs, | **DEFENDANT CITY OF LINO LAKES' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| Michael Ruhland, in his individual capacity, Christopher Lyden, in his individual capacity, and City of Lino Lakes, Minnesota, | |
| Defendants. | |

## INTRODUCTION

Defendant City of Lino Lakes hereby opposes Plaintiffs' motion for preliminary injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs' Amended Complaint and opening brief attempt to create the impression that anti-Muslim bigotry is the only obstacle to Plaintiffs' obtaining the various land-use approvals needed for their 434-unit proposed project to break ground. In fact, the site Plaintiffs proposed for the project is an especially challenging place to put a large residential subdivision.

The Future Land Use map in the City's most recent comprehensive guide plan (i.e., the 2040 Comprehensive Plan) reflects a 2020 Metropolitan Council-approved plan to develop that site and the adjacent acres in a careful, symmetrical arrangement of high-, medium-, and low-density residential uses (surrounding squares of "Planned Residential/Commercial"):



See Declaration of John Baker ("Baker Decl.") Ex. 1 at 3-6.

But would-be developers of two large adjacent sites (Plaintiffs and Pulte/Dell Webb), working independently of each other, came to the City within a short time of each other with proposed designs that—if approved by the City—would severely compromise this element of the City's official vision for that area. Plaintiffs' concept plan for the south side of Main Street only proposed to follow half of that pattern of

"squares" of different residential densities. Plaintiffs' plan made a partial attempt (at the eastern end) to put high-density housing in two squares as called for in the City's comprehensive plan, but not on the two other squares also guided for high-density residential uses on the middle part of their development.[1] The City's comprehensive plan guided the area on the opposite (north) side of Main Street in symmetrical fashion (with equally sized squares guided for high-density and medium-density residential uses and for mixed commercial/residential uses), but the drawings for a concept that a Pulte/Dell Webb partnership intended for that side of Main Street largely ignored it. By statute, such projects could not be approved without major amendments to the comprehensive plan, which by statute could not occur without convincing the City Council and the affordable-housing-conscious Metropolitan Council to bless it.[2]

Plaintiffs' introduction also claims, without citation, that "Lino Lakes' ordinances expressly mandate that new neighborhoods be built around a central 'physical feature unique to that particular neighborhood' such as a church."[3] While

---

[1] Thus, Plaintiffs' statement on the first page of their brief that "[t]heir project is in perfect alignment with the City's Comprehensive Plan," ECF 15 at 1, is erroneous.

[2] *See* Minn. §§ 462.355, subd. 3, 473.852, subd. 5, 473.859, subd. 3.

[3] ECF 15 at 2. Plaintiffs' brief (ECF 15) includes a similar mischaracterization of the zoning ordinance on page 12. Contrary to misimpression created through selective omissions in Plaintiffs' brief, the applicable provision does not depend on whether the City considers the masjid to be a church, as demonstrated by the phrase

a reference to "physical features unique to that particular neighborhood" appears in a subpart of the City zoning ordinance's Planned Unit Development (PUD) chapter,[4] the rest of Plaintiffs' sentence turns that subpart upside-down. Although City Code Section 1007.024(6) is titled "Urban Residential Planned Unit Development Requirements," and subpart (d) of that is titled "Neighborhood performance standards," none of the language Plaintiffs cite appears in any sentence framed as a mandate.[5] The neighborhood performance standards identify three ways that a neighborhood *may* accomplish an "identity," and the second one (b) states: "The neighborhood lots *may* be arranged such that a majority of the principal structure will take visual advantage of a green, playground, ball field, rock outcropping, stand of trees, <u>church</u>, school, *or other* <u>physical feature unique to that particular neighborhood</u>."[6]

Further complicating efforts at sound public planning through private development, Plaintiffs' proposed project site "is almost entirely within floodplain according to maps and calculations provided by [the Rice Creek Watershed

---

"church, school, *or other* physical feature unique to that particular neighborhood" in Section 1007.024(6)(d)(1)(b). (Emphasis added.)

    [4] Baker Decl. Ex. 2 at 3 (City Code § 1007.024(6)(d)(1)(b)).

    [5] *Id.* § 1007.024(6)(d).

    [6] *Id.* § 1007.024(6)(d)(1)(b) (emphasis added, with the language in Plaintiffs' brief underlined).

District]."[7] Most of the property south *and north* of Main Street east of Sunset Avenue "lies within designated floodplain."[8] As a 2022 Storm Water Management Study of Plaintiffs' proposed site concluded, "[o]ffsite drainage flows through the site due to being downstream of higher ground and the sites public and private ditches."[9] "Due to the SHWT [seasonal high water table] being high and the required floodplain volume, infiltration is infeasible."[10] Because of these site conditions, mitigation for Plaintiffs' proposed project site, and for Pulte/Del Webb's proposed project site, would require a significant amount of fill material, and the land needed for mitigation would occupy a significant part of the proposed projects.[11] Instead, "surface water management will be a primary driver in site development."[12] Large areas of the sites would need to be reserved for management of surface water and stormwater, rather than for homes and other structures.

Some form of further environmental review under the Minnesota Environmental Policy Act (MEPA) and its implementing regulations is required

---

[7] Baker Decl. Ex. 3 at 4 (describing the proposed site for the Integrate Properties LLC/Promenade project, which became the Plaintiffs' proposed site).

[8] Baker Decl. Ex. 4 at 2–3; *see also* Declaration of Michael Grochala ("Grochala Decl.") ¶ 7.

[9] Baker Decl. Ex. 3 at 2.

[10] *Id.*

[11] Grochala Decl.¶ 7.

[12] Baker Decl. Ex. 4 at 3.

before final state and local governmental actions could be taken regarding the Madinah Lakes concept; the question was exactly what level or scope of environmental review would occur.[13] MEPA does not require environmental review of adjacent proposed projects (such as Madinah Lakes and the Pulte/Del Webb project) to be conducted separately. Minnesota statutes "'identify alternative forms of environmental review which will address the same issues and utilize similar procedures as an [environmental impact statement (EIS)] *in a more timely or more efficient manner* to be utilized in lieu of an [EIS].'" *Minnesota Ctr. for Env't Advoc. v. City of St. Paul Park*, 711 N.W.2d 526, 530 (Minn. App. 2006) (emphasis added) (quoting Minn. Stat. § 116D.04, subd. 4a). One such alternative form is an Alternative Urban Areawide Review (AUAR). "An AUAR can substitute for an EIS." *Id.* (citing Minn. R. 4410.3600, subp. 1, and Minn. R. 4410.3610). Despite the citation-free assertion in Plaintiffs' brief that an AUAR is a "more complex and time-consuming environmental review even than EIS,"[14] and an assertion in Plaintiffs' brief (unaccompanied by a citation to anything but Plaintiffs' Amended Complaint)

---

[13] Plaintiffs' brief hints—but stops well short of arguing—that not even an Environmental Assessment Worksheet (EAW) needed to be prepared for Madinah Lakes, because one was performed for a previous developer's project. ECF 15 at 6. Their failure to have briefed that hint in their opening brief waives it as a potential basis for its motion. *See Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc*., 519 F.3d 421, 430 (8th Cir. 2008) (two-sentence footnote mentioning an issue was not sufficient to preserve the issue).

[14] ECF 15 at 24.

that "an AUAR is a more complex environmental review than an EAW-EIS,"[15] the Minnesota Court of Appeals has recognized that "[a]n AUAR's content and format must be similar to an environmental assessment worksheet (EAW)[.]" *Id.* (citing Minn. R. 4410.3610, subp. 4).

In such circumstances, it should come as no surprise that City officials began to discuss whether and how the City could call "time out" so as to allow more planning before the City Council would take up *either* would-be developer's proposed concept.

## ARGUMENT

### I.   Plaintiffs have failed to carry their burden to demonstrate that they are *likely* to prevail on the merits.

A City ordinance is the primary target of Plaintiffs' motion. Where, as here, plaintiffs seek a preliminary injunction to enjoin the effectiveness of a legislative act, the Court must apply a more rigorous standard than the generic "fair chance of prevailing" test from *Dataphase Systems v. C.L. Systems Inc.,* 640 F.2d 109, 112 (8th Cir. 1981) (cited by Plaintiffs, ECF 15 at 21). A more recent and more applicable *en banc* decision of the Eighth Circuit requires the movants to make a threshold showing that they are *likely to* prevail on the merits before injunctive relief can be ordered. *See Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730, 732–

---

[15] ECF 15 at 13.

33 (8th Cir. 2008) (en banc) ("[T]he 'fair chance' standard should not be applied to motions to preliminarily enjoin the enforcement of a state statute. Instead, we now clarify that, where a preliminary injunction of a duly enacted state statute is sought, we require a more rigorous threshold showing that the movant is likely to prevail on the merits.").

The *Rounds* standard applies to suits to enjoin local ordinances. *See Coal. to March on RNC & Stop the War v. City of St. Paul, Minn.*, 557 F. Supp. 2d 1014, 1020 (D. Minn. 2008) ("Under the circumstances of this case, the first factor places the burden on the Coalition to demonstrate that it is likely to prevail on the merits."); *Couser v. Shelby Cty. Iowa,* 681 F. Supp. 3d 920, 938 (S.D. Iowa 2023) (applying higher *Rounds* standard to county board's adoption of a proposed zoning ordinance regulating hazardous liquid pipelines). That is consistent with the Eighth Circuit's rationale for the heightened standard, because it "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference." *Rounds,* 530 F.3d at 732; *see also Evenstad v. City of W. St. Paul,* 306 F. Supp. 3d 1086, 1093 (D. Minn. 2018) (city ordinance passed by city council after two readings with documents circulated prior to the first reading "was enacted pursuant to a 'presumptively reasoned democratic processes,' if not a terribly deliberative one," and is thus governed by the higher standard under *Rounds*).

8

**II.    Plaintiffs invoke the *Arlington Heights* test for cases alleging unconstitutional treatment, but only apply the first of two essential steps of that test.**

Plaintiffs devote most of their legal argument to whether unlawful discrimination was "a motivating factor in the City's decision," citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977).[16] But there was always a second step of the test for unlawful motivation, as reflected in a footnote in *Arlington Heights* that cited *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 270 n.21 (1977).[17] Because "[a] rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise," could leave the plaintiff in a better position than if he or she had not engaged in the protected conduct, *Mount Healthy*, 429 U.S. at 285–86, whether unconstitutional motive was a substantial and motivating factor is only the start of the analysis. Where an unlawful motive was a factor in a decision, if "the same decision would have resulted even had the impermissible purpose not been considered . . . . there would be no justification for judicial interference with the challenged decision." *Arlington Heights,* 429 U.S. at 170–71 n.21 (citing *Mount*

---

[16] ECF 15 at 22. Plaintiffs' brief paraphrases it as "a motivating factor." *Id.* As articulated in Eighth Circuit decisions following *Arlington Heights,* the operative phrase is "*substantial* and motivating factor." *See, e.g.*, *Wingate v. Gage County Sch. Dist., No. 34,* 528 F.3d 1074, 1082 (8th Cir. 2008) (emphasis added).

[17] The Supreme Court issued the *Arlington Heights* and *Mount Healthy* decisions on the same day (January 11, 1977).

*Healthy*).[18] In short, for a court to interfere with a challenged decision, an unconstitutional motive must have been *decisive*.[19] To disregard that requirement, as Plaintiffs' brief does, results in a causation-free analysis of liability.

As the Supreme Court recognized in *Mount Healthy,* the second part of this test plays an important role in cases where the motives behind a public entity's actions are impugned. If a plaintiff can invalidate a decision for which constitutional reasons were articulated simply by showing the presence of a forbidden motive as

---

[18] Even *United States v. Yonkers Board of Education*, the 1987 Second Circuit decision that Plaintiffs quote in part (and paraphrase in part to make it seem more helpful), *see* ECF 15 at 25, recognizes the important role of the *Mount Healthy* two-step approach in determining, in a disparate-treatment housing-discrimination case, whether the plaintiff prevails. *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217 (2d Cir. 1987) (emphasis added).

[19] Unlike the city defendant in *Yonkers Board of Education*, here the City is not attempting to argue "that it is entitled to judgment in its favor on the housing discrimination claim because its housing decisions only responded to the concerns of its citizens[.]" *See* 837 F.2d at 1222. Rather than trying to use "citizens' concerns" as a shield that would somehow protect a decision even if it is caused by racism or religious discrimination, the City contends that Plaintiffs have failed to carry their burden of demonstrating they are likely to prevail on the merits of their motive-based claims, including the question of whether any forbidden motive was decisive. In any event, within the Second Circuit, *Yonkers* and similar cases "stand for a much narrower proposition: that a municipal body may be charged with discrimination if it acquiesces in the opposition of private citizens it knows were motivated by a desire to keep minorities from moving into their communities." *Carroll v. City of Mount Vernon*, 707 F. Supp. 2d 449, 457 (S.D.N.Y. 2010), *aff'd*, 453 F. App'x 99 (2d Cir. 2011). Those cases "do not hold that a municipal body 'discriminates' (for Title VII purposes) when it considers objections by private citizens seeking to ensure that their protected class is adequately represented or that the municipality adheres to its legal obligations." *Id.* "Consideration of whether a proposed action violates legal obligations is not analogous to acquiescence to bigotry." *Id.* at 457 n.10.

well, then the votes of public officials acting out of lawful, constitutional motives would be nullified.

As the Supreme Court later recognized, this essential step is not confined to cases arising under particular clauses of the Constitution, but is the general standard by which claims of unconstitutional motivation should be analyzed:

> Our previous decisions on this point have typically involved alleged retaliation for protected First Amendment activity rather than racial discrimination, but that distinction is immaterial. *The underlying principle is the same: The government can avoid liability by proving that it would have made the same decision without the impermissible motive.*

*Texas v. Lesage*, 528 U.S. 18, 21 (1999) (emphasis added).

In the forty-five years since the day *Arlington Heights* and *Mount Healthy* were decided, intervening Supreme Court decisions in cases where a plaintiff alleged an adverse decision in retaliation for engaging in First Amendment-protected activity have changed "but-for" causation from an affirmative defense to a facet of causation that a plaintiff has the burden to prove. In *Hartman v. Moore,* 547 U.S. 250, 260 (2006), the Supreme Court recognized that although it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." Thus, to prevail, *a plaintiff* must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury." *Id.* at 259.

Then in *Nieves v. Bartlett*, 587 U.S. 391 (2019), the Court reasoned that "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 398–99 (citing *Hartman*, 547 U.S. at 260). That is why the Eighth Circuit now treats but-for causation as an essential element of a plaintiff's case when an unconstitutional motivation is alleged. *See Sanimax USA, LLC v. City of S. St. Paul*, 95 F.4th 551, 559 (8th Cir. 2024) (holding, in a case alleging that a City's rezoning of an area that included Plaintiff's property had an unconstitutional motive, that "Sanimax 'must show the protected activity was a 'but-for cause' of the adverse action,' in that it 'would not have been taken absent [a] retaliatory motive'" (quoting *De Rossitte v. Correct Care Solutions, LLC*, 22 F.4th 796, 804 (8th Cir. 2022))).

Plaintiffs might dispute whether the burden of proving but-for causation has shifted in cases not referencing *retaliation,* and then claim that it should be allowed to address the second step of the analysis for the first time in its reply brief. But that ignores that—when seeking a preliminary injunction—it is Plaintiffs' burden to prove "that they are *likely to* prevail on the merits[.]" *Rounds*, 530 F.3d at 732. "Prevailing" requires both carrying a plaintiff's own burden of proof on at least one claim, and overcoming all defenses the defendant has raised to that claim. *See, e.g.,*

*Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (defense of laches "should be considered in evaluating the likelihood of success on the merits of a trademark infringement claim"). Because Plaintiffs ignored in their opening brief an essential element of the legal analysis of the merits, they have not made a serious effort to carry their real burden, as is necessary to prevail on their motion, and cannot sandbag Defendants as non-movants by waiting to do so for the first time in their reply brief. "[F]ederal courts do not, as a rule, entertain arguments made by a party for the first time in a reply brief." *Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.,* 491 F. Supp. 2d 871, 878 (D. Minn. 2007).

III.    **Plaintiffs' effort to equate their proposed project with another never-approved project proposed in 2022 disregards what really happened in 2022, and the significant events that occurred after 2022 and before the summer of 2024.**

Plaintiffs' brief (like their Amended Complaint) rests on an overly simplistic and semi-fictional syllogism. It alleges that another developer proposed a residential project for the same site, which the City "greenlighted"—while Plaintiffs' proposed residential project (with a masjid) for the same site was stopped by a moratorium. On those premises, Plaintiffs claim that the City discriminated against them because

of religion, race, or both, by adopting the moratorium ordinance, and ask the Court to strike down that well-recognized planning mechanism.[20]

There are two especially large flaws with Plaintiff's syllogism. First, City records show that it never "greenlighted" the earlier project. To the contrary, the 2022 proposed project received many negative messages from the City, and nothing constituting an "approval." Second, in 2024 there were significant events when Plaintiffs submitted their concept plan for review that did not exist in 2022, and which warranted a moratorium in 2024 but not in 2022.

## A. Plaintiffs' opening brief severely mischaracterizes the way that the City treated the previous developer's concept plan.

On the first page of their opening brief, Plaintiffs falsely claim that the City Council "gave . . . . a green light" to another developer's concept plan two years earlier to develop the same site.[21] That supposed "green light" is then used to contrast the City's failure to give a green light to the Plaintiffs' concept plan. In fact, meeting minutes prove that *neither* concept plan received "a green light." Both concept plans received feedback from the City, and much of the feedback that the prior developer received was negative and critical.

---

[20] *See, e.g., Almquist v. Town of Marshan*, 245 N.W.2d 819, 826–28 (Minn. 1976) (embracing the role that an interim moratorium can play in a local government's ability to carry out its planning authority under the Minnesota Planning Act).

[21] *See* ECF 15 at 1.

As City staff accurately recounted in the June 17, 2024 staff report when summarizing the history of the other developer's earlier proposal, "[n]o approvals were granted by the City and the project did not move past concept plan review."[22] Specifically, Integrate Properties LLC (IPL) proposed a residential development for the subject property in late 2021, which was initially the subject of a staff report to the Planning & Zoning Board for the Board's January 12, 2022 meeting.[23] That report recognized that IPL's proposal would require a comprehensive-plan amendment, an EAW, a rezoning of the property from Rural to PUD, PUD Development Stage Plan/Preliminary Plat approval, and PUD Final Plan/Final Plat approval.[24] The Board's minutes from that meeting include feedback from the Board—but no Board approval, and no Board recommendation that the City Council give any approval.[25] That project was then the subject of a staff report to the City Council for its February 7, 2022 meeting.[26] The staff report's recommendation was *not* that the Council approve or otherwise give a "green light" to the IPL concept plan; instead, its sole recommendation was to provide feedback on two questions (one about master planning in the Main Street Corridor, and one about PUD flexibility for lot

---

[22] Baker Decl. Ex. 5 (staff report at 2–3).

[23] ECF 17-1 at 2 (Diehl Decl. Ex. J).

[24] ECF 17-1 at 2–3 (Diehl Decl. Ex. J).

[25] ECF 17-2 at 6–7 (Diehl Decl. Ex. K).

[26] ECF 17-4 at 2 (Diehl Decl. Ex. M).

widths, lot sizes, and setbacks).[27] The City Council's minutes for its February 7, 2022 meeting include feedback from the Council members, but not the Council's approval.[28] No motions were made regarding the IPL concept plan, and no votes (to approve or otherwise) were taken.[29] Indeed, Plaintiffs provide no basis other than the rhetoric in the introduction of their brief to suggest that the IPL project received any "green light."

In contrast to Plaintiffs' effort to depict IPL as a favored comparator, much of the feedback that IPL received from the City about its previous project in early 2022 was negative.[30] Planning & Zoning Board member Michael Root urged a change in the project's density.[31] The Board's then-Chair, Paul Tralle, complained that the price points were too high, complained that the trails and other benefits to the City

---

[27] ECF 17-4 at 12 (Diehl Decl. Ex. M).

[28] ECF 17-3 at 3–6 (Diehl Decl. Ex. L).

[29] *Id.*

[30] Plaintiffs' brief claims, in error, that there was "no" community opposition to the IPL project. ECF 15 at 23. As minutes from public meetings in 2022 reflect, citizens criticized potential impacts of the IPL project. *See* ECF 17-3 at 4 (Diehl Decl. Ex. L); Baker Decl. Ex. 6 at 3. These included criticisms in 2022 of the IPL project's traffic impacts on the Carl Street residents voiced by Randy Rennaker (ECF 17-3 at 4 (Diehl Decl. Ex. L); Baker Decl. Ex. 6 at 3), who, two years later, would raise regarding the Madinah Lakes project "the concerns he raised previously." *See* Baker Decl. Ex. 7 at 2. But despite Rennaker's consistency in 2022, Plaintiffs' Amended Complaint impugns Rennaker's motives in 2024 and characterizes him as a "leader[] of the organized opposition to Madinah Lakes." ECF 9 ¶ 105.

[31] ECF 17-2 at 6 (Diehl Decl. Ex. K).

were too few, and criticized the gated community concept, the lack of amenities for the City to use, and the high number of 50-foot lots.[32] Board member Nathan Vojtech criticized the absence of a park component.[33] At the City Council level, Mayor Rob Rafferty also questioned the concept of a "gated community."[34] Council member Tony Cavegn "remarked that he'd prefer to see the commercial [uses] included because there is no guarantee the north [side of Main Street] will develop."[35]

Making matters worse for the narrative in Plaintiffs' brief, the IPL project (retitled "The Promenade") returned to the Planning & Zoning Board on November 9, 2022, after completion of an EAW, with the prior developer again seeking feedback on a revised concept plan.[36] Again, City staff did not seek a decision from the Board or a recommendation from the Board to the City Council; instead, staff wrote that they were "requesting feedback from" the Board.[37]

And the feedback the Board members provided to the Promenade's proposed developer at the November 9, 2022 meeting was a far cry from any recommendation

---

[32] ECF 17-2 at 7 (Diehl Decl. Ex. K).

[33] *Id.*

[34] ECF 17-3 at 4 (Diehl Decl. Ex. L).

[35] *Id.*

[36] Baker Decl. Ex. 8 at 1–2.

[37] *Id.* at 3.

of a "green light."[38] The minutes show that the meeting resulted in the delivery of at least one major unwelcome message to the applicant. Staff sought input at the November 9, 2022 Board meeting about the applicant's proposed lot widths of 55, 66, and 75 feet, which were compared in the staff report to the standard minimum widths of 80 feet and 60 feet in an R-1 (residential-one) zoning district.[39] The minutes of the Board's November 9, 2022 meeting reflect that "[t]he Board did not have confidence in the benefits we are getting are equal to giving up our standard lot size."[40] After that meeting, the proposers of the Promenade project never moved forward.[41]

Plaintiffs' concept plan, like the Promenade concept plan, also received the benefit of feedback from planning staff and the Planning & Zoning Board.[42] Some feedback from the Board members was positive, and some was negative.[43] The Board's minutes reflect that it "was not unanimous on the density," with Board member Perry Laden expressing comfort "with the overall density" but concern

---

[38] Baker Decl. Ex. 6 at 2–3.

[39] *Id.* at 3; Baker Decl. Ex. 8 at 2–3. Attachment 1 to the staff report reflected that *all* of the proposed single-family lots had widths of less than 80 feet (with 46 of the lots having proposed widths of 55 feet). Baker Decl. Ex. 8 at 4.

[40] Baker Decl. Ex. 6 at 3.

[41] Grochala Decl. ¶ 8.

[42] *See* Baker Decl. Ex. 7 at 6–8; Baker Decl. Ex. 9.

[43] Baker Decl. Ex. 7 at 7–8.

about the 55-feet-wide lots, Board member Root wishing to see the City "keep with the density that R-1 requires," and Board member Suzy Guthmueller expressing concern about the density and the low amount of green space.[44]

City staff then prepared the City Council to take up Plaintiffs' concept plan at its July 1, 2024 meeting, including a staff report with its packet.[45] But by July 1, the proposed moratorium had passed the City Council on a first reading (on June 24), with a second reading scheduled for July 8. After a discussion of several potential motions, the Council passed a "motion to table discussion of Plaintiffs' concept plan until August 19, 2024, after the vote on the moratorium, and if the moratorium vote passes, then not to proceed."[46]

In the end, the biggest difference between concept-plan review for the IPL/Promenade project and for Plaintiffs' project is that the former received feedback from City staff, Board members, and Council members (but no green light), and the latter received feedback from City staff and Board members, but not

---

[44] Baker Decl. Ex. 7 at 7–8.

[45] Baker Decl. Ex. 10.

[46] Baker Decl. Ex. 11 at 1–3. The statement in the July 1 meeting minutes of the motion that passed debunks Plaintiffs' characterization of the vote in their brief as one "to avoid reviewing Zikar's application." ECF 15 at 16. To the contrary, the City's motion effectively denied the concept plan, thereby preventing automatic approval under Minn. Stat. § 15.99. *See Mesenbrink Constr. & Eng'g, Inc. v. County of Rice*, No. A07-2101, 2008 WL 5334251, at *5 (Minn. App. Dec. 23, 2008) (holding that timely rejection of an application, while not labeled a "denial," precludes automatic approval under Section 15.99).

from Council members, and no green light. Even if the Court concludes that the City Council should also have provided feedback on July 1 (such as because the moratorium was not yet effective), the Court should not strike down the moratorium, but should direct the City Council to provide feedback on Plaintiffs' concept plan, and allow the moratorium, master planning, and AUAR to continue.

**B. Plaintiffs disregard significant differences between the planning-related circumstances in 2022, and in 2024.**

In 2024 (but not 2022) *two* proposed major projects across Main Street from each other became known to the City that together would have involved 1,071 new residential units, far more than what was proposed by one developer on one project site in 2022.[47] That occurred at a time of great doubt about whether the Minnesota Department of Natural Resources (DNR) and the Ramsey County District Court will allow Lino Lakes to draw sufficient water from the aquifer beneath it to serve all the needs the two projects would generate if they were built. On top of that, in 2024 the City was two years closer to the comprehensive plan's deadline to "complete" master planning for areas that included major parts of the two projects' sites, but the master planning had not even started.[48] If only one of these three new events had occurred, then the City might not have taken the step of enacting a moratorium. But in

---

[47] Baker Decl. Ex. 10 at 3–4 (434 units for Madinah Lakes); Baker Decl. Ex. 12 (depicting 637 new units for Pulte/Del Webb); ECF 17-4 at 2 (Diehl Decl. Ex. M) (concept plan for 707 units).

[48] Grochala Decl. ¶¶ 4–5.

combination, the three events motivated four of the five City Council members to insert a "time out" so that it could occur before any Council concept-plan review or development-stage plan application review would need to take place in that area of the City.

### 1.    In 2024—unlike 2022—two concept layouts for major residential developments were presented to the City Council.

The City's 2040 Comprehensive Plan did not contemplate that there would be development before 2030 on the north side of Main Street between Sunset Avenue and Fourth Avenue.[49] Then, in early January 2024, City planning staff was approached by representatives of Pulte/Del Webb about their interest in building a large-scale residential project that would consume more than half of that area.

Pulte/Del Webb's concept layout for their project reflects that—over more than 237 acres—they would propose to build 90 townhomes, single-family attached homes on 107 lots 44 feet wide, single-family unattached homes on 214 lots 50 feet wide, single-family unattached homes on 129 lots 64 feet wide, and single-family unattached homes on 97 lots 65 feet wide.[50]

Plaintiffs seek to minimize this event, because (unlike Plaintiffs) Pulte/Del Webb did not submit a concept-plan application for City review, and allegedly did

---

[49] Grochala Decl. ¶ 6.

[50] Baker Decl. Ex. 12.

not have site control. While Pulte/Del Webb may not have had a "*pending* land use application,"[51] in January 2024 they had shown the City's planning staff their concept layout and in February 2024 they had presented a PowerPoint slideshow to the City Council that outlined the project.[52] And after a Pulte/Del Webb representative watched one of Plaintiffs' legal team tell the Planning & Zoning Board that Pulte does not have any land under contract, that representative notified the attorney, Plaintiff Faraaz Mohammed, and (in writing) the Community Development Director that this was incorrect.[53]

Pulte/Del Webb's representative did not simply submit a concept layout, but also made a presentation to the City Council on February 5, 2024.[54] Plaintiffs' suggestion that the City should have ignored the Pulte/Del Webb concept layout because it was not the subject of a complete application has no basis in law or in sound planning.

The potential need for the City Council to make planning decisions regarding two proposed projects on large adjoining sites reaching the City independently in the same general time frame bolstered the justification for calling a "time out" for

---

[51] ECF 15 at 2 (emphasis added).

[52] Grochala Decl. ¶ 6.

[53] Baker Decl. Ex. 13.

[54] Baker Decl Ex. 14 at 1; Baker Decl. Ex. 15.

further planning. As the Community Development Director wrote to the Council in

a staff report for the May 28, 2024 working session:

> **The influx of new development interest provides an opportunity to collaborate on a larger planning scale to ensure a coordinated and efficient extension of public facilities that address the cumulative impacts of the broader development area**. . . .
>
> A proposed moratorium would allow time for the City to complete the master planning process within a larger geographic area to address land use, transportation, environmental resources, parks and open space, surface water management and utility issues. Staff would also suggest incorporating into the process the preparation of an Alternative Urban Areawide Review (AUAR). The AUAR is an environmental review document that would allow more in-depth analysis of the Master Plan and provide a mitigation document for implementation.[55]

> **2.    A major decision by an administrative law judge in May 2024 increases the likelihood that the City will face greater difficulties extracting water from the aquifer beneath it to serve current and future residents and businesses.**

Plaintiffs' brief repeatedly attempts to mischaracterize and trivialize (as mere

"concern[s] about water infrastructure"[56]) the increasing likelihood that the City

may be forced by a state agency or state courts to reduce the amount of water that

it draws from its aquifer to serve the drinking, bathing, and watering needs of its

citizens—including those who would live the Madinah Lakes project and the

Pulte/Del Webb project. In response to the almost purely rhetorical arguments in

---

[55] Baker Decl. Ex. 16 at 1–2 (emphasis added).

[56] *See, e.g.*, ECF 15 at 25.

Plaintiffs' opening brief about this topic,[57] the facts of the legal proceedings leading up to the adoption of the moratorium in July 2024 demonstrate the seriousness of the potential problems facing the City's elected and appointed officials.

From 2013 to the present, a judge of the Ramsey County District Court has adjudicated, then enforced, claims of two associations near White Bear Lake against the DNR arising from the Minnesota Environmental Rights Act (MERA), Minn. Stat. § 116B.03. *See* Ramsey County District Court, File No. 62-CV-13-2414. The MERA suit indirectly relates to Minnesotans who own property within several miles of the lake because "White Bear Lake and the aquifer are hydrologically connected, meaning that aquifer groundwater levels have an effect on the lake's water levels." *White Bear Lake Restoration Ass'n ex rel. State v. Minnesota Dep't of Nat. Res.,* 946 N.W.2d 373, 377 (Minn. 2020) (*WBL II*). The plaintiff associations' claims were "based on their allegation that groundwater pumping by municipalities [from the Prairie du Chien-Jordan Aquifer ('the aquifer') that runs below the lake,] pursuant to permits issued by the DNR, has impaired the lake and aquifer and is a cause of the low lake levels reached in the early 2010s." *White Bear Lake Restoration Ass'n ex rel. State v. Minnesota Dep't of Nat. Res.,* No. A18-0750, 2020 WL 7690268, at *1 (Minn. App. Dec. 28, 2020) (*WBL III*). The City of White Bear Lake and White Bear Township, which hold DNR permits to pump groundwater from the aquifer, intervened to

---

[57] *See* ECF 15 at 25–26.

defend the interests of their present and future residents to receive water pumped from the aquifer. *WBL II*, 946 N.W.2d at 378. However, the plaintiff associations did not name the City of Lino Lakes as a defendant, and Lino Lakes did not intervene. *WBL III*, 2020 WL 7690268, at *4 n.2, 16 n.7.

In an August 2017 order, the Ramsey County court required the DNR to, among other things, set a collective annual withdrawal limit for the lake; prepare, enact, and enforce a residential irrigation ban when the level of the lake falls below the court-ordered "trigger elevation" of 923.5 feet and until the lake level returns to 924 feet; and to "immediately amend" all existing permits within a five-mile radius of the lake to require an enforceable plan to phase down per capita residential water use to 75 gallons per day and total per capita use to 90 gallons per day. *Id.* at *3–4.

The DNR responded by amending 44 water appropriation permits in the Northeast Metro area. This prompted Lino Lakes and several other communities to timely seek a contested case proceeding challenging those amendments.[58]

In *WBL III,* the Minnesota Court of Appeals had required the Ramsey County court to amend its order because of "the right of the municipal water-appropriation permit holders to an administrative contested-case hearing prior to the imposition of any permit amendments." *Id.* at *1, 9. The Minnesota Court of Appeals further

---

[58] *In re Amendments to Various Water Appropriation Permits*, OAH 8-2002-37733, at 13 n.70 (OAH May 16, 2024) ("2024 ALJ Order") (Baker Decl. Ex. 17).

cautioned the Ramsey County court "that heed must be taken of the permit holders' statutory right to a hearing as it administers the injunction and that, *depending on the evidence adduced at the contested-case hearings,* modifications may be appropriate." *Id.* at *11 (emphasis added). Thereafter, the Office of Administrative Hearings conducted a consolidated contested-case proceeding, which covered permittees' appeals of the four permit conditions the DNR placed on water appropriation permits.[59]

Seven municipal permit holders—including the City of Lino Lakes—proceeded to an evidentiary hearing before Administrative Law Judge Eric Lipman in October and December 2023.[60] This was after the Lino Lakes City Council considered the IPL concept plan in 2022, but before the Council considered any aspect of Plaintiffs' proposed development of the same site. But at the time of the March and April 2024 Council meetings, because the contested case hearing had finished and was under submission, the City Council knew that a decision was coming (even if it did not yet know the result).

Judge Lipman's Order, which was issued on May 16, 2024,[61] had a mixed outcome for Lino Lakes. Most important, despite Lino Lakes' challenge, Judge

---

[59] *See* 2024 ALJ Order at 13.

[60] *Id.* at 1.

[61] Baker Decl. Ex. 17 (cover letter).

Lipman upheld Condition 3, the requirement that the City create an "enforceable plan" to phase down per capita water use (to 75 gallons per day residential use and 90 gallons per day total use).[62] Judge Lipman also rejected Lino Lakes' challenge to Permit Condition 1 (requiring submission of a water supply plan, including a contingency plan to fully or partially convert "the source water" for the municipality from groundwater to surface-water source(s)).[63] While Judge Lipman did invalidate the DNR's requirement that the permit holders, including the City, "prepare, enact and enforce a residential irrigation ban," the plaintiff associations have challenged that ruling in both the Minnesota Court of Appeals[64] and Ramsey County District Court.[65] Judge Lipman's May 16, 2024 ruling therefore left the City of Lino Lakes in a worse position than it was in before: the City must plan for enforceable reductions in its groundwater use and per capita residential water use (unless an appellate court, on certiorari, can be persuaded to overturn it).[66]

---

[62] 2024 ALJ Order at 30 (finding that Lino Lakes, among other cities, argued against the 75/90 per capita condition). The order was later corrected to remove an error on page 22 that implied otherwise.

[63] *Id.* at 2, 22–24.

[64] *See* Minnesota Court of Appeals, Matter No. A24-0943.

[65] *See* Ramsey County District Court, File No. 62-CV-13-2414, Dkt. 523.

[66] Between June 11 and June 17, 2024, five petitions for certiorari under the Minnesota Administrative Procedure Act (Nos. A24-943, 958, 959, 960, and 976) were filed in the Minnesota Court of Appeals seeking review of the ALJ's ruling. These appeals were consolidated in matter A24-0943. Based on the court of appeals' performance standard of deciding appeals within 290 days of the appeal's

     **3.**      **In 2024, the City is now two years closer to its deadline to have "completed" master planning of areas specified in its comprehensive plan—including a corridor that includes both the Plaintiffs' site and the proposed Pulte/Del Webb site.**

In addition to the obstacles described in the factual background section arising from the "checkerboard" of three different types of higher-density housing of squares south and north of Main Street between Sunset and Fourth Avenues,[67] there is a second relevant dimension to comprehensive planning in the seven-county metropolitan area. Under Minn. Stat. § 473.858, subd. 1, "[t]he comprehensive plan shall provide guidelines for the timing and sequence of the adoption of official controls to ensure planned, orderly, and staged development and redevelopment consistent with the comprehensive plan." Consistent with this provision, the City's 2040 Comprehensive Plan (a) required master planning of several specific places, including the Main Street Corridor between Fourth Avenue

---

commencement and the frequency with which the court achieves that standard, it is likely that the court of appeals will issue its decision regarding the ALJ's ruling in the spring of 2025—before the moratorium's expiration in July 2025. *See* Minnesota Judicial Branch, "Performance Measures; Key Results and Measures, Annual Report," 6 (Sept. 2024), *available* at https://www.mncourts.gov/mncourtsgov/media/CIOMediaLibrary/Documents/Annual-Report-2024-Performance-Measures.pdf.

[67] *See supra* p. 2.

and Sunset Avenue,[68] and (b) set an "implementation strategy" in the 2040 Plan to "*complete* master plans as noted in the individual planning districts."[69]

As the word "planning" reflects, the value of planning is diminished or lost if it is performed *after*, not *before*, the City considers whether to grant land-use approvals. That is because a core benefit of planning is to better inform the land-use approval process, and that cannot occur if land-use approval decisions are made on a timetable that disregards the status of master planning.

Borrowing the logic of Judge (later Justice) Stephen Breyer, "when a decision to which [master planning] obligations attach is made without the informed environmental consideration that [a master planning provision] requires, the harm that [a master planning provision] intends to prevent has been suffered." *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989) (interpreting the National Environmental Policy Act); *cf. No Power Line, Inc. v. Minn. Envtl. Quality Council,* 262 N.W.2d 312, 327 (Minn. 1977) (the purpose of MEPA is "to force agencies to make their own impartial evaluation of environmental considerations *before reaching their decisions*" (emphasis added)); *Allen v. City of Mendota Heights,* 694 N.W.2d 799, 803 (Minn. App. 2005) ("MEPA and the environmental-review rules specifically

---

[68] Baker Decl. Ex. 1 (Chapter 3: Land Use at 3-24). The entire northern part of Plaintiff's proposed site is along Main Street between Sunset Avenue and Fourth Avenue, and the entire southern part of the Pulte/Del Webb proposed site is also along Main Street between Sunset Avenue and Fourth Avenue.

[69] Baker Decl. Ex. 18 (Chapter 12: Implementation at 12-3) (emphasis added).

mandate that environmental review of projects take priority by prohibiting granting a permit, approving a project, or beginning a project until the environmental-review process is complete").

What Plaintiffs say should have happened in this case—i.e., final decisions in 2024 on their proposed project within 120 days of complete applications, either before, or at the same time as, master planning—is exactly backwards: it would put the "decision" cart before the "planning" horse. That is particularly true where, as here, the City's comprehensive plan did not contemplate that there would be development before 2030 on the north side of Main Street between Sunset Avenue and Fourth Avenue—yet Plaintiff Mohammad called the City in October 2023 about his interest in potential development of the sod farms north of Main Street, and Pulte/Del Webb came forward with the concept layout north of Main Street in early 2024.[70]

## IV. Plaintiffs' opening brief fails to demonstrate that a majority of the City Council members voted for the moratorium because of unlawful motives.

Sections I, II, and III above demonstrate why—even if the Court assumes or concludes that a forbidden motive was present—Plaintiffs have failed to carry their burden of demonstrating that they are likely to prevail on the merits (and therefore cannot obtain an injunction). But it is also important to recognize that Plaintiffs'

---

[70] Grochala Decl. ¶ 6.

approach to attacking Council member motivations is legally insufficient and unpersuasive.

**A.  Plaintiffs' political theories are no way to demonstrate a likelihood of success on the merits.**

Plaintiffs' opening brief (like their Amended Complaint) includes repeated references to political concepts. For example:

- An allegation "upon information and belief" that before Defendant Michael Ruhland (a member of the City Council) even proposed a moratorium he "was already working with Luke Walter or other opponents" of Plaintiffs' proposed project.[71]

- A thinly supported assertion that the Mayor and Council member Ruhland are "allies" of a county commissioner who allegedly sent an offensive text message to a third party.[72]

- An allegation that "it is clear that four council members "intended to . . . prevent Plaintiffs'" project,[73] despite the fact that the City Council only passed a temporary moratorium while master planning and environmental planning takes place to inform later Council consideration of applications not yet even submitted.

- An allegation that a photo with one Council member and two private citizens who spoke against the Madinah Lakes project reflects that the trio "went out to a local restaurant to celebrate passage of the moratorium."[74]

---

[71] ECF 9 ¶ 98; ECF 15 at 9.

[72] ECF 9 ¶ 83; ECF 15 at 8.

[73] ECF 9 ¶ 150.

[74] *Id.* ¶ 144.

Through these references, Plaintiffs are "trying to make [their] case on a nod, a wink, and the suggestion that 'we know what those politicians are like[.]'" *Garrett v. Barnes*, 961 F.2d 629, 634 (7th Cir. 1992). "It may be easy to become cynical about politics and politicians, but public perception of political machinations, innuendo, and speculation cannot be the basis of a jury verdict[.]" *Id.* And if it "cannot be the basis of a jury verdict," it should not be the basis for a preliminary injunction for which a threshold showing must be that Plaintiffs are likely to succeed on the merits of their claim.

**B.    Plaintiffs' repeated misuse of the word "pretext" as the equivalent of a statutory or constitutional violation ignores fundamental principles of discrimination law.**

Plaintiffs' opening brief's primary strategy for addressing reasons for the City's challenged actions is to label them as "pretexts" or "pretextual."[75] That is insufficient. As the Supreme Court has held, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown *both* that the reason was false, ***and*** that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16 (1993) (emphasis added). Plaintiffs' brief does too little to attempt to prove, through evidence, that they are likely to succeed on the merits of their claim that the reasons for the moratorium were both false, and that discrimination was the real reason.

---

[75] ECF 15 at 2, 10, 22, 24–25, 31–32.

In the only instance in which Plaintiffs' brief appears to acknowledge the need to show a challenged action was "'pretext' and unlawful discrimination, it quotes and then embellishes, a sentence from *Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Township*, 996 F. Supp. 409, 436 (D.N.J. 1998).[76] The actual sentence in *Assisted Living* does not include the phrase "and unlawful discrimination"; Plaintiffs added that in their brief. *Compare* 996 F. Supp. at 436, *with* ECF 15 at 31.

After its partial quote from *Assisted Living,* Plaintiffs' brief asserts, "that is exactly what happened here."[77] But here is what "bespoke pretext" in the eyes of the court in *Assisted Living*:

> Several weeks after ALA and LCM had acquired the minimum five acres necessary to satisfy the requirements the imposition of which made their first application unsuccessful and after submitting their second application for conditional use and site plan approval, the Township effectively pulled the rug out from under Plaintiffs by passing an ordinance which removed assisted living from among the uses conditionally allowable in the R–1 zone and imposed special sewering requirements on assisted living facilities.

996 F. Supp. at 436. Calling time-out while master planning and an AUAR go forward before proceeding further with concept-stage review pales in comparison to *Assisted Living*.

---

[76] *See* ECF 15 at 31.

[77] *Id.*

On close examination, Plaintiffs' concept of a "pretext" is not even limited to things that are false. Their concept includes any difference in reasons to support a moratorium that arose *after* Council member Ruhland spoke about a moratorium on April 1, 2024. That was before a moratorium was the topic of comments from the Plaintiffs and their supporters, comments from other members of the community, consideration of a moratorium and a recommendation to the Council from the Planning & Zoning Board, and deliberations between members of the Council.  If, as those discussions developed, different reasons for or against a moratorium were raised, and different City officials formed opinions about it and about some of the reasons urged, the Court can hardly conclude that evidence of additional or different reasons must be evidence of pretext, let along that those additional or different reasons are a pretext for unlawful discrimination. It could just as easily be a reflection of lawfully motivated officials forming their own opinions and conclusions over time.

**C.     Plaintiffs' focus on two of the four Council members who voted for the moratorium does not begin to show that it was adopted because of forbidden motives.**

To obtain relief against a municipal ordinance under federal law, the plaintiff must focus on the actions of "one in an authoritative policy making position" whose acts "represent the official policy of the municipality." *McGautha v. Jackson Cty., Mo., Collections Dep't,* 36 F.3d 53, 56 (8th Cir. 1994). An enactment in Minnesota of zoning ordinances, including a moratorium ordinance, is only an act of a city's

governing body—that is, its council. *See* Minn. Stat. §§ 462.357, subd. 2 (adoption of a zoning ordinances), 462.355, subd. 4 (adoption of moratorium ordinances). For that reason, in their opening brief, Plaintiffs need to have shown that the Lino Lakes City Council, rather than just some of its members, acted with an unlawful motive. *See Gautha*, 36 F.3d at 56 (citing *Church v. City of Huntsville,* 30 F.3d 1332, 1343 (11th Cir. 1994)). To do this, Plaintiffs need to have shown that "improperly motivated members suppl[ied] the deciding margin[.]" *Scarbrough v. Morgan Cty. Bd. of Educ.,* 470 F.3d 250, 262 (6th Cir. 2006) (citing *LaVerdure v. Cty. of Montgomery,* 324 F.3d 123, 125 (3d Cir. 2003), *Jeffries v. Harleston*, 52 F.3d 9, 14 (2d Cir. 1995), and *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1239 (9th Cir. 1994)); *see also Church,* 30 F.3d at 1343–45 (municipal-liability claim based on one member of a five-member city council failed, where two of the remaining four members' conduct had been non-discriminatory while the other two had been silent). In setting the standard for Plaintiffs, the Court should agree with *Church, Scarbrough, LaVerdure, Jeffries,* and *Kawaoka*, and with *Northwestern University v. City of Evanston,* No. 00 C 7309, 2002 WL 31027981, at *8 (N.D. Ill. Sept. 11, 2002), which held, under "both the logic of municipal liability and the weight of precedent," that "to establish municipal liability based on the discriminatory motive of a multi-member body, the plaintiff must show that a majority of its members acted with discriminatory intent."

In *Scott-Harris v. City of Fall River,* 134 F.3d 427, 437 (1st Cir. 1997),[78] the First Circuit *assumed,* but did not adopt, the validity of establishing a claim against a municipality through "evidence of both (a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others." *Scott-Harris*, 134 F.3d at 437–38 ("[W]e assume for argument's sake (but do not decide) that in a sufficiently compelling case the requirement that the plaintiff prove bad motive on the part of a majority of the members of the legislative body might be relaxed. . . .").[79] Without citing *Scott-Harris,* Plaintiffs' opening brief embodies the assumed standard.

But as the Supreme Court later described this part of the First Circuit's decision, it "held that the city was not liable because the jury could reasonably infer unlawful intent only as to two of the city council members, and municipal liability could not rest 'on so frail a foundation.'" *Bogan v. Scott-Harris,* 523 U.S. 44, 48 n.2

---

[78] The full citation is *Scott-Harris v. City of Fall River*, 134 F.3d 427, 437 (1st Cir. 1997), *cert. denied, Scott-Harris v. City of Fall River,* No. 96-1872523 U.S. 1003 (1998), *rev'd in irrelevant part, Bogan v. Scott-Harris,* 523 U.S. 44 (1998) (reinstating individual defendants' legislative immunity). On the relevant issue of the city's liability, plaintiffs petitioned for certiorari, and their petition was denied. On the separate issue of individual council member legislative immunity, the Supreme Court granted the public official-defendants' petition for certiorari on that question and reversed the First Circuit's decision.

[79] In *Scarbrough* the Sixth Circuit then expressly rejected the First Circuit's assumed approach. *See* 470 F.3d at 262. It considered the First Circuit's approach "difficult to apply, because it leaves many questions unanswered." *Id.*

(1998) (quoting *Scott-Harris,* 134 F.3d. at 440).[80] The First Circuit vacated the jury's

verdict against the City with instructions to grant judgment as a matter of law in its

favor. *Scott-Harris,* 134 F.3d. at 439–40.

> ### 1.   Under Eighth Circuit law, Plaintiffs' reliance on the words of nondecision-makers does little to demonstrate that the moratorium was adopted because of forbidden motives.

In attempting to taint the moratorium, Plaintiffs' opening brief dwells on

words that were said by unelected people from the podium, and not so much on the

City's elected (or appointed) officials on the dais.  In so doing, Plaintiffs overlook

the way that the Eighth Circuit currently evaluates evidence of discriminatory

motive.

Because Count I of Plaintiffs' Amended Complaint is for disparate treatment

in violation of the Fair Housing Act (FHA), the following passage from the disparate-

treatment part of the Eighth Circuit's FHA decision in *Gallagher v. Magner,* 619 F.3d

---

[80] The First Circuit expected the plaintiffs to produce not just evidence of high public attention, but something more: "widespread constituent *pressure.*" *Scott-Harris,* 134 F.3d at 439 (emphasis added). As it explained, "[t]here is a significant difference between heightened public interest—an environmental phenomenon with which legislatures grapple constantly—and pervasive constituent pressure." *Id.* at 440 n.12. The difference includes an element of coercion. See *id.* ("The plaintiff's assertion that the publication of front-page articles about her plight in the local newspaper *shows constituent coercion* will not wash.").

823, 831–32 (8th Cir. 2010),[81] affirming summary judgment for public defendants in

St. Paul on that claim, is particularly relevant:

> Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Griffith v. City of Des Moines,* 387 F.3d 733, 736 (8th Cir. 2004) (quotation omitted). "**Direct evidence does not include** stray remarks in the workplace, **statements by nondecisionmakers**, or statements by decisionmakers unrelated to the decisional process itself." *Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 933 (8th Cir. 2006).

*Gallagher,* 619 F.3d at 831-32 (emphasis added). *Gallagher* is one of many recent

Eighth Circuit decisions in which the court limited the scope of direct evidence of

discriminatory intent to statements *by decisionmakers. See, e.g., Doucette v.*

*Morrison Cty., Minn.,* 763 F.3d 978, 986 (8th Cir. 2014) (MHRA claim of age

discrimination); *Winters v. Deere & Co.,* 63 F.4th 685, 690 (8th Cir. 2023) ("The

district court correctly found that Morrison's thoughts, beliefs, and statements were

not direct evidence because he was not involved in the decision to fire Winters,"

quoting the "statements by nondecisionmakers" exception). Thus, evidence that a

co-worker said that hiring the plaintiff ("a black Muslim immigrant from Somalia")

---

[81] *Cert granted on other grounds,* Nov. 7, 2011, *pet. dismissed,* 565 U.S. 1187 (2012). While the disparate *impact* count in *Gallagher,* which survived summary judgment, was the subject of a stalemate vote on the plaintiffs' petition for rehearing en banc, a successful certiorari petition by St. Paul which was granted, then voluntarily dismissed, the its 2010 decision the Eighth Circuit decided, in St. Paul's favor, with finality, the disparate *treatment* claim.

would be "like raising terrorist kids" was not direct evidence of forbidden motive because the speaker "had no authority to make the hiring decision on [Plaintiff's] application." *Arraleh v. Cty. of Ramsey,* 461 F.3d 967, 971, 975 (8th Cir. 2006) (affirming summary judgment to Ramsey County).

Indirect evidence of wrongful discrimination is also admissible, but what is absent from Plaintiffs' opening brief is meaningful modern Eighth Circuit authority to conclude indirect evidence—alone—is sufficient to enjoin a local body's exercise of its authority to adopt a zoning ordinance. Like nearly every FHA plaintiff in the Eighth Circuit in in the last fifty years, Plaintiffs cite *United States v. City of Black Jack, Missouri,* 508 F.2d 1179 (8th Cir. 1974).[82] But *City of Black Jack* was issued without the benefit of the Supreme Court's interpretations of the FHA in *Arlington Heights*.

### D. On close examination, Plaintiffs' effort to impugn the motives of Mayor Rafferty are based almost entirely on rhetoric rather than evidence.

Under the legal standards explained above, unless Plaintiffs can demonstrate that they are likely to prove that unconstitutional motivation caused Mayor Rafferty, Council member Dale Stoesz, or both of them, to vote for the moratorium, the Court cannot grant the motion.

---

[82] ECF 15 at 24–25.

Plaintiffs' brief is silent regarding Council member Stoesz' motives, so they have effectively forfeited the question of whether his vote was unlawfully cast.

Plaintiffs' opening brief throws many adjectives and other rhetoric at Mayor Rafferty—but that is to make up for the absence of meaningful evidence that his vote in favor of the moratorium was motivated by race or religion, let alone that race or religion was a decisive factor. Plaintiffs try to create the impression that one of his comments at the meeting where the moratorium passed on second reading—which referred to communities and neighborhoods—must reflect an unconstitutional motive. But that requires the court to engage in a leap of logic that would be inappropriate at this early stage of the case.

## V. The public-interest and irreparable-harm factors favor the City.

When a court order prevents a governmental body from effectuating a legislative act enacted by representatives of the people, that court order represents a *per se* irreparable injury to the public. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *see also Abbott v. Perez*, 585 U.S. 579, 602–03 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."). The Eighth Circuit has specifically recognized this kind of irreparable harm where a governmental body is precluded from applying its "duly enacted legislation." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020).

40

The irreparable harm posed by court orders preventing the enforcement of duly enacted legislation is not limited to acts from state legislatures but extends to all forms of legislative bodies. *See NewRays One LLC v. Faulkner Cnty., Ark.*, No. 4:24-CV-00824-LPR, 2024 WL 4468784, at *4 (E.D. Ark. Oct. 8, 2024) ("Not allowing a County to enforce parts of its duly enacted law is inherently harmful to the County."). The court in *NewRays* noted that the county was "entitled to help its citizens by keeping noise in check" and that the public interest in that protection was "fairly high." *Id.* at *8. If the court would have enjoined the relevant ordinance, it would have prevented the county from "protecting some of its citizens from noise pollution." *Id.*

Similarly, Lino Lakes is entitled to help its citizens by protecting the water resources available to them, and by planning at a more appropriate time and way. If the Court were to enjoin the City's moratorium ordinance, it would prevent Lino Lakes from ensuring that its citizens' continued access to safe water remains protected.

Prohibiting an elected city council from enforcing an ordinance properly passed as part of its broad authority to issue such ordinances, would irreparably harm the City. *See Ashcroft*, 978 F.3d at 609; *see also Minnetonka Moorings, Inc. v. City of Shorewood*, 367 F. Supp. 2d 1251, 1257 (D. Minn. 2005) ("The law has long recognized a city council's wide discretion in crafting, adopting, and amending its

zoning ordinances."). Because the Lino Lakes City Council passed the moratorium as part of its broad authority, and because the expressed concerns regarding water infrastructure reflect a strong likelihood that the ordinance is not constitutionally infirm, prohibiting the City Council from enforcing the ordinance would irreparably harm the City. This factor weighs against an order enjoining the ordinance.

## VI.   The Court should not treat Plaintiffs' verified Amended Complaint as admissible evidence of everything in it.

Plaintiffs' repeated references to their own Amended Complaint does little to create confidence that the assertions in the memorandum are correct. Plaintiffs appear to believe that the inclusion of a verification block at the Amended Complaint's end transformed all "factual" assertions within it into admissible evidence. While courts have acknowledged that a verified complaint can be treated as the "equivalent of an affidavit" in the summary-judgment context, this treatment is not guaranteed. *Sornsen v. Wackenhut Corp.*, No. 01CV1967(JMR/FLN), 2003 WL 1956221, at *4 (D. Minn. Feb. 27, 2003). As with affidavits, verified complaints "must be made on personal knowledge." Fed. R. Civ. P. 56(c)(4). Fed. R. Civ. P. 56(c)(4) requires that affidavits, and verified complaints by extension, "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* In addition, "[a]ffidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge." *El Deeb v. Univ. of Minnesota*, 60

F.3d 423, 428 (8th Cir. 1995). "[A] court may not consider affidavits that do not

satisfy the requirements." *Id.* at 429. Here, Plaintiffs' verification block (signed by

Plaintiff Mohammed) includes no showing (or even attestation) that Mohammed is

competent to testify on the matters stated. Instead of attesting that he had personal

knowledge of the factual allegations, it alleges that they are based on his personal

knowledge *"or on records, statements, and communications of Defendants which I*

*have reviewed and with which I am familiar."*[83] Including that exception precludes it

from being an effective general verification. And in light of the nature of many of

the allegations in the Amended Complaint, which repeatedly refer to mental

processes of others and historical events regarding the parcel that appear to have

preceded his involvement—the "verification" seriously calls into question whether

Mohammed could have personal knowledge of the truth of a large share of the

Amended Complaint's allegations.

**VII.  Even if the Court concludes that a preliminary injunction should issue, it must reject Plaintiffs' effort to impose mandates on the City regarding the handling of future applications.**

One would think that the only thing Plaintiffs would expect the Court to

enjoin would be enforcement of the moratorium. Not only has no discovery

occurred (or even a Rule 16 conference) but the only application that Plaintiffs

submitted to the City concerned its concept plan, with applications (staff

---

[83] ECF 9 at 50 (emphasis added).

consideration, public hearings, and decisions) on development-stage land-use approvals still hypothetical.

Plaintiffs' proposed injunction, however, follows a "sentence first, verdict afterwards" approach,[84] including directives on what the City may or may not do in response to applications that have yet to be seen, let alone submitted. As drafted by Plaintiffs:

- The City would be enjoined from requiring all but one type of condition or approval from Plaintiffs (i.e. a condition or approval that is neutral and generally applicable);

- The City would also be enjoined from requiring any condition or approval "that is discretionary or that was not clearly enumerated in the City's Comprehensive Plan, Zoning Ordinance, or other City ordinance on March 1, 2024;" and

- The individual defendants would be enjoined from voting on or deliberating regarding any application submitted by Plaintiffs (or "anyone acting in concert with Plaintiffs").[85]

These requests are the opposite of an effort to preserve the status quo—which is the classic purpose of a preliminary injunction. *See, e.g., Cigna Corp. v. Bricker,* 103 F.4th 1336, 1342 (8th Cir. 2024) (a preliminary injunction's "'primary function . . . is to preserve the status quo until, upon final hearing, a court may grant full, effective relief'") (quoting *Ferry–Morse Seed Co. v. Food Corn, Inc.,* 729 F.2d 589, 593 (8th Cir.

---

[84] LEWIS CARROLL, THROUGH THE LOOKING-GLASS 100 (Penguin Books 1994 ed.).

[85] ECF 18 at 3–4.

1984) (ellipsis in *Cigna Corp.*). If the Court were to grant Plaintiff's proposed injunction, that would require a City Council (of three) to choose—prior to trial—between either approving Plaintiffs' unseen future applications with only two limited kinds of accompanying conditions, or denying them. While the first two requests are reminiscent of relief sometimes sought (in a judgment) by successful RLUIPA plaintiffs, Plaintiffs seek a preliminary injunction solely on grounds *other than* RLUIPA. And for all three of those kinds of prohibitions, Plaintiffs' opening brief offers no legal argument and cites no legal authority for the court to impose those particular kinds of prohibitions at the outset of the case.

But Plaintiffs have a deeper, jurisdictional, problem. By seeking pre-emptive relief imposing tight restrictions on what the City can do in response to applications that have yet to surface, Plaintiffs disregard the role that ripeness requirements play in land-use disputes about religious and other civil rights. "Ripeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, *and also to protect the agencies from judicial interference until an administrative decision has been formalized* and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (emphasis added) (citation and quotation marks omitted).

"Building on the foregoing, the Supreme Court has developed specific ripeness requirements applicable to land use disputes." *Murphy v. New Milford Zoning Comm'n,* 402 F.3d 342, 347 (2d Cir. 2005). This includes a strict finality requirement. In religious rights litigation (such as *Murphy*), federal courts have imported (from takings litigation) the requirement under "prong one" of *Williamson County Regional Planning Commission v. Hamilton Bank,* 473 U.S. 172, 186 (1985), that plaintiffs first obtain a final, definitive position as to an application of the relevant zoning laws on the property from the municipal entity responsible for those laws.[86] *See Murphy,* 402 F.3d at 349–50. A case is ripe when the court "can look to a final, definitive position from a local authority to assess precisely how [a property owner] can use [his or her] property." *Id.* at 402. The Second Circuit's ripeness analysis in *Murphy* has been followed by at least one district court within the Eighth Circuit. *See Chabad Lubavitch of the Quad Cities, Inc. v. City of Bettendorf, Iowa,* 389 F. Supp. 3d 590, 596–97 (S.D. Iowa 2019) ("As 'land use disputes are uniquely

---

[86] "*Williamson County* separately required that a land developer 'seek compensation through the procedures the State has provided for doing so.'" 473 U.S. at 194. The Supreme Court overturned this state law remedies requirement in *Knick v. Township of Scott,* 139 S.Ct. 2162 (2019). However, *Knick* did not disturb *Williamson County*'s final decision requirement. *See id.* at 2169 ("*Knick* does not question the validity of this finality requirement, which is not at issue here.")." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona,* No. 20-CV-6158 (KMK), 2021 WL 4392489, at *5 n.4 (S.D.N.Y. Sept. 24, 2021), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY,* No. 21-2822, 2022 WL 1697660 (2d Cir. May 27, 2022).

matters of local concern more aptly suited for local resolution,' *Murphy*, 402 F.3d at 348, and here the zoning board 'has the power to grant the permit that [Plaintiffs] need[ ]," *Guatay* [*Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957, 980 (9th Cir. 2011)], this Court is wary of wading into matters where the crucial dispute could have been solved by an application to the Board of Adjustment. The Court therefore determines that the finality requirement is appropriately applied to Plaintiffs' RLUIPA claim.") (brackets in *Chabad Lubavitch*).

Plaintiffs' only conceivably ripe claim is to enjoin the moratorium, and stop. If any relief is granted, the Court should go no further. Plaintiffs could then submit their applications to the City.

## CONCLUSION

Defendant City of Lino Lakes respectfully requests that the Court deny Plaintiffs' motion for preliminary injunction.

Dated:  November 18, 2024                **GREENE ESPEL PLLP**

 s/ John M. Baker
John M. Baker, Reg. No. 0174403
Katherine M. Swenson, Reg. No.
0389280
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
jbaker@greeneespel.com
kswenson@greeneespel.com
(612) 373-0830

*Attorneys for Defendant City of Lino
Lakes*