## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Zikar Holdings LLC, Jameel Ahmed, and
Faraaz Mohammed,

      Plaintiffs,

v.

Michael Ruhland, Christopher Lyden, and
City of Lino Lakes,

      Defendants.

File No. 24-CV-03721 (JMB/SGE)

**ORDER**

---

Samuel W. Diehl and Christopher R. Johnson, CrossCastle PLLC, Minneapolis, MN; and Matthew S. Duffy, Monroe Moxness Berg PA, Minneapolis, MN, for Plaintiffs Zikar Holdings LLC, Jameel Ahmed, and Faraaz Mohammed.

Jason J. Kuboushek and Andrew A. Wolf, Iverson Reuvers, LLC, Bloomington, MN, for Defendant Michael Ruhland.

James J. Thomson and Michelle E. Weinberg, Kennedy & Graven, Chartered, Minneapolis, MN, for Defendant Christopher Lyden.

John M. Baker and Katherine M. Swenson, Greene Espel PLLP, Minneapolis, MN, for Defendant City of Lino Lakes.

---

     This matter is before the Court on Plaintiffs Zikar Holdings LLC's (Zikar), Jameel Ahmed's, and Faraaz Mohammed's (together, Plaintiffs) motion for a preliminary injunction. (Doc. No. 10.) In this action, Plaintiffs allege that Defendant City of Lino Lakes (City) and two of its City Council members, Defendants Michael Ruhland and Christopher Lyden, enacted a one-year moratorium on development in a discrete area of the City where Plaintiffs had proposed to build a residential development that would include a masjid (mosque), and that they did so because of their discriminatory animus

toward Islam and Muslims.  Plaintiffs assert that, in doing so, Defendants have violated the Fair Housing Act (FHA), the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA).  In their motion for a preliminary injunction, Plaintiffs ask the Court to enjoin the City from enforcing the moratorium, among other things.  As discussed below, the Court denies the motion because Plaintiffs have not shown that they will be irreparably harmed in the absence of an injunction.

## BACKGROUND

### A.    The Robinson and Pulte/Del Webb Properties

Lino Lakes is a suburban city located in Anoka County, Minnesota.  At issue in this lawsuit are several parcels of land in the city's northwest corner, specifically, property adjacent to Main Street (which runs east-west) between Sunset Avenue and 4th Avenue (both of which run north-south).  Plaintiffs are primarily concerned with the parcels located on the south side of Main Street (Robinson Property).  (*See* Doc. No. 9 [hereinafter, "Am. Compl."]; Doc. No. 17-1 at 4.)  Also relevant to the parties' dispute are the parcels on the north side of Main Street (Pulte/Del Webb Property).  (*See* Doc. No. 29-13.)  All of these parcels are currently zoned for agricultural and rural residential use.  *See 2040 Comprehensive Plan*, City of Lino Lakes [hereinafter, "2040 Plan"] at 2-17, https://linolakes.us/184/2040-Comprehensive-Plan [https://perma.cc/4URQ-UKGF].

The City's 2040 Comprehensive Plan (2040 Plan) re-envisioned the future of the city's northwest corner.  *See* 2040 Plan at Part 3.  The 2040 Plan identifies the area around Main Street (i.e., the street running between the Pulte/Del Webb and Robinson Properties)

as a "gateway" district given its position as an entry point to the City. *Id.* at 3-24, 3-25. As such, the City has additional development aspirations for this area, as follows:

> Opportunity exists to redevelop both underutilized property and outdated land uses. A *master planning study should be prepared of the area* to examine existing land use, future land use compatibility, right-of-way needs, access management, stormwater management, and other appropriate uses.

*Id.* at 3-24 (emphasis added). Outside of the immediate "gateway" area, the 2040 Plan also notes that master planning is needed for the entire corridor "between Sunset Avenue and 4th Avenue." *Id.* The completion of master plans for the city's planning districts is noted as a "Medium"-level priority. *Id.* at 12-3.

The 2040 Plan gives the parcels comprising the Robinson Property and Pulte/Del Webb Property "multiple [future] land use designations," including low-, medium-, and high-density housing, as well as planned residential/commercial use, which together "create[s] somewhat of a checkerboard patterned look." (Doc. No. 17-1 at 5.) The 2040 Plan advises that master planning will ensure that this patchwork of land-use designations are developed in a cohesive manner. *See* 2040 Plan at 3-24.

### B.    Recent Interest in Developing the Robinson Property

In late 2021, Integrate Properties, LLC (IP), a property developer with no known religious affiliation, sought to develop the Robinson Property into a residential community comprising more than 700 housing units. (Doc. No. 17-1 at 1, 17.) IP submitted a Planned Unit Development (PUD) Concept Plan[1] to city planning staff. (*See id.* at 1.) The City

---

[1] A PUD is "[a]n area to be planned and developed as a single entity containing one or more residential clusters or planned residential developments and/or one or more public,

considered and reviewed this PUD Concept Plan from January 2022 through October 2022. (*See* Doc. Nos. 17-1–17-9.)   During this review period, Michael Grochala, the City's Community Development Director, sent a staff report to the City Council to recommend that the City fund a master plan for the gateway locations in the City, especially the gateway area implicated in IP's PUD Concept Plan.  (Doc. No. 17-6.)  Grochala reminded the City Council that the 2040 Plan had identified the development of design guidelines for gateway areas as a "short term action (1–5 years)," and that the completion of master plans is "in the medium priority category."  (*Id.* at 2.)  Ultimately, however, IP never pursued its development further than the PUD Concept Plan stage, the Robinson Property again became available for development, and master planning did not occur.  (Am. Compl. ¶ 53; Doc. No. 30 ¶ 8.)

Next, Ahmed and Mohammed took an interest in developing the Robinson Property. (Doc. No. 30 ¶ 6.)  Ahmed and Mohammed are Muslims who worship at a masjid in nearby Blaine, a suburban city directly adjacent to Lino Lakes.  (Am. Compl. ¶ 55.)  Ahmed's and

---

quasi-public, commercial or industrial areas."  Lino Lakes Code § 1007.001(2).  A "PUD [C]oncept [P]lan provides an opportunity for the applicant to submit an application and plan to the city showing the basic intent and the general nature of the entire development before incurring substantial cost."  *Id.* § 1007.024(9)(b)(1).  The City's Community Development Department forwards a PUD Concept Plan to the city's several advisory boards and full City Council for "their informal review and comment on the project's consistency with the City's Comprehensive Plan and development regulations" at otherwise regularly scheduled meetings.  *Id.* § 1007.024(9)(b)(3).  Eventually, the applicant will submit a PUD Preliminary Plan to "provide a master plan of the entire development upon which the Planning and Zoning Board will base its recommendation to the City Council," and "serve[] as a complete and permanent public record of the entire PUD and the manner in which it is to be developed."  *Id.* § 1007.024(9)(c)(1).

Mohammed's masjid in Blaine had more worshippers than capacity, and its services were regularly crowded. (*Id.* ¶¶ 56–58.) According to certain Islamic hadiths to which Ahmed and Mohammed subscribe, Muslims receive spiritual blessings if they are able to walk to their place of worship. (*Id.* ¶ 59.) Ahmed and Mohammed wished to develop a community that would permit Muslim community members to walk to their place of worship. (*Id.* ¶¶ 60–63.) In furtherance of this idea, they formed Zikar Holdings, LLC (Zikar). (*Id.* ¶ 65.) In late 2023, Plaintiffs identified the Robinson Property as a workable location for their contemplated residential development, which they would call "Madinah Lakes." (*Id.* ¶¶ 62, 65, 67; Doc. No. 30 ¶ 6.)

### C.   In 2024, the City Council Considers Two Developments in the Main Street Gateway District

In January 2024, a developer, Pulte Homes, contacted the City's planning staff about their interest in developing the Pulte/Del Webb Property. (Doc. No. 30 ¶ 6.) The following month, Pulte Homes delivered a presentation during a City Council work session, during which they outlined a potential 637-lot residential project. (Doc. No. 29-16; Doc. No. 29-13.)

Then, in March, Zikar met with Larsen and Grochala to discuss Zikar's potential Madinah Lakes development on the Robinson Property. (Am. Compl. ¶ 76.) Zikar contemplated a several-hundred-unit residential development. During the meeting, both Larsen and Grochala provided Zikar with helpful input and raised no concerns about the project. (*Id.* ¶ 77.) Around that same time, on March 17, Zikar posted a promotional video on its website about its desired development. (*Id.* ¶ 78.) Many Lino Lakes residents

learned about the video and some had concerns about Madinah Lakes, specifically its affiliation with Islam, and a group formed online in opposition to it. (*Id.* ¶¶ 79–80.) Within days, City staff had received calls and messages from numerous constituents who were concerned about or opposed to Madinah Lakes. (*Id.* ¶ 81.)

On March 25, City Councilmember Ruhland placed a request to add an item to the City's agenda for its April 1 work session regarding "[w]ater capacity with major new development." (Doc. No. 9-4 at 2.) In the request, Ruhland expressed concern that, given then-ongoing litigation with a neighboring suburban city,[2] the city's water infrastructure would be unable to serve the new residential developments proposed by "several developers." (*Id.* at 2–3.) Ruhland recommended that the City consider "a moratorium on residential development until we've had an opportunity to see what our future capacity of water is, and what our currently stressed infrastructure can sustain." (*Id.* at 3.) That evening, after a City Council meeting during which members of the public spoke out in opposition to Madinah Lakes, Mayor Rob Rafferty called Mohammed by phone. (Am. Compl. ¶¶ 104–07.) The Mayor informed Mohammed that he and council members were

---

[2] Ruhland was referring to *In the Matter of Amendments to Various Water Appropriation Permits*, OAH No. 8-2002-37733, which involved "the appropriateness of amendments made by the Commissioner of Natural Resources to water appropriation permits held by municipalities neighboring White Bear Lake." *Id.* (May 16, 2024) (order on evidentiary hearings that occurred in October and December 2023). The ruling issued on May 16, 2024. *See id.* In it, an Administrative Law Judge ultimately ruled that White Bear Lake's ban on groundwater use by neighboring cities was "arbitrary and capricious." *See id.* This ruling has been appealed and is currently pending before the Minnesota Court of Appeals. *See In the Matter of Amendments to Various Water Appropriation Permits*, Nos. A24-0943 (Minn. App. June 21, 2024) (consolidating appeals A24-0943, -0958, -0959, -0960, and -0976).

buried in phone calls from residents and asked that Zikar take down the video about Madinah Lakes from their website.  (*Id.* ¶ 106.)  Zikar did.  (*Id.* ¶ 107.)

In April, Zikar entered into a written purchase agreement to purchase the Robinson Property, subject to certain "contingencies."  (*Id.* ¶ 74; Doc. No. 17 ¶ 2.)  Zikar also submitted its PUD Concept Plan for Madinah Lakes to city planning staff.  (Am. Compl. ¶ 114.)  Zikar received some preliminary feedback on its PUD Concept Plan in late May. (*Id.* ¶ 119.)  City planning staff informed Zikar that the full City Council would review and comment on the PUD Concept Plan by July 1.  (*Id.* ¶ 115.)

Meanwhile, opposition to Madinah Lakes continued to coalesce online.  In various spaces on Facebook, Lino Lakes residents and others posted about their fears of a Muslim community rooting in Lino Lakes.  The flavor of the discourse in the group was negative toward Muslims.  Example posts are as follows: comparing Minnesota's Muslim community to the "Waco Branch Davidians, the Rajneeshee compound in Oregon, Jonestown, [t]he Manson Family, all [of which] had goals take over not assimilate!"  (Doc. No. 17-12 at 4); expressing concern that Muslims should develop elsewhere for an "eas[ier] connection for all of their culture in Minneapolis that will no doubt come along with this development" (*id.* at 16); suggesting that "[e]veryone around that Muslim city should get pigs" (*id.* at 8); announcing that "I am NOT AFRAID TO SAY I don't trust anything or anyone involved in this Muslim-centric ideology in my backyard.  PERIOD."  (*Id.* at 18.) Opponents to Madinah Lakes attended and spoke at City Council meetings during which the Madinah Lakes development was not on the agenda.  (Am. Compl. ¶¶ 120, 121, 122, 127.)

On July 1, the City was supposed to consider the PUD Concept Plan. (*Id.* ¶ 133.) However, the City Council resolved to table discussion on it until after a final decision on Ruhland's proposed moratorium had been made. (*Id.* ¶ 135.) Then, on July 8, the Moratorium came before the full City Council for a vote. (*Id.* ¶ 137.) The meeting included a lengthy public comment period, during which opponents and proponents of Madinah Lakes spoke. (*See* Doc. No. 9-5 at 1–9.) During discussion on the Moratorium, the Mayor suggested that, by creating Madinah Lakes, Plaintiffs intended to create a community for Muslims separate from greater Lino Lakes, and that "Lino Lakes is about establishing neighborhoods, not communities." (Am. Compl. ¶ 137(A).) Lyden, who supported the Moratorium, made negative comments about proponents of Madinah Lakes, many of whom were not native English speakers: "[O]ur city name is not pronounced Lean-o-Lakes. It's Line-o-Lakes and it's been that way for a long time." (*Id.* ¶ 137(B).) Lyden also directed comments toward the Council on American-Islamic Relations (CAIR), which had turned out to support Plaintiffs at City Council meetings:

> They're about talking about improving their image, about creating mutual understandings, that they want to promote justice, they talk about religious discrimination, they talk about hate crimes, talk about religious freedom, but they make no mention of the October 7th attack on Israel. It's important that you take responsibility and accountability in life. If you're worried about your image, CAIR maybe needs to take a hard look in the mirror.

(*Id.*) Ultimately, the Moratorium passed by a vote of 4-1. (*Id.* ¶ 139.)

As passed, the Moratorium was to last one year, unless extended by the City.  (Doc. No. 9-6 §§ 3, 4.)   The City Council made the following findings in support of the Moratorium:

> (1) Main Street at Sunset Avenue (CR 53) is identified as a "gateway" in the City's 2040 Comprehensive Plan.
>
> (2) The City's 2040 Comprehensive Plan recommends the preparation of a Master Plan for the Main Street corridor between 4th Avenue and Sunset Avenue (CR 53).  No such plan presently exists.
>
> (3) The City has been presented with two development proposals within the [covered] area that total 400 acres with approximately 900 new lots for residential use.
>
> (4) A moratorium will provide the City with time to study and work towards preparation of a Master Plan for the [covered] area that will address land uses, transportation, environmental resources preservation, parks, surface waters, and utility issues. A moratorium also presents the possibility of conducting an Alternative Urban Areawide Review (AUAR) environment study for the area.

(*Id.* § 2.)  In short, the City Council imposed the Moratorium in order to complete the master planning contemplated by the 2040 Plan.

Then, approximately one month later, Lyden was copied on an email to the author of a *New York Times* article about the tension between the City and its residents and Plaintiffs, from a person who identified himself as "Sean, USA (college-educated white)." (Doc. No. 9-8 at 1.)  The email can be characterized as a multi-page meandering invective of Islam and Muslims that concludes by wishing "[g]ood luck halting the Muslim conquest of Minnesota!"  (*See* Doc. No. 9-8.)  Lyden responded as follows: "Might be the best email I have ever received!  Thank you Sir!"  (*See id.* at 2.)  The City Council voted to censure

Lyden on grounds that Lyden's reply email "could be interpreted by some as endorsing the views and opinions expressed in the email." (Doc. No. 9-9; Am. Compl. ¶ 161.) Ruhland was the only councilmember who voted against the censure. (Am. Compl. ¶ 161.)

**D.    This Action**

On October 16, 2024, Plaintiffs filed their five-count Amended Complaint. (*See* Doc. No. 9.) In it, they allege that Defendants enacted the Moratorium to preclude the City Council's consideration of Plaintiffs' proposed development on the Robinson Property. They assert that this conduct violated the Fair Housing Act's (FHA) prohibition against discrimination on the basis of religion, the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA).

**ANALYSIS**

Plaintiffs now move for a preliminary injunction. (Doc. No. 10.) Specifically, Plaintiffs ask that the City be enjoined from the following three actions: (1) enforcing the Moratorium or any similar measure that is intended to prevent Plaintiffs from submitting further development applications; (2) requiring Plaintiffs to undertake any action that is not neutral or generally applicable as a condition of further approval; and (3) subjecting Plaintiffs to any condition or requirement that is discretionary and not clearly enumerated in the 2040 Plan, Zoning Ordinance, or other city ordinance on March 1, 2024.[3] (*See* Doc.

---

[3] In their moving papers, Plaintiffs also asked the Court to enjoin Ruhland and Lyden from participating in any City Council deliberations on future development proposals. (Doc. No. 18 at 4 ¶ 2.) However, at the hearing, Plaintiffs withdrew this request.

No. 18 at 3–4.)  Plaintiffs have not carried their burden to establish that the applicable factors favor granting the motion.

When considering whether to grant a motion for a preliminary injunction, the Court considers four factors: (1) "the threat of irreparable harm to the movant;" (2) "the probability that movant will succeed on the merits;" (3) "the state of balance between this harm [to the movant] and the injury that granting the injunction will inflict on other parties litigant;" and (4) "the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  Generally, no one factor is determinative, and the Court "should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quotation omitted).  The burden of establishing every factor belongs to the movants—here, Plaintiffs. *E.g.*, *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## A.    Irreparable Harm

The Court first considers whether Plaintiffs would suffer irreparable harm if an injunction does not issue.  *Dataphase*, 640 F.3d at 114.  For the reasons noted below, the Court concludes that this factor strongly favors denial of the motion.

The individual Plaintiffs and Zikar frame their asserted irreparable harm separately. First, Ahmed and Mohammed argue that, if the Moratorium is not enjoined, their right to freely exercise their religion will continue to be violated, and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (Doc. No. 15 at 31 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1974)).)

However, as discussed *infra* Part B.i, the Court disagrees that, on the record before the Court on this motion, Mohammed's and Ahmed's rights to freely exercise their religion have been impinged. Plaintiffs have thus not shown that Ahmed and Mohammed will be irreparably harmed if the Court does not grant their motion.

Next, Zikar asserts that, "[i]f the Moratorium is not enjoined, Zikar risks losing the opportunity to purchase the Robinson Property for good" because "[i]ts purchase agreement expires long before the expiration of the Moratorium." (Doc. No. 15 at 32; *see also* Doc. No. 17 ¶ 2 ("If the Moratorium is not enjoined Zikar will likely lose its opportunity to purchase the Robinson Property.").) According to Plaintiffs, "the loss of a particular piece of real property constitutes irreparable harm," which money cannot adequately compensate. (Doc. No. 15 at 32 (citing *Minn. Vikings Football Stadium, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 193 F. Supp. 3d 1002, 1016 (D. Minn. 2016)).)

The primary problem for Plaintiffs here is one of foundation. Plaintiffs have told the Court—but have not shown—that the purchase agreement between Zikar and the Robinson Property's owners "expires long before the expiration of the Moratorium." (Doc. No. 15 at 32.) At most, Plaintiffs' attorney, Sam Diehl, stated the following about the purchase agreement in a supporting declaration:

> In April 2024, Zikar executed a purchase agreement to buy the Robinson Property, subject to certain contingencies. The City of Lino Lakes' . . . Moratorium pre-vents [sic] Zikar from applying for the approvals it needs in order to close on this purchase. In addition, Zikar's purchase agreement, and its right to purchase the Robinson Property, will expire long before the conclusion of the Moratorium.

(Doc. No. 17 ¶ 2.) Although Diehl states that the Declaration is "based on [his] personal

knowledge" (*id.* ¶ 1), he does not aver that he has ever reviewed or read any relevant provision of the purchase agreement. As a result, the representations he makes about its terms lack foundation. *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995) ("Affidavits asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge."). Further, the Court cannot determine for itself what the purchase agreement says because it has not been placed in the record, neither in whole nor in part, by Plaintiffs.[4] (*See* Doc. No. 17.)

Further, the Court observes that Zikar does not frame the threat of irreparable harm in concrete terms. Instead, it describes the potential irreparable harm as a "likely los[t]" opportunity or a "risk[ed] los[s]." (Doc. No. 15 at 32; Doc. No. 17 ¶ 2.)

This being the case, Zikar's irreparable-harm argument is a conclusion based on counsel's mere *ipse dixit* about what a contract says. However, the Court does not grant

---

[4] The Court acknowledges that, in the Verified Complaint, Mohammed mentions the purchase agreement. Though he presumably has adequate foundation to describe its terms, he does not. He describes the purchase agreement as follows:

> In March 2024, Zikar agreed to buy the Robinson Property from its owners, contingent on obtaining any necessary City or other government approvals for Zikar's proposed development among other potential contingencies. The parties executed a written purchase agreement in April 2024 memorializing their agreed terms.

(Am. Compl. ¶ 74.) No part of the purchase agreement is attached to or otherwise described in the Complaint. (*See* Am. Compl.) No other portion of the record contains any specific explanation of what "other government approvals" or "other potential contingencies" were contemplated in the purchase agreement, much less any indication whether or not these other contingencies and conditions have been or can be satisfied.

injunctive relief on the say-so of counsel—instead, "[t]o secure preliminary relief, a plaintiff must do more than raise, *ipse dixit*, that possibility [of irreparable harm]; he must concretely demonstrate it." *Vision-Ease Lens, Inc. v. Essilor Int'l SA*, 322 F. Supp. 2d 991, 998 (D. Minn. 2004) (denying injunctive relief where irreparable-harm argument was supported only by conclusory averments in affidavit that was "larded with qualifiers" such as "could" and "most likely"). Plaintiffs have simply not provided the Court with any proof that they would indeed lose an opportunity they otherwise would not absent an injunction.

Moreover, based on the limited description of the purchase agreement provided by Mohammed (who the Court assumes has requisite foundation to make), the Court can discern that the purchase agreement was subject to certain conditions precedent. According to Mohammed, the purchase agreement was "contingent on [Zikar] obtaining any necessary City or government approvals." (Am. Compl. ¶ 74.) The Court observes that Plaintiffs have not provided the Court with any proof that Zikar had satisfied or was surely poised to satisfy those conditions precedent generally, let alone before any deadline that may or may not be set forth in the purchase agreement. Indeed, at oral argument on this motion, Plaintiffs' counsel argued that Zikar was "not seeking automatic approval" of any application before the City Council. Counsel's argument, therefore, indicates that Zikar has not been affected by the Moratorium at this stage of the proposed development. Plaintiff's argument amounts to mere speculation concerning theoretical future loss, and on the record presented, the Court concludes that the irreparable-harm factor weighs resolutely against granting the requested injunctive relief.

**B.     Success on the Merits**

The next *Dataphase* factor requires the Court to inquire into the "probability that movant will succeed on the merits." *Dataphase*, 640 F.3d at 114.  For the reasons noted below, this factor is neutral.

Ordinarily, a movant satisfies the success-on-the-merits factor by showing that they have a "fair chance" at prevailing on their claims, which is "something less than fifty percent." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (en banc).  However, when a motion is for the injunction of a statute or ordinance, a "more rigorous threshold showing" is required because legislation is deemed to be the result of "reasoned democratic processes," and, therefore, it is "entitled to a higher degree of deference and should not be enjoined lightly." *Id.* at 730, 732 (quotation omitted); *see also, e.g.*, *Doe 1 v. City of Apple Valley*, 487 F. Supp. 3d 761, 767 (D. Minn. 2020) (applying heightened *Rounds* standard on motion to enjoin city ordinance).

The Eighth Circuit advises that, when deciding whether to apply the heightened *Rounds* standard, courts must "evaluate whether the full play of the democratic process was involved in the [legislative] actions." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019) (cleaned up).  Plaintiffs do not address the City's assertion that a heightened showing is required on the probability-of-success factor. (*See* Doc. Nos. 15, 31.)  Further, aside from their overarching arguments that the two defendant council members acted with animus toward Muslims, Plaintiffs make no express argument why the Court should not presume that the Moratorium was not the result of the

full City Council's "reasoned democratic process" such that the heightened *Rounds* standard should not apply. (*See* Doc. No. 15 at 21–31.)

Therefore, the Court's inquiry on the first *Dataphase* factor is whether Plaintiffs are *likely* to succeed on the merits of their disparate-treatment claim under the FHA and their Free Exercise claim[5] against the City.[6]

### i.    Free Exercise Clause

Plaintiffs argue that they will likely succeed on the merits of their Free Exercise claim. (Doc. No. 15 at 28–30.) According to Plaintiffs, the City violated their rights to freely exercise their religion because the Moratorium "is quite literally gerrymandered to affect only a development proposed by Muslims." (*See id.* at 29.)

The U.S. Supreme Court advises that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law

---

[5] Upon careful review of Plaintiffs' arguments in their briefing and at oral argument, the Court discerns that the merits of only these two claims—Counts I and III—are at issue in this motion, and not the RLUIPA, Equal Protection Clause, or disparate-impact FHA claims.

[6] It is not clear to the Court whether, by withdrawing their requested relief related to Lyden and Ruhland, *see supra* footnote 3, Plaintiffs also withdrew their arguments that they are likely to succeed on the merits of their claims as against those Defendants. The Court assumes so. However, to the extent Plaintiffs intended to persist in arguing the likelihood of success of its claims against Lyden and Ruhland, the Court expresses its concern about the viability of these claims in light of the long-held doctrine that legislators, when acting within the scope of their duties, are "absolutely immune from liability" for section 1983 claims. *Bogan v. Scott-Harris*, 523 U.S. 44, 48 (1998); *Supreme Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732–33 (1980) (providing that legislative immunity applies to both claims for monetary damages and injunctive relief). Plaintiffs offer no argument concerning legislative immunity, and absent some convincing argument to the contrary, the Court concludes that Plaintiffs are unlikely to succeed in these claims.

has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Said conversely, a government action is reviewed under strict scrutiny only if it "places a substantial burden on the practice of a religious belief," and is not "neutral and generally applicable." *Church v. City of St. Michael*, 205 F. Supp. 3d 1014, 1041 (D. Minn. 2016) (quoting *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008), and *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008)).

A "substantial burden" is one that "place[s] significant pressure on a plaintiff to forego religious precepts or to engage in religious conduct." *City of St. Michael*, 205 F. Supp.3d at 1042. Importantly, "a religious plaintiff's inability to locate its premises in a particular location, without more, does not establish a constitutionally recognizable burden on free exercise." *Id.* (concluding ordinance that banned "[a]ssembly, religious institution, house of worship" in business district did not impose substantial burden on plaintiffs' congregation members' ability to practice their religion because it "merely prevents the [plaintiff] from using a specific property for religious worship"); *see also Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 274 & n.17 (3d Cir. 2007) (collecting cases); *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F. Supp. 2d 961, 986 (N.D. Ill. 2003) (same); *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 472 (8th Cir. 1991) (concluding zoning ordinance that permitted only commercial and retail uses in central business district did not substantially burden church plaintiff's free exercise of their religion because the ordinance "has no impact on

religious belief and should not be construed as directly regulating religious-based conduct").

Here, Plaintiffs are likely to show that the Moratorium might have delayed Plaintiffs' ability to build a place of worship and potential future residences near it in the northwest corner of Lino Lakes. The language of the Moratorium, however, places no permanent restrictions on Plaintiff's ability to build anything and, perhaps more importantly, it places no restriction on Plaintiff's ability to seek development of a mosque elsewhere in the City or to worship elsewhere in the City. Plaintiffs have therefore not shown that they are likely to prove the Moratorium was a "substantial burden" on their ability to practice Islam. Further, although Plaintiffs assert that the Moratorium was motivated by anti-Muslim animus because the City did not pass the Moratorium when IP was interested in developing the Robinson Property, Plaintiffs have not shown that they are likely to prove this assertion at trial. On its face, the Moratorium applies to *all* development in the covered area, not just development relating to a religious group and not just development proposed by Muslim developers. (*See* Doc. No. 9-6.) Moreover, at the time the Moratorium passed, two developers had expressed interest[7] in developing parcels in the covered area: one with a religious affiliation (Zikar) and one without (Pulte Homes).

---

[7] Plaintiffs make the point that Zikar was the only developer that had a PUD Concept Plan before city planning staff at the time of the Moratorium and that Pulte had not taken such a step. However, the record before the Court on this motion shows that Pulte had land under contract at the time the Moratorium issued and had not withdrawn its interest in developing the Pulte/Del Webb Property. (*See* Doc. No. 29-14.)

The Moratorium—both on its face and as applied—impacts both projects. Therefore, Plaintiffs have not shown a likelihood of success on their Free Exercise claim.

### ii.    *Fair Housing Act*

Plaintiffs argue that the City also violated the FHA when it implemented the Moratorium. The Court denies the motion because, based on the preliminary record presented to the Court at this time, Plaintiffs are not likely to succeed on their claim that the City violated the FHA.

The FHA prohibits municipalities from either blocking or impeding the provision of housing on the basis of religion, among other protected traits.[8] *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010) (citing 42 U.S.C. § 3604(a)–(b)). The framework that courts use to assess the merits of FHA discrimination claims depends on which of the four types of FHA violations is being raised: direct-evidence disparate treatment discrimination, indirect-evidence disparate treatment discrimination, disparate impact discrimination, or failure to accommodate. *Id.* at 831–34 (listing elements of both types of disparate treatment discrimination claims and of a disparate impact claim). Thus, the Court must first determine what type of claim or claims are at issue here.

Plaintiffs' argument is unclear. Spanning only two paragraphs, Plaintiffs' written argument concerning the merits of its FHA claim does not explain whether Plaintiffs are

---

[8] The parties appear to agree that the circumstances giving rise to this lawsuit—i.e., city staff deferring review of Zikar's PUD Concept Plan—fall into the FHA's purview. For that reason, and for the purpose of resolving the parties' arguments in this motion, the Court assumes without deciding that the FHA applies to the facts in this case.

proceeding on a claim of direct-evidence or indirect-evidence discrimination and intermittently mixes concepts and cases applying to these two distinct types of claims. (*See* Doc. No. 15 at 30–31.) In addition, the Amended Complaint repeatedly references "the pretextual moratorium" and "pretextual reasons" (*see* Compl. ¶¶ 6, 9, 95, 103, 124, 158), indicating that Plaintiffs raise an indirect-evidence disparate treatment claim, not a direct-evidence disparate treatment claim. Given the prevalence of the references to pretext in the Amended Complaint, the Court concludes that Plaintiffs are seeking injunctive relief based on only a theory of indirect-evidence disparate treatment discrimination.

Likewise, although the Amended Complaint includes a claim of FHA disparate impact discrimination in Count II, nowhere in the written submissions in support of the preliminary injunction motion do Plaintiffs argue likelihood of success under a disparate impact theory. Instead, Plaintiffs' written submissions focus on proof of discriminatory intent, which is not necessary under a theory of disparate impact. *See, e.g.*, *Gallagher*, 619 F.3d at 833–34 (explaining the primary theoretical difference between disparate treatment and disparate impact claims is proof of discriminatory intent). Given the focus of the arguments presented by Plaintiffs on discriminatory intent, the Court concludes that Plaintiffs do not request injunctive relief on the basis of their allegations of disparate impact discrimination under the FHA.

The Court applies the familiar *McDonnell Douglas* burden-shifting framework to indirect-evidence disparate treatment claims. *Gallagher*, 619 F.3d at 831–32. To succeed on such a claim, Plaintiffs bear an initial burden to make a prima facie showing that the City treated IP more favorably than it did Zikar. The City then bears a burden to articulate

a legitimate and non-discriminatory reason for their actions. *See Jones v. City of Faribault*, No. 18-CV-1643 (JRT/HB), 2021 WL 1192466, at *15 (D. Minn. Feb. 18, 2021). Finally, Plaintiffs bear the ultimate burden to establish that the City's proffered nondiscriminatory reason for enacting the Moratorium was a pretext for intentional discrimination against Muslims. *See id.*

Assuming without deciding that Plaintiffs have shown they are likely to make a prima facie case of disparate treatment discrimination, and that the City is likely to carry its burden to identify a nondiscriminatory reason for the Moratorium, the Court proceeds to assess the final step in the burden shifting framework to determine whether Plaintiffs are likely to succeed on the merits of their FHA disparate treatment claim.

On the record before the Court on this motion, a factfinder would be presented with the following evidence: Ruhland admitted that he did not think of proposing a moratorium on development in the City's northwest corner until after Zikar posted its promotional video about Madinah Lakes (Am. Compl. ¶ 131); Lyden openly criticized the way non-native-English-speaking proponents of the Madinah Lakes project pronounced "Lino Lakes" and suggested that, given the events on October 7, 2023 in Israel, Muslims in general are not community-oriented people (Doc. No. 9-5 at 12–13); Lyden expressed his enthusiastic approval and endorsement of an email that expressed vituperative and disparaging views of Islam and all Muslim people (Doc. No. 9-8); Ruhland did not vote in favor of censuring Lyden for endorsing the email on grounds that Lyden was entitled to his opinion about the email (Doc. No. 9-9; Am. Compl. ¶ 161); the City Attorney informed the City Council that the Moratorium was not legally necessary to undertake master planning

(Doc. No. 9-5 at 12); the City Council was aware of strong public opposition to Madinah Lakes and even received into the record more than eighty-two pages of posts made on social media by their constituents regarding their negative views of Islam, Muslims, and immigrants (Am. Compl. ¶¶ 129, 131, 132; Doc. No. 17-12); the Mayor asked Zikar to remove its promotional video about Madinah Lakes due to the volume of public outcry against it (Am. Compl. ¶¶ 106, 107); the comments of members of the public, the Mayor, and Lyden at the July 8 City Council meeting (during which the City Council voted on the Moratorium) often centered on Madinah Lakes, not the merits of conducting master planning.  (Doc. No. 9-5 at 2–9.)

It is true that Plaintiffs may not rely on the motives of just two City council members to establish discriminatory animus on the part of a larger decision-making body.  *S. Wine & Spirits of Am. Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 808 (8th Cir. 2013) (concluding that one legislator's motive cannot be attributed to entire legislature and highest executive officer).  However, when those two council members comprise 40% of the City Council,[9] and when those council members' statements are combined with constituent complaints that are both "public and pervasive in nature," a factfinder could make a "reasonable inference that [discriminatory] animus was a widely held motive, or that the [challenged] Ordinance 'effectuate[d] the discriminatory designs of private

---

[9] The City Council of Lino Lakes comprises "an elected mayor and four city council members.  *City Council & Boards*, City of Lino Lakes, https://linolakes.us/164/City-Council-Boards [https://perma.cc/P5AE-UBVR].  The Court may take judicial notice of government websites.  *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016) (acknowledging authority to take judicial notice of government websites).

individuals.'"  *Jones*, 2021 WL 1192466, at *15 (quoting *U.S. v. City of Black Jack, Mo.*, 508 F.2d 1179, 1185 n.3 (8th Cir. 1974)).

On this evidence, the Court believes a reasonable juror could infer that the Moratorium was pretextual.  However, the evidence presented at this stage, prior to discovery, is not so strong that it satisfies the heightened *Rounds* standard.  The motives and beliefs of the council members, as well as the basis for the timing of the Moratorium decision remain unknown at this stage, and absent additional circumstantial evidence of discriminatory intent, a reasonable fact-finder could conclude that supporting the Moratorium reflected the importance of complying with the 2040 Plan and prudent infrastructure and resource planning.  Thus, the Court concludes that this factor is neutral, weighing neither in favor of nor against granting Plaintiffs' preliminary injunction motion.

### C.      Balance of Harms

For the third *Dataphase* factor, the Court weighs the potential harm not issuing the requested injunction would cause to Plaintiffs against the potential harm to the City if it did issue an injunction.  *Dataphase*, 640 F.3d at 114.  The Court has already concluded that Plaintiffs have not demonstrated that they will be harmed if the injunction does not issue. *See supra* Part A.  That being the case, the only harm on the Court's scale, if any, is the City's.  The City argues that an injunction would harm the City and the public because "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  (Doc. No. 28 at 40– 42 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012).)  This factor weighs slightly against issuing an injunction.

**D.    Public Interest**

The last *Dataphase* factor requires the Court to consider whether the requested relief is in the public's interest. *Dataphase*, 640 F.3d at 114. Plaintiffs argue that this factor tips in their favor because "it is always in the public interest to protection [sic] constitutional rights." (Doc. No. 15 at 33 (quoting *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008).) However, as discussed *supra* Part B.i, Plaintiffs have not identified a constitutional violation. Further, the City does not address this factor. (*See* Doc. No. 28.) This factor is neutral.

In conclusion, the balance of the *Dataphase* factors weigh against issuing the requested injunction. Therefore, Plaintiffs' motion will be denied.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Plaintiffs' motion for a preliminary injunction (Doc. No. 10) is DENIED.

Dated:  December 26, 2024                          /s/ *Jeffrey M. Bryan*
                                                   Judge Jeffrey M. Bryan
                                                   United States District Court